**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **No. 1:19-cr-59** |
| **v.** | ) | |
| | ) | **Hon. Liam O'Grady** |
| **DANIEL EVERETTE HALE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MOTION TO DISMISS THE INDICTMENT</u>

This case presents issues at the core of the First Amendment. Mr. Hale is being criminally prosecuted for, allegedly, assisting a journalist to publish information critical of our government that had been shielded from the public by official secrecy. Whatever the constitutional merits of such a prosecution – and those are addressed in this Motion – it is indisputable that this prosecution treads closely to freedoms that are essential to a free and democratic society.

The freedoms of speech and the press are enshrined in the most unambiguous language in the Constitution, which provides that "Congress shall make no law" abridging either. U.S. Const. amend. I. These freedoms require no less protection in the national security context than elsewhere, because "[t]he First Amendment interest in informed popular debate does not simply vanish at the invocation of the words 'national security.'" *United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson, J., concurring).

## **INTRODUCTION**

The Espionage Act was written a century ago, before modern First Amendment jurisprudence existed.  It is abundantly clear from the history of the Act that it was written with confidence that it would never be used to criminalize actions undertaken to inform the American public.  In recent years, however, it has morphed into a government-secrecy law used regularly for that very purpose.  And that is the problem: While Congress surely has the power to criminalize the possession and communication of information on national security grounds – and that is what the Act does: criminalize the possession and communication of information – the First Amendment requires that power to be exercised with precision.  Congress must narrowly tailor laws to achieve compelling government interests while infringing as little as possible on freedoms that form the bedrock of democracy.  But the Espionage Act – which comprises Chapter 37 of Title 18 of the United States Code (aptly named "Espionage and *Censorship*") – was not written with such precision in mind.

As the seminal scholarly article on the Espionage Act explains, the law was enacted just after the United States entered World War I, and "not drafted to reconcile the competing demands of national security and public debate about matters of prime political importance."  Harold Edgar & Benno C. Schmidt, Jr., *The Espionage Statutes and Publication of Defense Information*, 73 Colum. L. Rev. 929, 934 (1973) ("Edgar & Schmidt").  Moreover, the Act's language is muddy and imprecise, and "in many respects incomprehensible." *Id.*  On its face, for example, the Act criminalizes conduct that is unambiguously protected by the First

Amendment, such as a journalist's publication of information of vital public concern that presents no proximate or substantial danger of harming national security. *See, e.g.,* 18 U.S.C. § 793(e) (criminalizing the communication of national defense information by a person not entitled to have it). Yet, to this day, nobody knows if or to what extent journalists may be prosecuted for fulfilling their constitutionally-protected role of informing the public. *See Morison*, 844 F.2d at 1081 (members of the press "are not being, and *probably* could not be, prosecuted under the espionage statute") (Wilkinson, J., concurring) (emphasis added).[1] That is important here because, under the First Amendment overbreadth doctrine, statutes that have a substantial chilling effect on protected rights are void even if the offense before the Court could be prosecuted without offending the First Amendment.

Adding to the uncertainty, no court has ever decided whether or to what extent First Amendment protections exist under the Espionage Act. That is because the Executive Branch brought no prosecutions even touching on press freedoms – no attempts to prosecute either journalists who publish defense information or those who undertake the necessary acts for such journalism to occur – until recent decades. And only in the last decade have such prosecutions become commonplace, with prosecutions of "leakers" occurring regularly, and the first prosecution of a purported journalist under the Espionage Act now pending. Further adding to the confusion,

---

[1]     Contrary to Judge Wilkinson's supposition in *Morison*, numerous Justices in the Pentagon Papers litigation commented in dicta that journalists probably *could* be prosecuted under the Espionage Act, at least in certain circumstances. *See New York Times Co. v. United States*, 403 U.S. 713, 737-38, 752, 759 (1971).

the government's conduct and public statements long suggested that publication of information by the press was beyond the reach of the statute, but it clearly no longer holds that view:  At least one count in the Indictment in this case requires this Court to decide whether the act of publication by a journalist is criminal under the Espionage Act.  Specifically, Count One charges that Mr. Hale obtained the information with reason to believe that another person – presumably the reporter with whom he allegedly shared it – would possess or communicate the information in violation of the Espionage Act.  If that is the government's theory, it will require this Court to instruct a jury that a journalist's possession or publication of defense information is a crime.

In addition to the Espionage Act's facial overbreadth in exposing protected press activities to prosecution, the Act is also vague and overbroad with respect to the type of information it covers: Does the information disclosed genuinely endanger lives while adding little or no value to public discourse?  Or does it – as in the case of the Pentagon Papers and here – risk only an alleged and inchoate harm to national security while providing the factual basis for award-winning journalism on matters the government has obscured from public view?  The legislative history shows that such questions plainly concerned the Act's drafters.  But the statute they enacted does not even begin to answer them – because, history shows, they all thought it incomprehensible that the Act could or would ever be applied to anyone but spies and saboteurs (i.e., those who acted with an unambiguously anti-American animus).  As a result, the provisions of the Act at issue here do not require proof of nefarious intent

or proof that the information disclosed actually risked any substantial harm. Without such an element, the vagueness of the Act's language provides no mechanism to assure that the law actually addresses a compelling government interest with sufficient precision to permit a First Amendment prohibition.

The core evil occasioned by the Espionage Act's imprecise language and ambiguous reach is a chilling effect on constitutionally protected speech and press activity. If the First Amendment stands for anything, it must protect a journalist who publishes "secret" information critical of the government where the disclosure is important to public discourse and presents at most a low risk of minimal harm to national security. But the facial breadth and vague terms of the Espionage Act, even aided by a century of judicial interpretation, leave a journalist who publishes such information to wonder if he or she may be imprisoned. Such chilling is inimical to a healthy democracy. Indeed, James Madison, the chief drafter of the Constitution and Bill of Rights, described press freedom in existential terms: "A popular Government, without popular information, or a means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." 9 James Madison, Writings of James Madison 103 (Gaillard Hunt ed. 1910). Echoing Madison's warning, the Supreme Court was equally vivid in its concern a century and a half later:

> [The] concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the

> First Amendment. It would indeed be ironic if, in the name
> of national defense, we would sanction the subversion of
> one of those liberties . . . which makes the defense of the
> Nation worthwhile.

*United States v. Robel*, 389 U.S. 258, 264 (1967) (invalidating provision of national security statute on overbreadth grounds where it criminalized activity properly subject to regulation *and* activity protected by the First Amendment).[2]

All five charges in this case suffer from the same fatal defect recognized in *Robel:* even in the national security context, Congress must legislate within "the bounds imposed by the Constitution when First Amendment rights are at stake." *Id.* at 267. With respect to each of the charges in this case, it did not. Because the statutory provisions underlying each charge impermissibly chill protected First Amendment freedoms, they are facially invalid.

## FACTUAL AND PROCEDURAL BACKGROUND

Daniel Hale is charged in a five-count Superseding Indictment with: i) obtaining national defense information ("NDI") in violation of 18 U.S.C. § 793(c); ii) retention and transmission of NDI in violation of 18 U.S.C. § 793(e); iii) causing the communication of NDI in violation of 18 U.S.C. § 793(e); iv) disclosure of classified communication intelligence information in violation of 18 U.S.C. § 798(a)(3); and v) theft of government property having a value exceeding $1000 (i.e., the NDI and classified information at issue in the other counts) in violation of 18 U.S.C. § 641.

---

[2]    *See also* Potter Stewart, *Or of the Press*, 26 Hastings L.J. 631, 634 (1975) ("The primary purpose of the constitutional guarantee of a free press was . . . to create a fourth institution outside the Government as an additional check on the three official branches.")

According to the Indictment, the allegations against Mr. Hale arise from his enlistment in the United States Air Force and subsequent employment in the United States Intelligence Community as a contractor with the National Geospatial-Intelligence Agency (NGA).  Specifically, while employed as a contractor in 2013, Mr. Hale is alleged to have identified a reporter (referred to in the Indictment as "the Reporter," and commonly believed in media accounts to be Jeremy Scahill) who wanted Mr. Hale to "tell [his] story about working with drones."  Superseding Indictment ¶ 13.  Subsequently, from 2013 through 2014, Mr. Hale is alleged to have met with the reporter in person, and communicated with him or her by email, text message and instant messaging.  Then, between February and August of 2014, Mr. Hale is alleged to have printed from his NGA computer 23 documents (15 of which the Indictment describes as classified).  *Id.* ¶ 32.  Later, between August 2014 and December 2016, the reporter is alleged to have published 17 of those documents, including 11 alleged to be classified.  *Id.* ¶ 33.  Specifically, the reporter is alleged to have published them on what the Indictment refers to as the Reporter's Online News Outlet (commonly believed in media accounts to be *The Intercept*).

In 2016, Jeremy Scahill and *The Intercept* won the University of Florida Award for Investigative Data Journalism (small/medium newsroom category) for publishing *The Drone Papers.*[3]  That publication, in turn, led to calls for Congressional investigation and reform of the drone program due to allegations that the Obama

---

[3]      *See* https://awards.journalists.org/winners/2016/.   *The Drone Papers* is available at https://theintercept.com/drone-papers/ (last accessed Sep. 8, 2019).

administration misled the public by describing the program as highly selective and precise while hiding the fact it had resulted in a large number of indiscriminate killings. *See, e.g.,* Micah Zenko, *The Intercept's 'Drone Papers' Revelations Mandate a Congressional Investigation*, Foreign Policy (Oct. 15, 2015).[4]

The Indictment alleges that, at the time of the events in question, Mr. Hale had reason to believe that the unauthorized disclosure of any of the documents alleged in the Indictment to be marked Secret or Top Secret could be expected to cause serious damage (in the case of Secret information), or exceptionally grave damage (in the case of Top Secret information), to the national security of the United States. *See* Indictment ¶ 4. The Indictment does not allege that any damage to national security has ever resulted from Mr. Hale's alleged conduct.[5]

---

[4]    *Available at* https://foreignpolicy.com/2015/10/15/the-intercepts-drone-papers-revelations-mandate-a-congressional-investigation/ (last accessed Sep. 7, 2019).

[5]    One could question whether the phrase "exceptionally grave damage" constitutes proper usage, as Colonel Jessup in the movie *A Few Good Men* (1992) questioned the phrase "grave danger" ("Is there any other kind?"). But that is the language of the Executive Order governing classification. *See* Exec. Order No. 13526, 75 Fed. Reg. 1013 (Dec. 29, 2009). The Order leaves open the question of the appropriate classification for information which, if disclosed, might cause "grave," but not "exceptionally grave," damage to national security. In any event, despite that numerous documents at issue here are alleged to have been Top Secret – meaning their disclosure could be expected to cause the gravest of damage to national security (as opposed to ordinarily grave damage, which is presumably very serious) – it is odd that no actual damage to national security has been identified in the four to five years since the Indictment alleges they were published.

## STRUCTURE OF THE ESPIONAGE ACT

The Espionage Act, codified at 18 U.S.C. §§ 793-798, was enacted in June 1917,[6] two months after the United States' entry into World War I. In the century since, the two main provisions of the Act, now codified at §§ 793 & 794, "have remained almost unchanged," though they were amended in 1950 to include the present § 793(e) (charged here in Counts Two and Three). Edgar & Schmidt, 73 Colum. L. Rev. at 939, 942. The latter provision, § 794, is not implicated here. It represents a "far more serious offense" than a § 793 violation because it is the "classic spying" statute, which criminalizes the provision of defense information to a foreign government with reason to believe that the information is to be used to harm the United States or aid a foreign country. *Morison*, 844 F.2d at 1065. Section 793, on the other hand – which forms the basis for Counts One through Three – criminalizes acts of retention, disclosure and communication that do not involve foreign actors or knowledge that the information will be used to harm the United States. The two subsections charged in Counts One through Three are "sweeping, and make criminal receipt of material knowing that it has been obtained in violation of other espionage provisions . . . and retention of such information." Edgar & Schmidt, 73 Colum. L. Rev. at 938. One of the two subsections, § 793(e), requires "willful" conduct, while the other, § 793(c), does not.

The fourth Espionage Act charge in this case is a violation of § 798(a)(3), a provision enacted in 1950 "dealing only with the publication of information

---

[6]     *See* https://catalog.archives.gov/id/5721240.

concerning domestic codes and communications intelligence operations." Edgar & Schmidt, 73 Colum. L. Rev. at 942. Unlike § 793, this offense does not require a finding that the information constitutes NDI. Rather, § 798 makes it a crime to "willfully communicate[], furnish[], transmit[] or otherwise make available[]" certain categories of "classified information." On its face and according to the little precedent that exists, the statute lacks any mechanism for a court or factfinder to look behind the Executive Branch's determination that information is "classified." On its face, therefore, § 798 imposes strict liability for communicating certain information the Executive Branch classifies, even where the evidence demonstrates that disclosure of the information poses no danger to national security (because it is wrongly classified) and is greatly beneficial to public discourse.

All of the Espionage Act provisions at issue here – subsections of §§ 793 and 798 – were crafted by Congress into their present language in 1950, in the same legislation (in the case of § 793) or in closely related legislation (in the case of § 798) as the provision of the Subversive Activities Control Act of 1950 invalidated by the Supreme Court in *Robel*.[7] And the reason for invalidation in *Robel* is the same reason advocated here – overbreadth resulting in the chilling of protected First Amendment freedoms. As explained further in Argument Section I, *infra*, this ground of relief

---

[7]     *See* Edgar & Schmidt, 73 Colum. L. Rev. at 1064 n. 371 (§ 793 in its present form enacted in Internal Security Act of 1950, and § 798 in closely-related legislation around the same time); *see also* Internal Security Act of 1950, 64 Stat. 987 (available at https://www.loc.gov/law/help/statutes-at-large/81st-congress/session-2/c81s2ch1024.pdf) (enacting the provision of the Subversive Activities Control Act invalidated in *Robel* (p. 992) and the present § 793 (pp. 1003-05)).

turns not on whether the conduct charged in the case before the Court properly *could* be proscribed under the First Amendment, but on whether the statute's facial overbreadth creates a chilling effect that requires its invalidation regardless.

## HISTORICAL BACKGROUND

Because the Alien and Sedition Acts of 1798 existed at a time when the Supreme Court lacked jurisdiction over criminal cases – a power it gained only in 1891[8] – there was no relevant First Amendment jurisprudence to guide the Congress of 1917.  Indeed, there was extremely limited precedent from the Supreme Court on the First Amendment until the twentieth century.[9]  The 1917 and 1918 passage of the Espionage Act and Sedition Act, respectively, changed that.

The Sedition Act, which extended the Espionage Act during wartime to "profane, scurrilous, or abusive language about the form of government . . . or the Constitution . . . or the military or naval forces . . . or the flag of the United States," was enacted on May 16, 1918.[10]  The Supreme Court upheld the constitutionality of

---

[8]      *See* Federal Judicial Center, *Jurisdiction: Criminal*, available at https://www.fjc.gov/history/courts/jurisdiction-criminal (last visited Sep. 9, 2019).

[9]      *See* The Free Speech Center and the John Seigenthaler Chair of Excellence in First Amendment Studies, *First Amendment Timeline*, available at https://www.mtsu.edu/first-amendment/page/first-amendment-timeline (last visited Sep. 9, 2019) (the Supreme Court heard no more than twelve First Amendment cases in its first century, and heard its first freedom-of-the-press case in 1907, when it declined to address whether the states were subject to the First Amendment through the Fourteenth, and dismissed the question presented as "a matter of local law," *see Patterson v. Colorado*, 205 U.S. 454, 461-62 (1907)).

[10]      The text is available at http://www.legisworks.org/congress/65/publaw-150.pdf (last visited Sep. 9, 2019).

these censorship provisions in its famous cases *Schenck v. United States*, 249 U.S. 47, 52 (1919) (affirming a conviction for distribution of anti-draft pamphlets), and *Abrams v. United States*, 250 U.S. 616 (1919) (affirming convictions for speaking out against the government's involvement in World War I).  In *Schenck*, Justice Holmes (writing for the Court) announced the "clear and present danger" standard, which as modified by the "imminent lawless action" test in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), continues to be the standard for considering legislative prohibitions on activities otherwise protected by the First Amendment.  In other words, *Schenck* is largely confined to the specific context of World War I, and requires an examination of the "proximity and degree" of evils Congress may legitimately prevent – Holmes gave the example of "falsely shouting fire in a theatre" – in determining whether a First Amendment restriction may withstand scrutiny.  *Schenck*, 249 U.S. at 52.

The Sedition Act of 1918 – it should go without saying – evinces a Congressional understanding of the First Amendment that is drastically different than it is understood today.  Indeed, the Supreme Court in the last century has rejected the reasoning of *Schenck* and *Abrams* to the extent it justified the prosecution of political speech criticizing the government.  *See, e.g., Texas v. Johnson*, 491 U.S. 397 (1989) (burning American flag in protest is protected speech); *Snyder v. Phelps*, 562 U.S. 443, 452, 458 (2011) (speech of Westboro Baptist Church members is protected because, no matter how "offensive or disagreeable," "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection") (internal quotations and citation omitted).

But the Court has had no further occasion to address the issues raised by *Schenck* and *Abrams* because, in 1921, Congress let the Sedition Act of 1918 expire, while the Espionage Act lived on.  Since then, the Supreme Court has addressed the Espionage Act only once when, in 1941, it upheld §§ 793(b) and 794(a) – two provisions not at issue here – against a vagueness challenge. *See Gorin v. United States*, 312 U.S. 19, 27-28 (1941) (finding the offenses sufficiently definite to comport with due process because of "[t]he obvious delimiting words . . . requir[ing] those prosecuted to have acted in bad faith.").  The "delimiting words" identified in *Gorin* – requiring the defendant to have acted "with intent or reason to believe that the information . . . is to be used to the injury of the United States" or to aid a foreign nation – are entirely absent from the four Espionage Act provisions charged here.

While the legislative history of the Espionage Act is not a model of clarity, it firmly establishes that when Congress enacted the law in 1917, and when it amended it in 1950, it had the consistent understanding that the Act would not and could not apply to the type of conduct charged in this case.  That is, Congress repeatedly observed that the Act was intended to prohibit only spying, sabotage and like conduct, and not any activity of the press or any actions taken to inform the public of perceived government wrongdoing.[11]  In the 1917 Senate debate, for example, when an early version of § 793 was drafted without apparent regard for whether it could lead to such

---

[11]     *See* Edgar & Schmidt, 73 Colum. L. Rev. at 1077 (legislative history is "unquestionable" in establishing that the espionage statutes were not intended to "forbid acts of publication or conduct leading up to them, in the absence of additional and rarely present bad motives").

prosecutions, the Senate was "bombarded with newspaper-inspired protests, including a petition signed by a million citizens."[12]  The sponsors of the legislation responded with assurances that the Act was not intended to reach such conduct, and would never be so applied, with the Senator managing the bill assuring opponents that nobody "innocent of any intent to aid the enemy" would be prosecuted.[13]

The debate surrounding the 1950 legislation, in which the current version of § 793 was enacted, contained much stronger assurances that the Act was intended to criminalize only conduct undertaken with an intent to harm the United States. Senator McCarran, the sponsor of the bill, responded to concerns that § 793 might criminalize newsgathering by stating that "any suggestion of such a threat naturally concerns me greatly," and he therefore requested interpretations of the statutory language from the Legislative Reference Service and the Attorney General.[14]  The opinion of the former was that § 793 did not apply to newsgathering in the absence of "wrongful intent,"[15] while the Attorney General provided the Executive Branch's unequivocal assurance that the statute would never be applied in the absence of an intent to harm the United States:

> The history and application of the existing espionage statutes . . . together with the integrity of the three branches of the Government which enact, enforce, and apply the law, would indicate that nobody other than a spy,

---

[12]     *Id.* at 1013.

[13]     *Id.* at 993 (summarizing floor statements of Senator Overman).

[14]     *Id.* at 1025 (citing and quoting the Congressional Record).

[15]     *Id.*

saboteur, or other person who would weaken the internal
security of the Nation need have any fear of prosecution
under either existing law or the provisions of this bill.[16]

These assurances appear to have dampened any concern that the Espionage

Act would be used to stymie activities of the press or acts taken to inform public

discourse on matters of national concern.  Nonetheless, the American Newspaper

Association suggested a provision which, as included in the final introductory

language to the Internal Security Act of 1950, provided that "[n]othing in this Act

shall be construed to authorize, require, or establish military or civilian censorship

or in any way limit or infringe upon freedom of the press or of speech."[17]

In sum, after comprehensively reviewing the legislative history, Professors

Edgar and Schmidt concluded that the Espionage Act was "unquestionably" intended

to exclude from prosecution acts intended to inform the public through the press.[18]

But they also recognized that Congress's actions were routinely inconsistent with its

stated intent, because the statutory provisions themselves "are so sweeping as to be

absurd," resulting in ambiguities and overbreadth that "go well beyond tolerable

limits."[19]  Instead of narrowing the statutory language to achieve its stated intent,

Congress simply "said it was not so," because "[i]t did not realize that [the] literal

---

[16]    *Id.* at 1026 (quoting Attorney General's letter as entered into Congressional
Record).

[17]    *Id.* at 1026-27.

[18]    *Id.* at 1077.

[19]    *Id.* at 1031-32.

terms [of the Act] might apply to speech leading to public debate, or preliminary activities undertaken with that aim."[20]

In the ensuing decades, these tensions between the legislators' stated intent and the language they adopted faded into irrelevancy because the Executive was true to its word:  For almost the entire 20th century, prosecutions under the Espionage Act were limited to cases of spying and related conduct.  In its first 75 years, there were only three prosecutions under the Act premised on "leaking" to the media, the most famous being the failed prosecution of Daniel Ellsberg and Anthony Russo in connection with the Pentagon Papers.[21]  In the last decade, however, the federal government's use of the Espionage Act has expanded dramatically.  There have been 18 prosecutions of media sources since 2009.[22]  And, for the first time ever, the government has now charged a purported journalist, Julian Assange, for disseminating information in alleged violation of the Act.[23]  That will not, however, be the first case to test whether a journalist's publication of truthful information is a crime:  As already noted, Count One in the instant case appears to allege that Mr.

---

[20]     *Id.*

[21]     *See* Reporters Committee for Freedom of the Press, *Federal Cases Involving Unauthorized Disclosures to the News Media, 1778 to the Present*, available at https://www.rcfp.org/resources/leak-investigations-chart/ (last accessed Sep. 9, 2019).

[22]     *Id.*

[23]     E.D.Va. No. 1:18-cr-111 (CMH); *see* Charlie Savage, *Assange Indicted Under Espionage Act, Raising First Amendment Issues*, New York Times (May 23, 2019) (whether press may be prosecuted under the Espionage Act "has never been tested in court" because "until now the government has never brought such charges.")

Hale obtained documents with knowledge that the reporter would possess or use them in violation of the Act. At trial, this will require the Court to instruct a jury that a journalist commits a crime by possessing or publishing truthful information.

## **ARGUMENT**

I.  Each of the Espionage Act Counts Should be Dismissed Because They are Facially Overbroad and Chill Protected First Amendment Rights

### A. *The Overbreadth Doctrine Requires the Invalidation of Laws That Chill a Substantial Amount of First-Amendment-Protected Activity*

"In the First Amendment context . . . a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotations and citation omitted). This is an exception to the usual rule of standing, which provides that "a person to whom a statute may constitutionally be applied will not be heard to challenge the statute on the ground that it may conceivably be applied unconstitutionally to others, in situations not before the court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (internal citations omitted). The reason for the exception in the First Amendment context is the chilling effect of laws that ban constitutionally-protected speech. In that context, defendants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612.

Applying the overbreadth doctrine, the Supreme Court in *Stevens* struck a federal statute banning certain depictions of animal cruelty as substantially overbroad. 559 U.S. at 468. The defendant had been successfully prosecuted, and sentenced to 37 months in prison, for selling "videos of pitbulls engaging in dogfights and attacking other animals." *Id.* at 466. Without deciding the constitutionality of the statute as applied to dogfighting videos, the Court instead analyzed "how broadly [the statute] is construed" to determine whether it was facially invalid. *Id.* at 473. The Court found that the law on its face could be used to prosecute sellers of protected speech, such as "hunting magazines and videos." *Id.* at 482. In finding the statute unconstitutional, the Court declined to rely on the Executive Branch's assurance that it would enforce the statute only in cases of "extreme" depictions of cruelty: "the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.* at 480. Further, the Court declined to construe the statute narrowly "to avoid serious constitutional doubts," because the facial reach of the statute was unambiguous: "[T]his Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction." *Id.* at 481 (internal quotations and citation omitted). Accordingly, the Court found the statute "substantially overbroad, and therefore invalid under the First Amendment." *Id.* at 482.[24]

---

[24]     In addition to the chilling effect, the other factors courts consider in determining whether a statute is "substantially overbroad" within the meaning of the overbreadth doctrine include "the number of valid applications, the historic or

The same year that *Stevens* was decided, the Court applied the same reasoning to strike a campaign-finance statute in *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010). The *Citizens United* Court started from the premise that political speech receives the highest level of First Amendment protection, and that Congress may prohibit such speech only with legislation that "furthers a compelling interest and is narrowly tailored to achieve that interest." 558 U.S. at 339-40 (citations and quotations omitted). Moreover, as in *Stevens*, the Court declined the government's invitation to construe the statute narrowly to avoid overbreadth concerns. *Id.* at 328. Because the statute could not be narrowed through a coherent reading that would give meaning to the statutory language, the Court held that it "cannot resolve [the constitutionality of the challenged statute] on a narrower ground without chilling political speech that is central to the meaning and purpose of the First Amendment." *Id.* at 328-29.[25]

---

likely frequency of conceivably impermissible applications, the nature of the activity or conduct sought to be regulated, and the nature of the state interest in the underlying regulation." *Gibson v. Mayor & City Council of City of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004) (internal citations omitted). As already noted, the overbreadth doctrine was applied in the national security context in *United States v. Robel*, 389 U.S. at 264.

[25]     *See also United States v. Malloy*, 568 F.3d 166, 174 (4th Cir. 2009) ("according to our First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech . . . . The government interest in prohibiting criminal conduct must be weighed against the danger of chilling constitutionally protected speech.")

*B. The Charges Here Lack Any Limiting Principle That Would Narrow Their Application to Disclosures Which Risk Sufficient Harm to Justify the Criminalization or Chilling of Core First Amendment Freedoms*

The three provisions of the Espionage Act charged in this case should be stricken under the overbreadth doctrine because they criminalize a vast array of protected activity at the core of the First Amendment. None of the charges, on their face, requires any evidence of harm or potential harm to national security.[26] That said, the first three counts require that the offense involve NDI, which is (by judicial interpretation) defined to require that the information be "potentially damaging" to national security.[27] But that limitation is almost meaningless from the standpoint of establishing a compelling government interest because it is not quantified either in terms of the gravity or the likelihood of any potential harm. Whether one looks to the statutory language or to judicial glosses on the statute, no answer emerges to these questions: How likely does the harm to national security need to be in order to criminalize publication of information by the press? How proximate need it be?

---

[26]     Section 793(e), charged in Counts Two and Three, requires "reason to believe" that the information "could be used" to harm the United States or aid a foreign country, but that applies only to violations premised on "information." Where, as here, the alleged NDI constitutes "documents," the § 793 "reason to believe" element does not apply. *See United States v. Kiriakou*, 898 F.Supp.2d 921, 923 (E.D.Va. 2012). Counts Two and Three in this case thus do not allege the "reason to believe" element. *See* Superseding Indictment (dkt 12), Counts Two and Three.

[27]     The statutory definition of NDI is so broad on its face as to be absurd: it includes any photograph or map "connected with the national defense." This could include things like a map that a military base publishes for visitors or a photo of tanks on display at a military parade. Accordingly, it has been narrowed by precedent to require that the information be "potentially damaging to the United States," and "closely held," *Morison*, 844 F.2d at 1071-72, though it need not be designated "classified."

Assuming the harm is sufficiently likely and proximate, what quantum of harm is necessary?  Is a risk of *de minimis* harm enough?  Is severe harm required?  Something in between?

The statutes charged in Counts One through Three – §§ 793(c) and (e) – do not answer these questions.  As noted, the only mention of a government interest is the judicial gloss on the term "NDI" (requiring the information disclosed to be "potentially damaging").  But that term, even as judicially defined, has no limiting principle in terms of either likelihood or substantiality of any potential damage.  Consider, for example, a person who drives with the tire pressure in his or her car slightly lower than recommended.  This is "potentially damaging" to the tires – maybe they will need replacement a bit sooner than they otherwise would – but the chance of any substantial damage is low and any damage that *does* occur is vanishingly small.  In the First Amendment context presented here, where a substantial amount of conduct facially covered by the Espionage Act touches on core First Amendment activity of vital national concern, it is not enough to premise criminality on a (possibly quite low) "potential" for (possibly quite minimal) "damage."  But that is all that Counts One through Three – even as judicially modified – require.

Accordingly, the only trial evidence required to establish a violation on Counts One through Three is the Executive Branch's *ipse dixit* regarding the general potential for some undefined amount of harm.  Such a showing would likely be insufficient to criminalize publication by the press even in the case of ordinary information of no particular import.  But "leak" cases, by their nature, do not involve

ordinary information.  Typically they involve matters on which the Executive Branch is accused of lying to the public, where the other side of the story can be told only by sharing information the Executive is seeking to obscure.  In other words, they demand the greatest degree of First Amendment protection.  Accordingly, criminalizing them requires the government to show a far greater and more proximate danger to national security than §§ 793(c) and (e) require.

The fourth Espionage Act charge (a violation of § 798, alleged in Count Four) fares no better.  Unlike the § 793 offenses, § 798 turns solely on classification – which is a purely Executive Branch determination.  *See United States v. Boyce*, 594 F.2d 1246, 1251 (9th Cir. 1979) ("Under section 798, the propriety of the classification is irrelevant.  The fact of classification of a document or documents is enough to satisfy the classification element"); *Fondren v. United States*, 63 F.Supp.3d 601, 608 (E.D.V.A. 2014) (CMH) (same, citing *Boyce*); *see also United States v. Smith*, 750 F.2d 1215, 1217 (4th Cir. 1984) ("[T]he government . . . may determine what information is classified.  A defendant cannot challenge this classification.  A court cannot question it.")

But attaching criminal liability purely to an Executive Branch determination that cannot be challenged is inconsistent with the First Amendment, which requires a compelling government interest and narrow tailoring.  And in the case of classified information, there is little doubt that many items are either: i) improperly classified

in the first instance, as Judge Ellis has observed;[28] or ii) classified by nothing more than inertia, years after any potential harm from disclosure has passed.  *See, e.g.,* Peter Finn, *National Archives Needs to Declassify a Backlog of Nearly 400 Million Pages*, Wash. Post (Dec. 3, 2011).  Accordingly, Section 798 turns entirely on the government's unchallenged say-so about potential harm, depriving a defendant of due process. *See United States v. Villareal Silva*, 931 F.3d 330, 335 (4th Cir. 2019) (when an Executive Branch determination is "an element in a criminal prosecution, the defendant in that prosecution must, as a matter of due process, be able to challenge the element . . . if he did not have a prior opportunity to do so.") (citing *United States v. Mendoza-Lopez*, 481 U.S. 828, 837-39 (1987)).[29]

By criminalizing so much conduct – including a substantial amount of First-Amendment-protected conduct – while requiring so little proof of a compelling government interest, each of these statutes chills protected First Amendment rights.[30]  And, importantly, that chilling effect arises not solely from the potential prosecution of journalists, but also from the prosecution of those whose actions are

---

[28]    *See* T.S. Ellis, III, *National Security Trials:  A Judge's Perspective*, 99 Va. L. Rev. 1607, 1618 (2013) ("On the basis of my exposure to classified information over a number of years . . . I have a firm suspicion that the executive branch over-classifies a great deal of material that does not warrant classification.").

[29]    The Executive Order governing classification allows a person to challenge a classification determination, but solely within the Executive Branch.  *See* Executive Order 13526 (Dec. 29, 2009) § 1.8.

[30]    In addition to the freedoms of speech and press, the Act's overbreadth chills a third First Amendment freedom as well – the right to petition the government. People simply cannot petition the government to redress grievances that a law prevents them from learning about.

necessary predicates for the journalists' work.  Even if it is assumed that one who leaks information in breach of a duty to the government is entitled to less free-speech protection than an ordinary citizen, that does not remove the chilling effect on press freedom occasioned by prosecuting him or her.  That is because criminalizing communication *to* a journalist substantially burdens a free press in much the same way as criminalizing publication *by* a journalist.  It substantially infringes on some of the media's most important work: uncovering information that the government seeks to keep to itself, sometimes for duplicitous reasons.  *See Morison*, 844 F.2d at 1081 ("There exists the tendency, even in a constitutional democracy, for government to withhold reports of disquieting developments and to manage news in a fashion most favorable to itself.") (Wilkinson, J., concurring).

In sum, the offenses charged in this case are not narrowly tailored to address a compelling government interest.  Moreover, the statutory terms are devoid of language or legislative history that could support a coherent, narrower reading that would comply with the First Amendment.[31]  And, in light of recent developments in the government's use of the Act – which make prosecutions burdening core First Amendment freedoms reasonably likely where they used to be far-fetched – the overbreadth doctrine applies.  Such prosecutions (outside the "classic spying" context

---

[31]     From a legislative perspective, a statutory re-write would not be particularly difficult.  For example, the offenses charged here could be amended to require a bad-faith motive by requiring knowledge or intent that the information is to be used to harm the United States.  And a provision could be added requiring the government, in the case of prosecuting a member of the press or one whose conduct is limited to sharing information with the press, to show a substantial risk of proximate and substantial harm.  But re-writing the statute is for Congress.

of § 794) now comprise "a substantial number of applications" of Espionage Act cases in relation to the "legitimate sweep" of the provisions charged here.[32]

II.   Each of the Espionage Act Counts Should be Dismissed Because Key Terms in the Act are Void for Vagueness Under the Due Process Clause

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Court has recognized three rationales for invalidating vague criminal laws: i) to provide clear notice of "what is prohibited," so that "a person of ordinary intelligence [will have] a reasonable opportunity to know what is prohibited, [and] . . . act accordingly;" ii) to prevent "arbitrary and discriminatory enforcement," because vague laws fail to "provide explicit standards for those who apply them;" and iii) to prevent the chilling of First Amendment rights where a statute "abut(s) upon sensitive areas of basic First Amendment freedoms." *Id.* at 108-09 (internal quotations and citations omitted). When vagueness raises First Amendment

---

[32]   The Fourth Circuit in *Morison* rejected a First Amendment overbreadth claim. 844 F.2d at 1075-75. It did so, however, more than 30 years ago, when the prosecution of leakers whose motive was to inform the public was essentially unheard of. It is not controlling on that point because overbreadth analysis requires consideration of facts that have changed since then: "the historic or likely frequency of conceivably impermissible applications." See 16A Am. Jur. 2d Const. Law § 427 (citing cases). At the time *Morison* was decided, the only true leak case that had ever been prosecuted (involving the Pentagon Papers leakers) had not resulted in a conviction. The only "leak" case before that, in 1957 against John Nickerson, involved a defendant angry over a decision that negatively affected his business as a defense contractor. *See* Sam Lebovic, *The Forgotten 1957 Trial that Explains our Country's Bizarre Whistleblower Laws* (Politico, March 27, 2016). And *Morison* itself alleged sharing of information for personal financial motivations. As a result, any observations the Fourth Circuit made in 1988 about the risk that the Espionage Act would chill protected First Amendment activity have no bearing today, in light of the more recent historical record.

concerns, "[t]he vagueness doctrine has special bite,"[33] because the chilling effect may require invalidation under the First Amendment overbreadth doctrine.[34]

Here, each of the Espionage Act provisions charged in the Indictment raises all three vagueness concerns, due to the ambiguous breadth of the same statutory terms discussed above. First, the failure of the statutes to require any particular quantum and/or likelihood of harm to national security sufficient to justify a First Amendment prohibition leaves a "person of ordinary intelligence" to guess whether publishing a certain news article, or having a certain conversation, violates the statute. To give one example, could a reporter, or a "leaker," really be imprisoned for discussing a not-yet-unclassified assessment of an entity that has not existed for decades, like the Viet Cong? The statutes, even to the extent they have been judicially narrowed, suggest they could be, while First Amendment jurisprudence suggests they could not. This lack of notice cannot be corrected with a limiting construction because

---

[33]     Geoffrey R. Stone, et al., *The First Amendment* 122 (2d ed. 2003).

[34]     In the last four years, the Supreme Court has applied the vagueness doctrine to invalidate at least three federal criminal statutes. *See Johnson v. United States*, 135 S.Ct. 2551, 2561 (2015) (striking as vague part of "violent felony" definition because standard for determining "serious potential risk" is "uncertain both in nature and degree of effect"); *Sessions v. Dimaya*, 138 S.Ct. 1204, 1215 (2018) (striking as vague the "crime of violence" category defined by "substantial risk," due to "uncertainty about the level of risk that makes a crime 'violent'")); *United States v. Davis*, 139 S.Ct. 2319 (2019) (striking as vague "substantial risk" prong of 18 U.S.C. § 924(c)(3)(B)); *see also Manning v. Caldwell*, 930 F.3d 264 (4th Cir. 2019) (*en banc*) (striking regulation on "habitual drunkards" as unconstitutionally vague).

the statutes provide no guidance; a court would simply be guessing to adopt a construction consistent with Congressional intent and the language of the statute.[35]

Second, the vagueness of these same statutory terms runs a real risk of arbitrary and discriminatory enforcement, and therefore viewpoint discrimination. Leak prosecutions, while increasingly common, are still rare in comparison to the frequency of classified-information leaks, which a cross-agency panel of the United States government has described as a "routine daily occurrence."[36] Indeed, a publicly available CIA report observes that, "[t]he US press is an open vault of classified information."[37] Moreover, a substantial number of those leaks have at least the tacit approval of the government because they come from high-ranking officials seeking to present a positive narrative about government policy.[38] Yet leak prosecutions are

---

[35]     The *Morison* court found the willfulness element of §§ 793(d) and (e) sufficient to cure any notice problem occasioned by the statutory definition of NDI. 844 F.2d at 1071-72. *Morison* did not involve, however, a vagueness challenge based on the quantum or likelihood of harm necessary to support a prosecution. In any event, one of the charges at issue (§ 793(c), charged in Count One), lacks a willfulness element.

[36]     *See* Report of the Interdepartmental Group on Unauthorized Disclosures of Classified Information (Mar. 31, 1982) at 6 (available at https://fas.org/sgp/library/willard.pdf) (last accessed Sep. 11, 2019).

[37]     *See* James B. Bruce, *Laws and Leaks of Classified Intelligence: The Consequences of Permissive Neglect* at 1, available at https://www.cia.gov/library/center-for-the-study-of-intelligence/kent-csi/vol47no1/pdf/v47i1a04p.pdf (last accessed Sep. 11, 2019).

[38]     *See* David E. Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 Harv. L. Rev. 512, 529-30 & nn. 80-85 (2013) ("Journalists and government insiders have consistently attested that leaking is far more common among those in leadership positions.").

instituted, almost exclusively, against those who identify as dissenters, i.e., those who

release information to contradict an official narrative they believe to be untrue.[39] And

because the statutes provide no "meaningful guidance regarding proscribed conduct,"

they "invite arbitrary enforcement" against defendants whose viewpoints are deemed

"undesirable," much like the *en banc* Fourth Circuit found with respect to the phrase

"habitual drunkard:"

> Police officers, prosecutors, and even state circuit court
> judges likely will have differing perceptions regarding
> what frequency of drunkenness exceeds the necessary
> threshold for a person to be considered an "habitual
> drunkard." The interpretation of the phrase therefore
> leaves open the widest conceivable inquiry about a person's
> behavior and depends entirely upon the prohibition
> philosophy of the particular individual enforcing the
> scheme at that moment.   Indeed, *the absence of any*
> *standards or limiting language to assist in the*
> *interpretation of the term "habitual drunkard" supports*
> *Plaintiffs' assertion that the law was designed to target*
> *persons, including the homeless, that state officials deem*
> *undesirable.*[40]

Because these statutes, like the Virginia statute at issue in *Manning*, lack any

meaningful limitations to proscribe their use as a means of discrimination – in this

---

[39]    There are exceptions, such as the defendant in *Morison*, whose motive
appears to have been economic.  But for those leakers whose principal motivation
was to inform the public, it appears that only dissenters are prosecuted.

[40]    *Manning*, 930 F.3d at 275-76 (internal citation and quotations omitted)
(emphasis added).

case viewpoint discrimination in violation of the First Amendment – they should be voided for vagueness due to their capacity for arbitrary enforcement.[41]

Third, for the reasons discussed above in Argument Section I regarding First Amendment overbreadth, the ambiguous scope of the statutes at issue here requires their invalidation under vagueness doctrine due to their chilling effect on protected First Amendment activities.

III.   The Theft-of-Government-Property Count, as Applied Here, Chills First Amendment Freedoms in the Same Manner as the Espionage Act Counts and Should Also be Dismissed

Count Five, alleging theft of government property, should be dismissed both on the statutory interpretation grounds raised in the defense's separate, contemporaneously-filed motion and because allowing the standard theft-of-government-property statute to be used in classified-information cases raises all the same First Amendment concerns discussed above in Argument Section I.  To put it simply, if prosecuting leak cases under the statutes that are specific to that context impermissibly chills First Amendment rights – and it does – then prosecuting them through a statute of general applicability does too.  *See* Jessica Lutkenhaus, *Prosecuting Leakers the Easy Way: 18 U.S.C. § 641 (Note)*, 114 Colum. L. Rev. 1167, 1208 (2014) (because Congress did not weigh "the need to protect secrecy with the

---

[41]   The appearance of discriminatory, viewpoint-based enforcement is exacerbated by what have now become routine United States Government statements that certain media entities, and sometimes the media itself, are "The Enemy of the People."  *See* Stephanie Sugars, *From Fake News to Enemy of the People: An Anatomy of Trump's Tweets* (Committee to Protect Journalists, Jan. 30, 2019), available at https://cpj.org/blog/2019/01/trump-twitter-press-fake-news-enemy-people.php (collecting examples).

values of disclosure and free public discourse" in enacting § 641, that offense should not apply to such conduct absent "clearer standards defining § 641's application to government property in a way that accounts for constitutional values."). Even those cases that have affirmed § 641's application (on statutory construction grounds) to government information acknowledge the inevitable clash between such use and the First Amendment.[42] At bottom, using § 641 in such cases chills speech and press freedoms without *any* finding relating to government interests, and without narrow tailoring. Both are necessary predicates to justify a criminal prohibition of core First Amendment activity.

## CONCLUSION

The Espionage Act, when applied to those who leak to the press through the provisions charged in this case, chills First Amendment freedoms that are essential to a functioning democracy. For decades, the Executive Branch was faithful to the Act's original intent, charging only spies and saboteurs even though the Act's nearly limitless language permits so much more. But now that the Act is used regularly against those who leak for no purpose other than informing their fellow citizens about their own government, its chilling effect is fatal to its continued viability. Moreover, its broad terms allow viewpoint-based prosecutions of the press and those whose actions are necessary for the press to freely operate. Accordingly, the provisions charged here should be voided as facially overbroad, the § 641 charge should be voided as applied, and the Indictment should be dismissed.

---

[42] *See* Defendant's Motion to Dismiss Count Five at 4-5.

Respectfully Submitted,

DANIEL EVERETTE HALE
By Counsel,

Geremy C. Kamens
Federal Public Defender


_____/s/_____
Todd M. Richman
Va. Bar No. 41834
Cadence A. Mertz
Va. Bar No. 89750
Tor B. Ekeland, admitted *pro hac vice*
Counsel for Mr. Hale
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0845
Facsimile: (703) 600-0880
Todd_Richman@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2019, I filed the foregoing via the CM/ECF system, which will electronically serve a copy upon all counsel of record.


                                                                 /s/

Todd M. Richman
Va. Bar No. 41834
Counsel for Mr. Hale
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0845
Facsimile: (703) 600-0880
Todd_Richman@fd.org