# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 1:19-cr-59 |
| v. | ) | |
| | ) | Hon. Liam O'Grady |
| DANIEL EVERETTE HALE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNOPPOSED BRIEF OF AMICUS CURIAE
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
SUPPORTING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

Jennifer A. Nelson
VA Bar No. 94394
University of Virginia Law School
First Amendment Clinic
580 Massie Road
Charlottesville, VA 22903
Phone: 434.924.7354
Facsimile: 434.924.4672
jn5g@virginia.edu
*Counsel of Record for Amicus Curiae the
Reporters Committee for Freedom of the
Press*

Gabriel Rottman*
University of Virginia Law School
First Amendment Clinic
580 Massie Road
Charlottesville, VA 22903
Phone: 434.924.7354
Facsimile: 434.924.4672
*\*Pro Hac Vice Application Pending*

## **CORPORATE AND FINANCIAL DISCLOSURE STATEMENTS**

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable judges and magistrate judges to evaluate possible disqualifications or recusal, the undersigned counsel for the Reporters Committee for Freedom of the Press certify that there are no parents, trusts, subsidiaries and/or affiliates that have issued shares or debt securities to the public.

Pursuant to Fourth Circuit Local Rule 26.1, the Reporters Committee for Freedom of the Press declares that it is an unincorporated non-profit association of reporters and editors with no parent corporation and no stock.

## **TABLE OF CONTENTS**

CORPORATE AND FINANCIAL DISCLOSURE STATEMENTS ................................................ii

TABLE OF AUTHORITIES ................................................................................................iv

INTEREST OF AMICUS CURIAE ........................................................................................1

SUMMARY OF ARGUMENT ..............................................................................................2

ARGUMENT ....................................................................................................................7

I.   This case must be considered in the context of a dramatic uptick in the prosecution of journalistic sources since 2009, an increase in the severity of punishment, and a heightened danger of selective enforcement against lower-ranking disclosers ...........................................7

II.  Journalistic source prosecutions directly chill newsgathering by dissuading sources from coming forward with newsworthy information in the public interest ....................................14

III. This increase in the number of cases, as well as the rising severity of sentences and the selectivity of prosecutions, is relevant for the overbreadth and vagueness analyses and serves to distinguish this case from *Morison*. ...................................................................................19

IV.  Drone warfare is especially newsworthy as a new and controversial tactic. ..........................23

CONCLUSION ................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ........................................................................19

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)..........................................21

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982).............................20

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ..........................................................21

*Rita v. United States*, 551 U.S. 338 (2007).....................................................................10

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).............................................................20, 21

*Smith v. Goguen*, 415 U.S. 566 (1974)............................................................................20

*United States v. Morison*, 604 F. Supp. 655 (D. Md. 1985), *aff'd*, 844 F.2d 1057
  (4th Cir. 1988), *cert. denied*, 488 U.S. 908 (1988)......................................................7

*United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988)...........................14, 15, 19, 22

*United States v. Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006), *aff'd*, 557 F.3d 192
  (4th Cir. 2009)................................................................................................................3

**Statutes**

18 U.S.C. §§ 793(c)-(e)..............................................................................................10, 19

18 U.S.C. § 798 ..................................................................................................................11

Pub. L. No. 103-236, 108 Stat. 382 (1994).........................................................................8

**Other Authorities**

Aamer Madhani and Kevin Johnson, *Journalism Advocates Call Leak Investigations Chilling*,
  USA Today (May 21, 2013) ..........................................................................................16

Adam Goldman, *How David Petraeus Avoided Felony Charges and Possible Prison Time*,
  Wash. Post, Jan. 25, 2016 ............................................................................................12

Avi Asher-Schapiro, *Leak Prosecutions Under Trump Chill National Security Beat*,
  Comm. to Protect Journalists (Mar. 6, 2017)...............................................................17

Benjamin Wittes, *Civilian Deaths from Drone Strikes*, Lawfare (Aug. 12, 2011).........23

Br. of the Washington Post et al., as Amici Curiae, In Support of Reversal,
  United States v. Morison, 844 F.2d 1057 (4th Cir. 1988) .........................................1, 2

Charlie Savage, *For U.S. Inquiries on Leaks, a Difficult Road to Prosecution*,
  N.Y. Times, June 9, 2012 .............................................................................................11

Charlie Savage, *Obama Pardons James Cartwright, General Who Lied to F.B.I. in Leak Case*,
  N.Y. Times (Jan. 17, 2017)...........................................................................................13

Charlie Savage, Power Wars:  Inside Obama's Post-9/11 Presidency (2015)...................9

*Civilian Casualties & Collateral Damage*, Lawfare .......................................................24

Concise Oxford English Dictionary 289 (11th ed. 2004) .................................................19

Constitutional and Counterterrorism Implications of Targeted Killing, Hearing Before the S.
  Judiciary Subcomm. on the Constitution, Civil Rights, and Human Rights
  (113th Cong. 2013) ........................................................................................................23

Criminal Complaint, United States v. Hitselberger, No. 12-cr-231 (RC)
  (D.D.C. Aug. 6, 2012).....................................................................................................8

Daniel Fazio, *Censorship in the Korean War:  Press-Military Relations, June 1950-January 1951*,
  26 Australasian Journal of Am. Studies (2007) ..............................................................4

Daniel N. Hoffman, Governmental Secrecy and the Founding Fathers (1981)..................7

David Pozen, *The Leaky Leviathan:  Why the Government Condemns and Condones Unlawful
  Disclosures of Information*, 127 Harv. L. Rev. 512 (2013)...........................9, 21, 22

Devlin Barrett, et al., *Some Federal Prosecutors Disagreed with Decision to Charge Assange Under Espionage Act*, Wash. Post, May 24, 2019......................................................................22

Douglas Martin, *Anthony Russo, 71, Pentagon Papers Figure, Dies*,
N.Y. Times, Aug. 8, 2008 .............................................................................................................3

*Drone Strikes and Transparency*, Nat'l Pub. Radio (Mar. 10, 2019)..............................................24

Ellen Nakashima and Adam Goldman, *Leak Investigation Stalls Amid Fears of Confirming U.S.-Israel Operation*, Wash. Post (May 10, 2015)......................................................................13

Elliot Carlson, Stanley Johnston's Blunder (2017)............................................................................4

Erwin Chemerinsky, Constitutional Law (5th ed. 2015) ...............................................................20

Factual Basis, United States v. Petraeus, No. 15-cr-47 (W.D.N.C. Mar. 3, 2015).......................12

Frank E. Quindry, *Aerial Bombardment of Civilian and Military Objectives*, 2 J. Air L. and Commerce 474 (1931) ................................................................................................................24

G. Alex Sinha, With Liberty to Monitor All (2014) .................................................................17, 18

Gabe Rottman et al., Federal Cases Involving Unauthorized Disclosures to the Media, 1778 to the Present, Reporters Comm. for Freedom of the Press.....................................1, 3, 5, 6, 8, 12

Gabe Rottman, *Special Analysis of the May 2019 Superseding Indictment of Julian Assange*, 34 Commc'ns Lawyer (2019) ......................................................................................................9

Gabe Rottman, *Special Analysis of the May 2019 Superseding Indictment of Julian Assange*, Reporters Comm. for Freedom of the Press (May 30, 2019)....................................................22

Gabe Rottman, *The Assange Indictment Seeks to Punish Pure Publication*, Lawfare (May 24, 2019)...........................................................................................................................6

Geoffrey Stone, Perilous Times:  Free Speech in Wartime (2004) .................................................4

Gordon Lubold and Shane Harris, *Trump Broadens CIA Powers, Allows Deadly Drone Strikes*, W.S.J., Mar. 13, 2017 ................................................................................................................25

Harold Edgar and Benno C. Schmidt, Jr., *The Espionage Statutes and Publication of Defense Information,* 73 Columbia L. Rev. 929 (1973) ............................................................................4

James G. Hershberg, *The War of Leaks*, N.Y. Times (Oct. 27, 2017)............................................5

Jeremy Bentham, Panopticon or the Inspection House (1791)........................................................15

Jonathon Penney, *Chilling Effects:  Online Surveillance and Wikipedia Use*,
31 Berkeley Tech. L. J. 117 (2016) ......................................................................................18, 19

Josh Gerstein, *Obama's Hard Line on Leaks*, Politico, Mar. 3, 2011 ...........................................11

Katy Glenn Bass, Chilling Effects:  NSA Surveillance Drives U.S. Writers to
Self-Censor (2013)......................................................................................................................18

Kelsey Cora Skaggs, *Surveilling Speech and Association:  NSA Surveillance Programs and the First Amendment*, 18 U. Penn. J. Const. L. 1479 (2016) ...........................................................15

Leonard Downie and Sara Rafsky, The Obama Administration and the Press:  Leak Investigations and Surveillance in Post-9/11 America, Comm. to Protect Journalists (2013) .........................16

Letter from the Honorable Daniel Patrick Moynihan to President William Jefferson Clinton
(Sept. 29, 1998)..................................................................................................................4, 8, 11

Michael E. DeVine, Cong. Research Service, Covert Action and Clandestine Activities of the Intelligence Community:  Selected Definitions in Brief (2019)..................................................25

Michael Isikoff, *Ex-Pentagon General Target of Leak Investigation*, NBC News
(June 27, 2013)............................................................................................................................13

Molly Redden, *Is the 'Chilling Effect' Real?*, New Republic (May 15, 2013) .............................16

News Release, Attorney General Jeff Sessions Delivers Remarks at Briefing on Leaks of Classified Materials Threatening National Security (Aug. 4, 2017) .........................................14

Report of the Commission on Protecting and Reducing Secrecy, S. Doc. 105-2
 (103rd Cong. 1997)................................................................................................8
Scott Shane, *C.I.A. Is Disputed on Civilian Toll in Drone Strikes*, N.Y. Times, Aug. 11, 2011....24
Stephen Aftergood, *When the President Pardoned a Leaker*, Secrecy News (Sept. 21, 2016) .......8
Superseding Indictment, United States v. Assange, Case 1:18-cr-00111-CMH
 (filed May 23, 2019) .................................................................................6, 19, 21
Tim Weiner, Legacy of Ashes:  The History of the CIA (2007) ....................................................24
Tom Wicker, *Leak On, O Ship of State*, N.Y. Times, Jan. 26, 1982 .............................................11
U.S. Sentencing Guidelines Manual ..........................................................................................11
United States Memorandum in Aid of Sentencing, United States v. Cartwright,
 No. 16-cr-188 (D.D.C. Jan. 10, 2017) ..................................................................12
Unopposed Br. of *Amicus Curiae* Reporters Committee for Freedom of the Press,
 United States v. Albury, Case No. 18-cr-00067 (WMW) (filed Oct. 4, 2018).......................2, 11
Vernon Loeb, *Clinton Ignored CIA in Pardoning Intelligence Analyst*,
 Wash. Post, Feb. 17, 2001...........................................................................................8
W.J. Hennigan, *Prosecutors Threw the Book at Julian Assange.  Here's How That Could
 Backfire*, TIME Magazine (June 14, 2019) ............................................................17

## INTEREST OF AMICUS CURIAE

Amicus Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated non-profit association of reporters and editors that was founded by leading journalists and media lawyers in 1970 in response to an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Attorneys with the Reporters Committee provide pro bono legal services to reporters, file more than 40 amicus briefs a year in cases touching on press rights, and prepare other legal resources, particularly around media "leak" cases. Amicus has been tracking the increase in the number of such cases in the last decade, of which this is the latest against an alleged journalistic source. *See* Gabe Rottman et al., Federal Cases Involving Unauthorized Disclosures to the Media, 1778 to the Present, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/resources/leak-investigations-chart/ [hereinafter *Unauthorized Disclosures Chart*].[1]

Amicus has an interest in ensuring that the federal spying laws cannot be used in a manner that impedes newsgathering by dissuading sources from disclosing government information that is essential knowledge for an informed electorate. For that reason, amicus joined 30 other news media amici in a brief at the Fourth Circuit in 1987 urging reversal of Samuel Loring Morison's conviction—the first, and until 2009, only successful prosecution of a journalistic source. *See* Br. of the Washington Post et al., as Amici Curiae, In Support of Reversal at 49, United States v. Morison, 844 F.2d 1057 (4th Cir. 1988). Amici's argument in *Morison* rested on the

---

[1]      Mr. Rottman directs the Technology and Press Freedom Project at the Reporters Committee and appears here in his capacity as a lecturer at the University of Virginia School of Law, where he directs the First Amendment Clinic with Ms. Nelson, who is a staff attorney at the Reporters Committee. The First Amendment Clinic is representing the Reporters Committee before this Court.

constitutional infirmities in the Espionage Act itself, infirmities that pose risks to newsgathering and press rights that transcend the facts of these cases. *Id.* at 7.

Additionally, the increase in the number of leak prosecutions tracked by amicus is directly relevant to the vagueness and overbreadth questions that are before the Court and were before the Fourth Circuit in *Morison*. Further, amicus filed a brief most recently at the sentencing phase of the Terry Albury prosecution, the second leak prosecution under this administration, which highlighted the increasing severity of punishment in these cases. Unopposed Br. of *Amicus Curiae* Reporters Committee for Freedom of the Press, United States v. Albury, Case No. 18-cr-00067 (WMW) (filed Oct. 4, 2018), https://perma.cc/6J9P-UKE6 [hereinafter *Albury RCFP Brief*]. That increased severity—coupled with indicia of selective enforcement against lower-ranking disclosers—is also relevant to the constitutional vagueness analysis in this case.

Finally, amicus's interest in protecting newsgathering from the reach of federal spying laws is acute when it relates to controversial military or intelligence activities such as lethal operations using aerial drones. While amicus takes no position on drone warfare, it is indisputable that the public has an abiding interest in the subject, the press has a constitutional right to report on the controversy, and the statutes here are ill-equipped constitutionally to handle newsgathering and publication in areas of high public interest.

## SUMMARY OF ARGUMENT

Until just this past decade, prosecuting the public disclosure of government secrets as an act of spying was an extreme rarity, such a rarity that the first journalistic source successfully prosecuted as such was pardoned by President Bill Clinton.

In the 230 years of American history before 2009, only five prosecutions were attempted under this theory. In the first, an attempt to secure an indictment not against a source, but directly against a reporter and news outlet for publishing information gleaned from cracked Japanese

naval codes during World War II, the grand jury refused to indict.  *See Unauthorized Disclosure Chart*, *supra*, at 13-14 (Stanley Johnson and the Chicago Tribune).  In the second, the government only managed to secure a plea, with no jail time, based on the illegal retention of government property.  *Id.* at 14-15 (Amerasia).  In the third, a court martial of the Army's liaison to Congress on the Jupiter missile project for drafting a memorandum critical of the decision to move the program to the Air Force, the defendant accepted a plea on much reduced charges and continued serving.  *Id.* at 15-17 (John Nickerson).  In the fourth, the Pentagon Papers case, charges were dismissed because of government misconduct.  *Id.* at 19-21 (Daniel Ellsberg and Anthony Russo).  Only in the fifth, the Samuel Loring Morison leak of Soviet fleet photographs to a British publication, was the government successful.[2]  *Id.* at 32-35.  Following several years of lobbying by Senator Daniel Patrick Moynihan (D-NY), chairman of the Senate Commission on Protecting and Reducing Government Secrecy, President Clinton pardoned Morison in 2001.  As Moynihan wrote in a 1998 letter to the president:

> What is remarkable is not the crime, but that he is the only one convicted of an activity which has become a routine aspect of government life: leaking information to the press in order to bring pressure to bear on a policy question.
>
> As President Kennedy has said, "the ship of state leaks from the top." An evenhanded prosecution of leakers could imperil an entire administration. If ever there were to be widespread action taken, it would significantly hamper the ability of the press to function.

---

[2]     There were only two other cases before 2009 involving the prosecution of non-government employees for the unauthorized disclosure of national defense information.  The first was the dropped prosecution of Anthony Russo, Daniel Ellsberg's friend who helped copy the Pentagon Papers.  *See* Douglas Martin, *Anthony Russo, 71, Pentagon Papers Figure, Dies*, N.Y. Times, Aug. 8, 2008, https://perma.cc/WUT3-GZLX.  The second did not implicate a journalistic source or news organization.  *See United States v. Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006), *aff'd*, 557 F.3d 192 (4th Cir. 2009).

Letter from the Honorable Daniel Patrick Moynihan to President William Jefferson Clinton (Sept. 29, 1998), https://perma.cc/W5MC-QXUC [hereinafter *Moynihan Letter*].

Notably, these 230 years of overwhelming prosecutorial forbearance in media leak cases include every major conflict this country has ever joined, including the Revolutionary War, the War of 1812, the Mexican-American War, the Spanish-American War, and:

- The Civil War, where attempts at press censorship focused more on suppressing Democratic newspapers versus restraining the publication of secrets, and where the press continued to assert the right to publish military information, *see* Geoffrey Stone, Perilous Times:  Free Speech in Wartime 126-128 (2004);

- World War I, where President Woodrow Wilson expressly asked for the power to restrain publication of military secrets in the press and was rebuffed by the Congress that passed the Espionage Act of 1917, *see* Harold Edgar and Benno C. Schmidt, Jr.*, The Espionage Statutes and Publication of Defense Information,* 73 Columbia L. Rev. 929, 941 (1973), https://perma.cc/7JRJ-HGTN;

- World War II, where, even in the Japanese codes case, the Justice Department had some doubt about whether the Espionage Act could cover journalistic acts, *see* Elliot Carlson, Stanley Johnston's Blunder 155 (2017);

- The Korean War, where, for instance, the Associated Press broke the news of the Inchon landing nine hours before the military's news release, *see* Daniel Fazio, *Censorship in the Korean War:  Press-Military Relations, June 1950-January 1951*, 26 Australasian Journal of Am. Studies 2, 10 (2007);

- The Vietnam War, of which the unsuccessful Pentagon Papers case was the only attempted leak prosecution (despite numerous high-profile leaks, including the

Marigold affair, which included press leaks authorized by President Lyndon Johnson), *see* James G. Hershberg, *The War of Leaks*, N.Y. Times (Oct. 27, 2017), https://perma.cc/HCE7-K6PJ;

- The entirety of the Cold War, *see Unauthorized Disclosure Chart*, *supra*, at 25-30, 36-38 (discussing the Operation Holystone and Ivy Bells submarine-based surveillance programs against the Soviet Union and decisions not to seek an indictment in either case); and

- The first Gulf War, the conflict in the Balkans, and the first years of the post-9/11 conflicts in Iraq and Afghanistan, *see generally id*.

Moreover, this forbearance was not because the tension between secrecy and public accountability was unknown to the government and the public.  Such tensions date back to the founding era, when Thomas Paine controversially agreed to resign his chairmanship of the Committee of Foreign Affairs in response to the uproar created by his publication of information about early French support for the revolutionary cause.  *Id.* at 3-5.  Indeed, in passing the Sedition Act of 1798, the Federalist-controlled Fifth Congress considered, and rejected, an unauthorized disclosure provision that would have criminalized the disclosure of government secrets by journalists or other non-governmental officials.  Daniel N. Hoffman, Governmental Secrecy and the Founding Fathers 206, 262 (1981).  Such a rejection was even more extraordinary given that part of the catalyst for debate on the Sedition Act was a leak:  anti-Federalist Benjamin Bache's publication in the Philadelphia Aurora of a letter between the Duke of Talleyrand and Elbridge Gerry where Talleyrand offered to renew negotiations over French grievances with Gerry alone. *Id.* at 199, 204-05.  Bache said the letter had been suppressed by Federalist hawks for two weeks in the hopes that war would be declared against France in the interim.  *Id.* at 199.

5

That was then and this is now.  Starting under the Obama administration and the prosecution of Shamai Leibowitz in 2009, the Justice Department has to date brought 17 cases against journalistic sources and one based in part on sending classified material to a public archive at a think tank.  *Unauthorized Disclosure Chart*, *supra*.  These 18 cases include 11 cases in President Obama's eight years and seven in the 32 months of the Trump administration.  *Id.*

Further, in May 2019, the Justice Department obtained a superseding indictment against Julian Assange, the founder of WikiLeaks, for publishing classified information exfiltrated by Chelsea Manning.  Superseding Indictment, United States v. Assange, Case 1:18-cr-00111-CMH (filed May 23, 2019), https://perma.cc/AFD7-X29U [hereinafter *Superseding Assange Indictment*].  Although the Assange case involves the publication of the names of assets or informants, which distinguishes it as an ethical and practical matter from the other news outlets that reported on the same material, three of the counts in the Assange superseding indictment are based on a "pure publication" theory.  That is, the actus reus triggering liability under § 793(e) of the Espionage Act was the act of posting classified documents online, and thus "communicat[ing]" them "to all the world."  *Id.* at 32-34 (counts 15-17).  This is the first time in history that the government has successfully secured an indictment under this legal theory.  *See* Gabe Rottman, *The Assange Indictment Seeks to Punish Pure Publication*, Lawfare (May 24, 2019), https://perma.cc/Z6YZ-U7VN.

These post-2009 developments are directly relevant to the legal and policy issues raised by the defendant's prosecution.  First, the defendant's prosecution must be considered in the context of the dramatic increase in the number of unauthorized disclosure prosecutions.

Second, aggressive leak prosecutions create a demonstrable chill on newsgathering in the public interest, particularly in national security reporting where secrecy is at its zenith, by dissuading sources from discussing classified or sensitive but unclassified material.

Third, and relatedly, the increase in prosecutions and the severity of recent sentences—as well as indicia of selective prosecution against lower-level disclosers—are directly relevant to the First Amendment overbreadth and vagueness analyses.

And, finally, it is noteworthy that the unauthorized disclosures charged in this case concern drone warfare, a relatively new and still highly controversial tactic. Accordingly, the electorate has a strong public interest in having accurate information about, for instance, precision statistics and the respective roles of the CIA and military, which dictate congressional oversight requirements. Again, amicus takes no position on the drone program. But, because of the nature of the program, even the most sensitive operational documents are newsworthy, more so than other classified material concerning long-standing and generally accepted military or intelligence activities. That the Espionage Act is ill-equipped to distinguish between national defense information of high public interest, such as tasking orders showing a mistaken target or unvarnished civilian casualty counts, versus that of low public interest, such as quotidian troop movement plans, speaks to its constitutional infirmity.

For all these reasons, amicus supports the motion to dismiss the indictment.

## ARGUMENT

I.  **This case must be considered in the context of a dramatic uptick in the prosecution of journalistic sources since 2009, an increase in the severity of punishment, and a heightened danger of selective enforcement against lower-ranking disclosers.**

Prior to 2009, there had been one successful prosecution of a journalistic source for leaking government secrets to the press. *See United States v. Morison*, 604 F. Supp. 655 (D. Md. 1985), *aff'd*, 844 F.2d 1057 (4th Cir. 1988), *cert. denied*, 488 U.S. 908 (1988). Morison served

eight months of a two-year sentence and was pardoned in 2001, following concerted lobbying by

Sen. Daniel Patrick Moynihan (D-NY).[3]  Sen. Moynihan did not defend Morison's character or

his actions.  Rather, Sen. Moynihan's argument to the president was based on the rarity of

journalistic source prosecutions, and that the government charged Morison under the spying laws.

*See Moynihan Letter*, *supra* ("Press censorship has been proposed since [passage of the

Espionage Act], but never adopted.  Ironically, we now have in Samuel Loring Morison a man

who has been convicted for leaking information, while so many real spies are discovered but

never prosecuted.").  For his part, President Clinton bucked intense pressure from the CIA in

pardoning Morison, "even though there was little or nothing to be gained politically by doing so."

Stephen Aftergood, *When the President Pardoned a Leaker*, Secrecy News (Sept. 21, 2016),

https://perma.cc/X4J4-TXMX; *see also* Vernon Loeb, *Clinton Ignored CIA in Pardoning*

*Intelligence Analyst*, Wash. Post, Feb. 17, 2001, https://wapo.st/2mksgCd.

Following 2009, there have been 17 prosecutions against journalistic sources, one

prosecution of a Navy contract linguist in part for sending classified material to Stanford's

Hoover Institute, and, most recently, the return of a superseding indictment against Julian

Assange charging him with 17 counts under the Espionage Act for soliciting, receiving, and

posting online material acquired by Chelsea Manning.  *See Unauthorized Disclosure Chart*, *supra*

(listing 17 post-2009 journalistic source cases and Hitselberger, the linguist); Criminal Complaint,

---

[3]      Sen. Moynihan was no dilettante on these issues.  He chaired the Commission on
Protecting and Reducing Government Secrecy, a statutory commission created under Title IX of
Pub. L. No. 103-236, 108 Stat. 382 (1994), to investigate "all matters in any way related to any
legislation, executive order, regulation, practice, or procedure relating to classified information or
granting security clearances." *Id.* § 905(1).  The Moynihan Commission submitted its final,
unanimous report on March 3, 1997, which included numerous recommendations for improving
the classification and clearance processes to better protect properly classified material and
mitigate overclassification.  *See* Report of the Commission on Protecting and Reducing Secrecy,
S. Doc. 105-2, Appx. C (103rd Cong. 1997).

United States v. Hitselberger, No. 12-cr-231 (RC) (D.D.C. Aug. 6, 2012), https://perma.cc/TSR4-2RC8; Gabe Rottman, *Special Analysis of the May 2019 Superseding Indictment of Julian Assange*, 34 Commc'ns Lawyer 5 (2019), https://perma.cc/YW9R-XNHN.

There are several theories to explain the sudden appetite for leaks prosecutions. These include the increasing ease with which digital metadata is created, stored, and analyzed, and the government's ability to collect and use that information to more accurately track reporter-source communications, as well as an increased willingness at the Justice Department to pursue these cases following major post-9/11 leaks concerning National Security Agency surveillance. *See* Charlie Savage, Power Wars: Inside Obama's Post-9/11 Presidency, 351, 405-06 (2015).

Not only are there far more cases today than 10 years ago, one can discern two trends in these cases: punishments that continue to increase in severity and the possibility of selective prosecutions against more vulnerable, lower-level disclosers. David Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 Harv. L. Rev. 512, 617 (2013) ("[E]ven though the laws against leaking and the classification guidelines are written in generally applicable terms, in practice . . . senior policymakers are given substantially more leeway to disregard them without risk of formal sanction."). In the two cases involving senior officials since 2009, prosecutors accepted a no-jail plea (Petraeus), and President Obama pardoned the official before sentencing (Cartwright).

To illustrate the former point—the severity of modern cases relative to the one historical precedent, *Morison*—the following are the 17 post-2009 journalistic source cases along with the Hitselberger case, with the disposition of the case in parentheses:

- Shamai Leibowitz (pled guilty in 2010; 20-month sentence);

- Thomas Drake (pled guilty to one computer crime count in 2011; probation);

- Chelsea Manning (sentenced to 420 months in 2013 under the Uniform Code of Military Justice; commuted in 2016 to time served plus 120 days);

- Donald Sachtleben (pled guilty in 2013; 43-month sentence);

- Steven Jin-Woo Kim (pled guilty in 2014; 13-month sentence);

- John Kiriakou (pled guilty in 2014; 30-month sentence);

- James Hitselberger (pled guilty in 2014; time served);

- Jeffrey Sterling (convicted at trial; sentenced to 42 months in 2015);

- Edward Snowden (under indictment);

- Gen. David Petraeus (pled guilty to a misdemeanor in 2015; probation);

- Gen. James Cartwright (pled guilty to making a false statement in 2016; pardoned);

- Reality Winner (consent plea in 2018; 63 months);

- Terry Albury (pled guilty in 2018; 48 months);

- Joshua Schulte (case pending);

- James Wolfe (pled guilty to one false statement charge in 2018; two months);

- Natalie Edwards (charged under bank secrecy laws; case pending);

- John Fry (charged under bank secrecy laws; case pending);

- Daniel Hale (case pending).

Importantly, in just one year, 2018, the government secured the longest (Reality Winner) and second-longest (Terry Albury) sentences ever in an Espionage Act prosecution of a journalistic source. This is legally relevant as these sentences were formulated using the federal sentencing guidelines, which are meant to be an empirical distillation of past sentences in similar cases. *Rita v. United States*, 551 U.S. 338, 349 (2007). Notably, the guidelines ranges for the relevant sections of the Espionage Act, including those invoked in this case, 18 U.S.C. §§ 793(c)-

(e) and 798, were formulated in 1987, long before the modern era of media leak prosecutions

when the only case on the books was *Morison*.  *See* U.S. Sentencing Guidelines Manual §§

2M3.2, 2M3.3 (U.S. Sentencing Comm'n 2018).  Accordingly, not only are journalistic sources

being prosecuted like spies, they are increasingly being punished like them, which runs counter to

the explicit command of Congress that the sentencing guidelines reflect past experience with

analogous cases.  *See Albury RCFP Brief*, *supra*, at 4-5; U.S. Sentencing Guidelines Manual ch.

1, pt. A at 3 (U.S. Sentencing Comm'n 2018) ("Congress sought reasonable uniformity in

sentencing by narrowing the wide disparity in sentences imposed for *similar criminal offenses*

committed by *similar offenders*.") (emphasis added).

In addition to the increasing severity of the sentences in journalistic source cases, there are

indications of the selectivity that Sen. Moynihan warned of 1998:  "I have been told, though I do

not know it to be true, that his rank—not too high, not too low—was a consideration in the

decision to seek prosecution."  *Moynihan Letter*, *supra*.  Earlier in the letter, Moynihan quoted

President John F. Kennedy:  "[T]he ship of state leaks from the top."  *Id.*; *see also* Tom Wicker,

*Leak On, O Ship of State*, N.Y. Times, Jan. 26, 1982, https://perma.cc/E9T7-V9J3 ("[N]o

president really wants to [stop leaks].  They only want to stop the leaks they don't like . . . .").  In

other words, either because of "graymail"—the concern that defendants with particularly sensitive

knowledge will be able to force its disclosure were a case to go to trial—or because of a dearth of

political will to prosecute higher ranking leakers, the use of the Espionage Act against

unauthorized disclosers will tend to target those of lower rank.  *See* Charlie Savage, *For U.S.

Inquiries on Leaks, a Difficult Road to Prosecution*, N.Y. Times, June 9, 2012, https://perma.cc/

6LNJ-2RDJ (noting "graymail defense" in leak cases); Josh Gerstein, *Obama's Hard Line on

Leaks*, Politico, Mar. 3, 2011, https://perma.cc/5AN9-QV2G (citing Harvard law professor and

the former head of the Office of Legal Counsel, Jack Goldsmith, noting a double standard and saying, "Top officials frequently leak classified information and nothing happens to them.").

The two top-ranking individuals on the list above are illustrative.  First, retired General David Petraeus—the then-CIA director—shared eight notebooks with his biographer that contained "the identities of covert officers, war strategy, intelligence capabilities and mechanisms, diplomatic discussions, quotes and deliberative discussions from high-level National Security Council meetings, and [Petraeus's] discussions with the President of the United States." Factual Basis, United States v. Petraeus, No. 15-cr-47, ¶ 17 (W.D.N.C. Mar. 3, 2015), https://perma.cc/8K7M-N9BB.  General Petraeus pled guilty in 2015 to a misdemeanor charge of mishandling classified information under 18 U.S.C. § 1924 and received two years' probation and a $100,000 fine (increased from an agreed-upon $40,000 with prosecutors).  *Unauthorized Disclosure Chart*, *supra*, at 78.  Later, when asked if there was a double standard at play in the case, outgoing Attorney General Eric Holder, who approved the settlement, said, "There were some unique things that existed in this case that would have made the prosecution at the felony level and a conviction at the felony level very, very, very problematic."  Adam Goldman, *How David Petraeus Avoided Felony Charges and Possible Prison Time*, Wash. Post, Jan. 25, 2016, https://wapo.st/2lWLUUX.

Second, now-retired General James "Hoss" Cartwright was a Marine Corps four-star.  *See* United States Memorandum in Aid of Sentencing at 1, United States v. Cartwright, No. 16-cr-188 (D.D.C. Jan. 10, 2017), https://perma.cc/KTX7-CCHJ.  His last posting was as vice-chairman of the Joint Chiefs of Staff and he previously served, from 2004 to 2007, as commander of U.S. Strategic Command, which, among other things, is responsible for the nation's nuclear strike and deterrence capabilities.  *Id.* at 18.  In June 2013, the Justice Department notified General

Cartwright that he was under investigation for the unauthorized disclosure of classified

information about Operation Olympic Games, which involved the use of a highly sophisticated

computer virus—Stuxnet—to cause kinetic damage to Iranian nuclear centrifuges.  *See* Michael

Isikoff, *Ex-Pentagon General Target of Leak Investigation*, NBC News (June 27, 2013),

https://perma.cc/7AKN-MEMD.

Ultimately, the Justice Department abandoned an Espionage Act investigation because of

concerns that sensitive information would have to be disclosed at trial.  Ellen Nakashima and

Adam Goldman, *Leak Investigation Stalls Amid Fears of Confirming U.S.-Israel Operation*,

Wash. Post, May 10, 2015, https://perma.cc/8U45-9B42.  In 2016, General Cartwright pled guilty

to making false statements to FBI investigators about his interactions with reporters.  Prior to

sentencing, President Obama pardoned the general, reportedly in part because the president

credited General Cartwright's explanation that he provided information to correct possible

inaccuracies and to prevent the disclosure of harmful information.  Charlie Savage, *Obama

Pardons James Cartwright, General Who Lied to F.B.I. in Leak Case*, N.Y. Times (Jan. 17,

2017), https://perma.cc/NJM7-E8WZ.

In sum, context here matters.  When the Fourth Circuit heard Morison's appeal in 1987, he

was in a class of one—the only national security leaker to have been convicted under the

Espionage Act for sharing classified information with a news publication.  Now, the defendant

stands in a class that has grown at a supersonic clip, relatively speaking, over just the last decade.

Furthermore, he faces a potential sentence that is far higher than the ones contemplated by the

*Morison* court, and an environment where prosecutors have evinced a clear desire to seek

sentences that fail to take into account the manifest differences between leakers and spies.  Last,

when one juxtaposes the no-prison plea in the Petraeus case and the pardon in the Cartwright case

13

with the multi-year prison terms handed down in cases involving individuals of lower rank, the

danger of selective enforcement is demonstrably higher today than it was in the late 1980s.

Cases involving the prosecution of the public disclosure of government secrets as an act of

spying are no longer "rare and unrealistic prospect[s]." *United States v. Morison*, 844 F.2d 1057,

1084 (4th Cir. 1988) (Wilkinson, J., concurring).  Rather, as then-Attorney General Jeff Sessions

said in announcing redoubled efforts to prosecute unauthorized disclosures in August 2017:  "The

Justice Department is open for business."  News Release, Attorney General Jeff Sessions Delivers

Remarks at Briefing on Leaks of Classified Materials Threatening National Security (Aug. 4,

2017), https://perma.cc/4WQ9-BF4l.

## II. Journalistic source prosecutions directly chill newsgathering by dissuading sources from coming forward with newsworthy information in the public interest.

In the *Morison* appeal, both Judge Wilkinson and Judge Phillips, in refusing to find the

Espionage Act unconstitutionally vague or overbroad as applied to Morison, cited the lack of

evidence that a conviction in the *Morison* case would significantly chill investigative

newsgathering.  Judge Wilkinson, in his concurrence, plainly stated that "investigative reporting

is a critical component of the First Amendment's goal of accountability in government" and to

"stifle it might leave the public interest prey to the manifold abuses of unexamined power."

*Morison*, 844 F.2d at 1084 (Wilkinson, J., concurring).  But, Judge Wilkinson wrote, "It is far

from clear . . . that an affirmance here would *ever* lead to that result."  *Id.* (emphasis added).

Judge Phillips went further.  Not only did he credit the "real and substantial" First

Amendment issues in the case, he noted that the Espionage Act statutes are "unwieldy and

imprecise instruments for prosecuting government 'leakers' to the press as opposed to

government 'moles' in the service of other countries."  *Id.* at 1086 (Phillips, J., concurring

specially).  Crucially, he then rests his entire special concurrence on the determination that the

Morison conviction would not "significantly inhibit needed investigative reporting about the workings of government in matters of national defense and security." *Id.* That, Judge Phillips found, was the "*critical judicial determination* forced by the first amendment arguments advanced in this case." *Id.* (emphasis added).

After a decade of leak prosecutions, a body of qualitative evidence now exists showing that leak crackdowns dissuade sources from coming forward. Furthermore, there is also research, some quantitative, showing that the concern over government scrutiny of reporter-source communications in the context of "bulk" or "mass" electronic surveillance programs also may chill newsgathering. Although this research is focused on the effect of foreign intelligence surveillance programs that collect metadata and content under a lower standard of individualized suspicion than a probable cause warrant, the "panopticon" effect could be similar (that is, the uncertainty over when or if one is being surveilled leads to self-regulation and self-censorship). *See* Jeremy Bentham, Panopticon or the Inspection House (1791); Kelsey Cora Skaggs, *Surveilling Speech and Association: NSA Surveillance Programs and the First Amendment*, 18 U. Penn. J. Const. L. 1479, 1503 (2016). Accordingly, there is evidence of chill today that could not exist in 1987 because of the singularity of Morison's conviction.

Qualitatively, numerous national security and investigative reporters are on record that sources have dried up in a direct response to aggressive unauthorized disclosure prosecutions. Scott Shane, a national security reporter at the New York Times, said, in connection with the Obama administration's leak prosecutions:

> I think we have a real problem. Most people are deterred by those
> leak prosecutions. They're scared to death. There's a gray zone
> between classified and unclassified information, and most sources
> were in that gray zone. Sources are now afraid to enter that gray
> zone. It's having a deterrent effect. If we consider aggressive press

> coverage of government activities being at the core of American
> democracy, this tips the balance heavily in favor of the government.

Leonard Downie and Sara Rafsky, The Obama Administration and the Press:  Leak

Investigations and Surveillance in Post-9/11 America, Comm. to Protect Journalists 2 (2013),

https://perma.cc/GR88-C8FG.

Similarly, the Washington Post national security reporter Rajiv Chandrasekaran said,

"[O]ne of the most pernicious effects is the chilling effect created across government on matters

that are less sensitive but certainly in the public interest as a check on government and elected

officials." *Id.* at 4.  Frank Sesno, the former CNN Washington bureau chief now at George

Washington University, said that the leak prosecutions and restrictions on access to information

were "squeezing the flow of information at several pressure points." *Id.* at 5.  Following the

revelation that the Associated Press received a subpoena in 2013 in the Sachtleben case covering

records for more than 100 phone lines used by upwards of 30 journalists, Associated Press

president Gary Pruitt said that "[o]fficials that would normally talk to us and people we talk to in

the normal course of newsgathering are already saying to us that they're a little reluctant to talk to

us" for "fear that they will be monitored by the government."  Aamer Madhani and Kevin

Johnson, *Journalism Advocates Call Leak Investigations Chilling*, USA Today (May 21, 2013),

https://perma.cc/KZ85-ESWE (alteration in original).  Jane Mayer, a longtime investigative and

national security reporter for the New Yorker, stated in 2013 that leak prosecutions are a "huge

impediment to reporting, and so chilling isn't quite strong enough, it's more like freezing the

whole process to a standstill."  Molly Redden, *Is the 'Chilling Effect' Real?*, New Republic (May

15, 2013), http://bit.ly/2kGfUnI.

National security and investigative journalists have echoed these sentiments more

recently, in connection with the later Obama administration prosecutions and the Trump

administration's efforts against unauthorized disclosures.  "There's fear of reprisal, whether legal or professional, it's a general sense of anxiety," Spencer Ackerman, a national security reporter at the Daily Beast, told the Committee to Protect Journalists.  Avi Asher-Schapiro, *Leak Prosecutions Under Trump Chill National Security Beat*, Comm. to Protect Journalists (Mar. 6, 2019), https://perma.cc/DPX5-ZTFN.  "Are there people who talked to me, who've stopped talking to me?  Yes," said Adam Goldman, a national security reporter at the New York Times. *Id.*  "These feel like dangerous days for reporters," said Mayer.  *Id.*  Time Magazine national security and Pentagon reporter, W.J. Hennigan, wrote in a recent story about the Assange superseding indictment:  "The U.S. government's aggressive prosecution of leaks and efforts to control information are already having a chilling effect on journalists and government whistle-blowers.  Many journalistic sources, including those of TIME, have shifted to encrypted means of communication or don't engage at all as a result of the Assange indictment."  W.J. Hennigan, *Prosecutors Threw the Book at Julian Assange.  Here's How That Could Backfire*, TIME Magazine (June 14, 2019), https://perma.cc/P7YK-NZFA.

With respect to the qualitative and quantitative research on mass surveillance, there are several notable studies that show a chilling effect in this context on reporter-source interactions. Human Rights Watch and the American Civil Liberties Union issued a report in 2014 based on interviews with 46 journalists, 42 lawyers, and four government officials that found that increased government surveillance cut "away at the ability of government officials to remain anonymous in their interactions with the press, as any interaction—any email, any phone call—risks leaving a digital trace that could subsequently be used against them."  G. Alex Sinha, With Liberty to Monitor All, 1, 3 (2014), https://perma.cc/6L9T-NZHK.  The report concluded that mass surveillance hinders newsgathering and reporting because it takes reporters "significantly longer

to gather information . . . and they are ultimately able to publish fewer stories for public consumption." *Id.* at 4.

Another study, conducted by independent researchers at FDR Group and commissioned by the writers' fellowship PEN America, surveyed more than 520 American writers, 22 percent of whom self-identified as journalists, about whether they have changed their behavior following revelations of mass surveillance.  Katy Glenn Bass, Chilling Effects:  NSA Surveillance Drives U.S. Writers to Self-Censor 3, 26 (2013), https://perma.cc/MS2P-AU7U.  The topline findings were that 28% of the surveyed group curtailed or avoided social media activities, and another 12% seriously considered doing so; 24% percent deliberately avoided certain topics in email or telephone conversations, and another 9% seriously considered doing so; 16% have avoided writing or speaking on a particular topic, and another 11% have seriously considered doing so; 16% refrained from conducting internet searches or visiting websites on controversial or suspicious topics, and another 12% seriously considered doing so; 13% took extra steps to disguise or cover their digital footprints, and another 11% have seriously considered doing so; and 3% have declined opportunities to meet individuals for fear of surveillance.  *Id.* at 6.  Moreover, for the journalists in the survey group, 93 percent were "very concerned" about government efforts to compel journalists to reveal the sources of classified information and 30 percent of journalist respondents reported taking extra steps to protect source anonymity.  *Id.* at 8.

Finally, a study by law professor Jonathon Penney in 2016 used Wikipedia traffic to determine if it changed following widespread publicity in 2013 about mass surveillance programs. *See* Jonathon Penney, *Chilling Effects:  Online Surveillance and Wikipedia Use*, 31 Berkeley Tech. L. J. 117 (2016).  The study found a "statistically significant reduction [in Wikipedia traffic to privacy-sensitive articles] after June 2013" and "that there was a long-lasting secular trend in

traffic to such articles." *Id.* at 125. In other words, there was an immediate dip in traffic to these articles, with topics like "Al Qaeda," "eco-terrorism" and "dirty bomb," and a long-term, non-periodic trend downward. *Id.* at 144, 176 T.8.

In short, although much of the evidence of chill is necessarily anecdotal and qualitative, there is now a significant amount of that evidence, as well as some quantitative evidence showing that mass surveillance can chill information gathering by the public, including the press. This evidence did not exist at the time of the *Morison* appeal and the two concurring Fourth Circuit judges rested much of their reasoning on how that case did not seem to pose a threat of a chilling effect.

**III.    This increase in the number of cases, as well as the rising severity of sentences and the selectivity of prosecutions, is relevant for the overbreadth and vagueness analyses and serves to distinguish this case from *Morison*.**

In addition to the more demonstrable chill today and the proliferation of criminal media leak prosecutions, two other aspects of the recent history of leak cases suggest that both the overbreadth and void-for-vagueness analyses in *Morison* might come out the other way now. Indeed, this is one of the cases where the vagueness in the statute strengthens the arguments of those who see the Espionage Act as overbroad. [4]   Accordingly, the discussion below is relevant to

---

[4]    For instance, the phrase "communicates . . . to any person not entitled to receive [national defense information]" in 18 U.S.C. § 793(d) and (e) is inscrutable. On the one hand, the express use of the term "publishes" in other parts of the Espionage Act—namely, §§ 794(b) and 798(a)—suggests that Congress did not intend "communicates" to include dissemination to the public more broadly. But the dictionary definition of "communicate" is to "share or exchange information or ideas" and does not rest on whether the sharing or exchanging is with one person or the public at large. *See* Concise Oxford English Dictionary 289 (11th ed. 2004). In fact, the "pure publication" counts in the superseding Assange indictment effectively adopt the position that "communicates" means publish. *See Assange Superseding Indictment*, *supra*, at 32-34. If the government's theory is a permissible construction of the statute, then the law could cover acts of publication by the press, acts that would almost certainly receive First Amendment protection. *See Morison*, 844 F.2d at 1081 (Wilkinson, J., concurring) ("[P]ress organizations . . . are not being, and probably could not be, prosecuted under the espionage statute."); *see also Bartnicki v. Vopper*, 532 U.S. 514 (2001) ("[I]t by no means follows that punishing disclosures of lawfully

both of these "closely related" doctrines. *See* Erwin Chemerinsky, Constitutional Law 994-95 (5th ed. 2015).

First, the increasing severity of punishments of late, including last year's longest and second-longest sentences ever secured by the government in these cases, requires a more searching vagueness review under recent Supreme Court precedent. The Justice Department is directly applying the sentencing guidelines ranges that were formulated based on traditional espionage. The espionage statutes come with the highest potential penalty—a significant deprivation of liberty and, under the wartime spying law, § 794(b), a possible death sentence. Not only do these statutes potentially punish expression, which independently requires searching vagueness review, *see Smith v. Goguen*, 415 U.S. 566, 573 (1974) (overturning law barring "contemptuous[]" treatment of flag), they come with the same possible punishment as selling secrets to Russia, China, North Korea, or Iran. That the government has aggressively taken this position in numerous journalistic source cases over the last 10 years mandates a new look at the vagueness of the law because the more severe the penalty the more exacting the standard of review. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring) ("Given [the severity of civil penalties today], any suggestion that criminal cases warrant a heightened standard of review does more to persuade me that the criminal standard should be set *above* our precedent's current threshold than to suggest the civil standard should be buried *below* it.") (emphasis in original); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982) ("The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment.").

---

obtained information of public interest by one not involved in the initial illegality is an acceptable means of serving those ends.").

Similarly, the indicia of selectivity in the post-2009 cases—the Petraeus plea deal and the decision to prosecute General Cartwright on a lesser charge (plus his pardon), versus the increasingly aggressive investigation and prosecution of lower ranking individuals—present more than a specter of arbitrary or discriminatory enforcement.  *See* Pozen, *supra*, at 617 (offering both the cynical perspective on disparities in leak enforcement between higher- and lower-ranking defendants and a more sympathetic view, and confirming the existence of the disparity).  This development raises several legal and practical considerations, most acutely that the law would thus permit high level officials to leak and influence the policy debate while the spying laws are deployed to intimidate journalistic sources into silence, depriving the public of countervailing information.  This kind of concern is one of the primary evils vagueness doctrine exists to combat.  *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."); *see also Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring) ("Vague laws invite arbitrary power."); *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015) ("[T]he indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges.").

Finally, as noted above, just this year the government secured an indictment including charges under § 793(e) of the Espionage Act that, as a legal matter, are based exclusively on the act of "communicating the [classified] documents to all the world by publishing them on the internet."  *Superseding Assange Indictment*, *supra* n.5, at 33-35.  Although the substituted language in the square brackets above is "containing the names of . . . sources," the failure to redact the names of sources is not an automatic trigger of Espionage Act liability.  Rather the underlying legal theory is that the publication of classified information online, without more,

21

Case 1:19-cr-00059-LO   Document 63-1   Filed 09/23/19   Page 29 of 32 PageID# 493

constitutes "willfully communicat[ing]" national defense information "to any person not entitled to receive it" and thus violates § 793(e).

Put plainly, the Justice Department has now taken the position in a live prosecution that pure publication can trigger the Espionage Act. This significant step goes directly to vagueness—it's impossible to know which publications will trigger liability—and, in particular, to overbreadth as the government's theory in the Assange superseding indictment opens up the unavoidable *possibility* that the government will seek to prosecute other acts of publication. *See Morison*, 844 F.2d at 1057 (Wilkinson, J., concurring) (refusing to find risk of substantial overbreadth because improper applications of the law would cause a "political firestorm"). News reports suggest that in fact the forbearance in the Assange case under the Obama administration, as the facts in that indictment were known in Manning's 2011 court martial, was because "Assange's conduct was too similar to that of reporters at established news organizations." Devlin Barrett, et al., *Some Federal Prosecutors Disagreed with Decision to Charge Assange Under Espionage Act*, Wash. Post, May 24, 2019, https://wapo.st/2m2sopV.[5] Accordingly, the decision to pursue charges against Assange under this theory is a legally relevant datapoint in the related overbreadth and void-for-vagueness analyses here. While the conduct of future administrations is of course unknowable, current practice demonstrates that leak prosecutions are more likely now than they were in *Morison*. *See also* Pozen, *supra*, at 627 ("[Q]uestions about whether the Espionage Act . . . could be applied to media leakers, as a legal matter, [have] largely giv[en] way to questions about how aggressively they should be applied, as a policy matter.").

---

[5]     Amicus takes no position on whether, in fact, Assange is a journalist and that fact is "immaterial" for the First Amendment analysis in his case. *See* Gabe Rottman, *Special Analysis of the May 2019 Superseding Indictment of Julian Assange*, Reporters Comm. for Freedom of the Press (May 30, 2019), http://bit.ly/2mqI9Hn.

IV.     **Drone warfare is especially newsworthy as a new and controversial tactic.**

Amicus takes no position on the use of unmanned aerial vehicles as an instrument of

warfare.  As a matter of newsworthiness, however, not all classified information is created equal.

The drone program itself, especially the practice of "targeted killing," is intensely controversial

on multiple levels.  *See* Constitutional and Counterterrorism Implications of Targeted Killing,

Hearing Before the S. Judiciary Subcomm. on the Constitution, Civil Rights, and Human Rights

at 1 (113th Cong. 2013) (statement of Rosa Brooks), http://bit.ly/2m78av3 ("[T]he mere mention

of drones tends to arouse strong emotional reactions on both sides of the political spectrum.").  As

such, that controversy amplifies the public interest in unvarnished data and information—

particularly data or information that contradicts official statements by the government.  *See*

Benjamin Wittes, *Civilian Deaths from Drone Strikes*, Lawfare (Aug. 12, 2011),

https://perma.cc/6ZMH-VBH2 ("[The difficulty in independent verification of government data]

means that we are, at some level, inevitably proceeding on the basis of an instinct about how

much we trust government to know and report its error rate.").  Because of challenges in

collecting that data from non-governmental sources, often the only way to get that data to the

public is through unauthorized disclosures of classified information by anonymous sources.

There are three salient reasons for the increased public interest in, and therefore newsworthiness

of, this material, versus properly classified information about long-accepted and established

military or intelligence activities.

First, drone warfare is relatively new but raises issues that have been debated from the

dawn of the aviation age.  *See Statement of Rosa Brooks*, *supra*, at 1 ("Ultimately, 'drones' *as*

*such* present us with few new issues—but the manner in which the United States has been using

drone strikes raises serious questions about their strategic efficacy and unintended

consequences.") (emphasis in original).  Questions about proportionality, necessity, collateral

damage, and the targeting of civilian populations are all in direct play in the debate over U.S.

drone strike policy—and cannot be answered without public visibility into both the substance and

process of government decision-making.  *See* Frank E. Quindry, *Aerial Bombardment of Civilian*

*and Military Objectives*, 2 J. Air L. and Commerce 474, 482-491 (1931), https://perma.cc/934L-

GR3V (surveying the early attempts to regulate aerial bombardment); *see also Drone Strikes and*

*Transparency*, Nat'l Pub. Radio (Mar. 10, 2019), https://perma.cc/98CG-V7LJ (discussing Trump

administration partial rescission of Obama administration transparency order).

Two, advocates for drone strikes within government, whose claims are shielded by the

classification system from scrutiny, have publicly claimed that such strikes are precise and limit

civilian casualties.  That claim has been challenged and the right answer to this dispute is

important for a democratic society to hold the military and intelligence agencies accountable.

*See, e.g.*, Scott Shane, *C.I.A. Is Disputed on Civilian Toll in Drone Strikes*, N.Y. Times, Aug. 11,

2011 (reviewing official claims of high precision—including those by anonymous sources in

government—and debate over accuracy); *Civilian Casualties & Collateral Damage*, Lawfare,

https://perma.cc/HE49-JMVC (summarizing the debate and data sources).

And, three, there is a debate within government itself—a debate that dates back to the very

founding of this country's civilian, peacetime intelligence agency—as to whether CIA should be

responsible for conducting paramilitary operations, or whether American foreign policy is better

served by a CIA focused on intelligence collection and analysis.  *See* Tim Weiner, Legacy of

Ashes:  The History of the CIA 59-61 (2007) (recounting CIA Director Walter Bedell Smith's

concerns over scope of covert operations for fear the "operational tail will wag the intelligence

dog").  Additionally, the CIA's responsibility for covert operations and its ability to conduct

drone strikes create different congressional reporting requirements from the military and, given that CIA strikes are covert, they are unacknowledged by the White House. *See* Gordon Lubold and Shane Harris, *Trump Broadens CIA Powers, Allows Deadly Drone Strikes*, W.S.J., Mar. 13, 2017, https://on.wsj.com/2m7abY9; *see also* Michael E. DeVine, Cong. Research Service, Covert Action and Clandestine Activities of the Intelligence Community:  Selected Definitions in Brief (2019), https://perma.cc/3M3E-FFHV.

In sum, the material alleged to have been leaked is indisputably newsworthy and public visibility into drone operations is essential for democratic governance and accountability.

**CONCLUSION**

For all these reasons, amicus curiae Reporters Committee supports defendant's motion to dismiss the indictment.

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Jennifer A. Nelson_____*
Jennifer A. Nelson
VA Bar No. 94394
University of Virginia Law School
First Amendment Clinic
580 Massie Road
Charlottesville, VA 22903
Phone: 434.924.7354
Facsimile: 434.924.4672
jn5g@virginia.edu
*Counsel of Record for Amicus Curiae the*
*Reporters Committee for Freedom of the*
*Press*

Gabriel Rottman*
University of Virginia Law School
First Amendment Clinic
580 Massie Road
Charlottesville, VA 22903
Phone: 434.924.7354
Facsimile:  434.924.4672
*\*Pro Hac Vice Application Pending*

</div>