FILED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

2021 JUL 13 ℗ 2: 32

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:19-cr-59 |
| v. | Hon. Liam O'Grady |
| DANIEL EVERETTE HALE, | |
| Defendant. | |

## BRIEF OF AMICUS CURIAE
## <u>REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS</u>

*Of Counsel:*

Bruce D. Brown
Katie Townsend
Gabe Rottman
Mailyn Fidler
Reporters Committee For
  Freedom Of the Press
1156 15th St. NW, Ste. 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

Jay Ward Brown, VSB No. 34355
Mara Gassmann, VSB No. 82131
Ballard Spahr LLP
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Telephone (202) 508-1136
Facsimile (202) 661-2299
brownjay@ballardspahr.com
gassmannm@ballardspahr.com

*Counsel for Reporters Committee*
*For Freedom Of The Press*

**CORPORATE AND FINANCIAL DISCLOSURE STATEMENTS**

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable judges and magistrate judges to evaluate possible disqualifications or recusal, the undersigned counsel for the Reporters Committee for Freedom of the Press certify that there are no parents, trusts, subsidiaries, and/or affiliates that have issued shares or debt securities to the public.

Pursuant to Fourth Circuit Local Rule 26.1, the Reporters Committee for Freedom of the Press declares that it is an unincorporated non-profit association of reporters and editors with no parent corporation and no stock.

i

# TABLE OF CONTENTS

CORPORATE AND FINANCIAL DISCLOSURE STATEMENTS........................i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF AMICUS CURIAE ........................................................1

SUMMARY OF ARGUMENT ..............................................................3

ARGUMENT ....................................................................................8

I.      The severe sentencing ranges for espionage offenses based on spying cases are not appropriate for disclosure of national defense information to the media........................................................8

II.     Severe sentences have been rare in post-2009 leak cases ............10

III.    Sentencing mitigation on constitutional grounds may be appropriate in unauthorized disclosure cases ...............................14

CONCLUSION.................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007)........................................................................................9, 10

*Kimbrough v. United States,*
    552 U.S. 85 (2007).............................................................................................9

*Rita v. United States,*
    551 U.S. 338 (2007)...........................................................................................8

*United States v. Booker,*
    543 U.S. 220 (2005)...........................................................................................9

*United States v. Daniels,*
    446 F.2d 967 (6th Cir. 1971) ...........................................................................16

*United States. v. Kiriakou,*
    898 F. Supp. 2d 921 (E.D. Va. 2012) ..............................................................16

*United States v. Morison,*
    844 F.2d 1057 (4th Cir. 1988) ...................................................................1, 5, 6

*United States v. Rosen,*
    445 F. Supp. 2d 602 (E.D. Va. 2006) ...............................................................4

**Statutes**

18 U.S.C. § 3553 ......................................................................................................10

**Other Authorities**

*Federal Cases Involving Unauthorized Disclosures to the News
    Media, 1778 to the Present,* Reporters Comm. for Freedom of the
    Press, https://www.rcfp.org/resources/leak-investigations-chart/
    (last updated Dec. 8, 2019) ..........................................................................4, 12

Gabe Rottman, *The Assange Indictment Seeks to Punish Pure
    Publication,* Lawfare (May 24, 2019), https://perma.cc/MD8J-
    7XCC ..................................................................................................................5

Harold Edgar and Benno C. Schmidt, Jr., *The Espionage Statutes and Publication of Defense Information*, 73 Colum. L. Rev. 929, 941 (1973) ........................................................................................................3

Josh Gerstein, *Leniency for AIPAC Leaker*, Politico (June 11, 2009), https://perma.cc/VZ5E-9YXQ ..............................................................4

Ltr. from the Hon. Daniel Patrick Moynihan to President William Jefferson Clinton (Sept. 29, 1998), https://perma.cc/W5MC-QXUC .................4

Mailyn Fidler, *Conscientious Objectors and Whistleblowers: Sentencing Should Recognize First Amendment Interests*, Just Security (Oct. 18, 2018), https://perma.cc/9E9Y-YLMV ..................................15

Mailyn Fidler, *First Amendment Sentence Mitigation: Beyond a Public Accountability Defense for Whistleblowers*, 11 Harv. Nat'l Sec. J. 214, 218 (2020) ..........................................................14, 15, 16

United States Sentencing Comm'n, Guidelines Manual, §2M3.3 (2018) .............................................................................................8

## INTEREST OF AMICUS CURIAE

The Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated non-profit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

Amicus has a powerful interest in ensuring that the espionage laws cannot be used in a manner that impedes newsgathering by dissuading sources from disclosing newsworthy government information that is essential for an informed electorate. For that reason, amicus joined 30 other news media amici in a brief at the U.S. Court of Appeals for the Fourth Circuit in 1987 urging reversal of Samuel Loring Morison's 1985 conviction—the first and, until 2009, only successful prosecution of a journalistic source under the Espionage Act of 1917. *See* Br. of the Washington Post et al., Amici Curiae, In Support of Reversal at 49 ("Morison Br."), *United States v. Morison*, No. 86-5008 (4th Cir. filed Mar. 27, 1987), https://perma.cc/TZV6-4FD7; *see also United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988). Amici's arguments in *Morison* rested on the constitutional infirmities in the Espionage Act itself, infirmities that pose risks to newsgathering

1

and the free flow of information to the public that transcended the facts of that case. Morison Br. at 7.

Additionally, amicus filed a brief at an earlier stage of this case surveying the marked post-2009 increase in prosecutions of journalistic sources under the Espionage Act and other laws governing the unauthorized disclosure of government information, and how that increase calls into question the constitutional analysis in the Fourth Circuit's *Morison* opinion. *See* Unopposed Br. of Amicus Curiae Reporters Comm. For Freedom of the Press ("Unopposed Br."), *United States v. Hale*, No. 1:19-cr-00059 (E.D. Va. filed Sept. 23, 2019). Further, amicus filed a brief at the sentencing phase in another recent journalistic source case, that of former FBI special agent Terry Albury, which highlighted the concern that sentencing alleged journalistic sources as harshly as actual spies could suppress the disclosure of newsworthy information in the public interest. *See* Unopposed Br. of Amicus Curiae Reporters Comm. For Freedom of the Press, *United States v. Albury*, No. 18-cr-00067 (D. Minn. filed Oct. 4, 2018).

Amicus therefore has a strong interest in sentencing practices in news media "leak" cases, both because the aggressive use of the espionage laws against journalistic sources can cause such sources to dry up, denying the public information central to its ability to hold the government accountable, and because draconian punishment in these cases can lead to the same effect.

## SUMMARY OF ARGUMENT

Congress passed the Espionage Act of 1917 to combat the crime in its name—the disclosure of national defense secrets to a foreign adversary for financial or ideological gain. Congress's intent to limit the law to actual spying was manifest in its rejection of a provision—lobbied aggressively for by the Wilson administration—that would have explicitly authorized press censorship. *See* Harold Edgar and Benno C. Schmidt, Jr., *The Espionage Statutes and Publication of Defense Information*, 73 Colum. L. Rev. 929, 941 (1973), https://perma.cc/7JRJ-HGTN. For more than 90 years after its passage, the Act had been deployed in only a handful of cases involving press leaks, none of which led to a conviction under the law, save the prosecution of Navy intelligence analyst Samuel Loring Morison in 1985 for leaking classified information to a defense magazine. His case was so singular that President Bill Clinton pardoned Morison in 2001 following concerted advocacy by Senator Daniel Patrick Moynihan, Democrat of New York and chair of the Senate Commission on Protecting and Reducing Government Secrecy.

As part of that effort, Senator Moynihan succinctly articulated the danger in aggressively pursuing leakers using the criminal justice system:

> What is remarkable is not the crime, but that he is the only one convicted of an activity which has become a routine aspect of government life: leaking information to the press in order to bring pressure to bear on a policy question.

3

> As President Kennedy has said, "the ship of state leaks from the top."
> An evenhanded prosecution of leakers could imperil an entire
> administration. If ever there were to be widespread action taken, it
> would significantly hamper the ability of the press to function.

Ltr. from the Hon. Daniel Patrick Moynihan to President William Jefferson Clinton

(Sept. 29, 1998), https://perma.cc/W5MC-QXUC (hereinafter the "Moynihan

Ltr.").

As surveyed in the Reporters Committee's earlier brief before this Court in

support of Defendant's motion to dismiss the indictment, *see* Unopposed Br. at 6,

the government's disinclination to bring spying charges in leak cases shifted

dramatically starting in earnest in 2009.[1] Since then, the Justice Department has

brought 18 cases against government employees or contractors for the

unauthorized disclosure of government information to the press, as well as one

against a Navy linguist based in part on the disclosure of classified information to a

think tank. *See Federal Cases Involving Unauthorized Disclosures to the News*

---

[1]    There is one other pre-2009 case that resulted in a conviction under the
Espionage Act outside of the traditional espionage context, that of Pentagon
analyst Larry Franklin, who pled guilty in 2005 to disclosing national defense
information to two employees of the American Israel Public Affairs Committee,
who allegedly disclosed that information to others, including members of the news
media. *See United States v. Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006), *aff'd*,
557 F.3d 192 (4th Cir. 2009). There, Franklin received a dramatically reduced
sentence of community confinement (down from an initial 12 years) after Judge
T.S. Ellis "cited the lack of punishment and light punishment on other leakers" as
well as Franklin's cooperation with authorities. *See* Josh Gerstein, *Leniency for
AIPAC Leaker*, Politico (June 11, 2009), https://perma.cc/VZ5E-9YXQ.

*Media, 1778 to the Present*, Reporters Comm. for Freedom of the Press,

https://www.rcfp.org/resources/leak-investigations-chart/ (last updated Dec. 8,

2019) (hereinafter "Unauthorized Disclosure Chart").  In May 2019, the Justice

Department also, for the first time, secured a grand jury indictment charging a

private party, not subject to a secrecy agreement, with violating the Espionage Act

based, in part, on the sole act of publicly disclosing national defense information.

*See* Gabe Rottman, *The Assange Indictment Seeks to Punish Pure Publication*,

Lawfare (May 24, 2019), https://perma.cc/MD8J-7XCC.

Amicus's earlier brief further discussed how this increase in the number of

spying cases against journalistic sources affects the constitutional analysis in the

Fourth Circuit's *Morison* decision, in which Judge Wilkinson and Judge Phillips,

in separate concurrences (with Judge Phillips concurring specially), determined

that affirmance in that specific case would not lead to a flood of cases impairing

investigative journalism by chilling sources from coming forward.  *See Morison*,

844 F.2d at 1084 (Wilkinson, J., concurring) (finding no substantial overbreadth

because prosecutions for disclosure of "governmental waste and misconduct [are a]

rare and unrealistic prospect").  Indeed, Judge Phillips explicitly recognized the

potential for vagueness and overbreadth problems in journalistic source cases,

writing that "the Espionage Act statutes as now broadly drawn are unwieldy and

imprecise instruments for prosecuting government 'leakers' to the press as opposed

to government 'moles' in the service of other countries." *Id.* at 1085 (Philips, J., concurring specially).  But Judge Phillips found that the "critical judicial determination" underpinning his special concurrence was Judge Wilkinson's "convincing discussion of the practical dynamics" of government-press relations "to bolster his estimate that this use of the statute will not significantly inhibit needed investigative reporting about the workings of government in matters of national defense and security." *Id.* at 1086.  As detailed in the earlier brief, the post-2009 increase in journalistic source prosecutions has produced growing qualitative, and some quantitative, evidence that the chill on newsgathering dismissed as unrealistic in the *Morison* concurrences is indeed real. *See* Unopposed Br. at 14-19.

Amicus respectfully offers three additional arguments here for the proposition that the severity of punishment in leak cases can create the same First Amendment concerns as the prosecutions themselves, and that the difference between traditional spying and disclosing government secrets to the press can properly be considered in determining an appropriate sentence.

First, the federal sentencing guidelines are ill-equipped to capture the First Amendment concerns raised by the criminal prosecution, under a World War I-era law aimed at punishing spies, of an individual who discloses newsworthy information in the public interest through the press.  The guidelines are an

6

empirical project, based on a synthesis of thousands of past sentences in like cases, to provide consistency in federal sentencing. Because the guidelines levels applicable here were formulated in 1987, long before the post-2009 increase in media leak prosecutions, those levels overwhelmingly reflect sentencing practices in traditional espionage cases, not leak matters. The Court would be within its discretion to consider that fact in sentencing.

Second, sentences in leak cases have consistently been well below the low end of the sentencing range recommended by the unadjusted base offense level or levels applicable in Defendant's case. The median sentence length for all 16 leak cases from 2009 to present ending in conviction is 16.5 months, with several cases ending in probation, commutation, or pardon.[2]

Finally, third, historical precedent exists for sentencing mitigation in cases involving sensitive First Amendment interests, which may be appropriate in journalistic source prosecutions under the Espionage Act.

---

[2]    Probation and pardons are counted as zero months for the purposes of this calculation; commutations are counted as the full original sentence.

## **ARGUMENT**

I.  **The severe sentencing ranges for espionage offenses based on spying cases are not appropriate for disclosure of national defense information to the media.**

In formulating the sentencing guidelines in 1987, the United States

Sentencing Commission (the "Sentencing Commission") adopted a largely data-

driven approach to reflect past practice and promote consistent sentencing across

the federal courts. *See Rita v. United States*, 551 U.S. 338, 349 (2007) ("Rather

than choose among differing practical and philosophical objectives, the

Commission took an 'empirical approach,' beginning with an empirical

examination of 10,000 presentence reports setting forth what judges had done in

the past and then modifying and adjusting past practice in the interests of greater

rationality, avoiding inconsistency, complying with congressional instructions, and

the like."). The Guidelines Manual currently sets the unadjusted base offense level

that likely applies to the count Defendant has pled guilty to—the retention and

transmission of tangible secret and top-secret national defense information in

violation of 18 U.S.C. § 793(e)—at 29, which translates to 87 to 108 months with

no prior criminal history (the level is 24 for classification below top secret).

United States Sentencing Comm'n, Guidelines Manual, §2M3.3 (2018).[3]

---

[3]    Section 2M3.2 of the Guidelines Manual applies to "diverse forms" of "obtaining and transmitting national defense information with intent or reason to believe the information would injure the United States or be used to the advantage

Crucially, those base offense levels were set in 1987, long before the post-2009 increase in press leak prosecutions.  As such, not only do the guidelines overwhelming reflect sentencing data in *spying* cases, the fact that press leak cases were virtually unheard of in 1987 (save Morison) also means that the Sentencing Commission had no occasion to consider the First Amendment implications of charging press leakers under the espionage statutes when setting these levels.

The Court would thus be within its discretion to consider, for instance, the potential chill on newsgathering or other knock-on effects from leak prosecutions that are not present in spying cases when assessing the appropriate application of the sentencing guidelines to media leak cases.  *Cf. Kimbrough v. United States*, 552 U.S. 85, 110 (2007) ("[I]t would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s [the Sentencing Reform Act's] purposes, even in a mine-run case.").  Indeed, in the post-*Booker* era, where the Guidelines are only advisory, *United States v. Booker*, 543 U.S. 220, 260-62 (2005), courts may not "presume that the Guidelines range is reasonable,"

---

of a foreign government," and sets the base offense level higher than § 2M3.3—at level 35 for top secret information and level 30 otherwise.  The government has not yet filed its sentencing memorandum, so amicus does not know which section of the Guidelines Manual it will invoke.  But if it does seek a sentence under Section 2M3.2 up to the statutory maximum of 10 years, the concerns raised here would apply with equal, or greater, force.

*Gall v. United States*, 552 U.S. 38, 50 (2007) (citing *Rita*, 551 U.S. at 351)). Further, a reviewing court may not presume that a sentence outside the guidelines range is *un*reasonable. *Id.* at 51. Rather, an appellate court "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.*

On their face, several § 3553(a) factors would support sentences below the guidelines ranges in press leak cases. Sentences should reflect the "nature and circumstances" of the offense, the command that the sentence provide "just punishment," the requirement that the sentence not be "greater than necessary," and the need to avoid disparities in sentencing between defendants who have been convicted of "similar conduct." *See* 18 U.S.C. § 3553(a)(1), (a)(2), (a)(6). With respect to the guidelines ranges for espionage offenses, the Sentencing Commission did not consider these factors as applied to a press leak case because it could not—there was only one such case in 1987.

## II.   Severe sentences have been rare in post-2009 leak cases.

In the post-2009 leak cases that have resulted in conviction, lengthy sentences have been the exception. Since 2009, for instance, four other individuals have, like Defendant, pled guilty to one count of violating various subparts of the Espionage Act, and in each case the ultimate sentence was below the low-end of the guidelines range. Shamai Leibowitz pled guilty to one count of violating 18

U.S.C. § 798(a); the relevant guidelines suggested 46 to 57 months, and he

received 20.  *See* Judgment, *United States v. Leibowitz*, No. 8:09-cr-00632 at 2 (D.

Md. May 25, 2010); Plea Agreement at 4, *Leibowitz*, No. 8:09-cr-00632 at 4 (D.

Md. Dec. 17, 2009).  Steven Jin-Woo Kim pled guilty to one count of violating 18

U.S.C. § 793(d); the relevant guidelines advised a sentence of 120 months at the

high-end of the range, but he received a 13-month sentence.  *See* Gov't Sentencing

Mem. at 8, *United States v. Kim*, No. 10-225 (D.D.C. Mar. 24, 2014).  Henry Frese

pled guilty to one count of violating 18 U.S.C. § 793(d).  Plea Agreement at 1,

*United States v. Frese*, No. 1:19-cr-304 (E.D. Va. Feb. 20, 2020).  In his case, the

relevant guidelines suggested a sentence of 151 to 188 months, but he received 30

months.  *See* Sentencing Hr'g, *Frese*, No. 1:19-cr-304 (E.D. Va. June 18, 2020).

Reality Winner pled guilty to one count of violating 18 U.S.C. § 793(e); the

relevant guidelines range advised 87 to 108 months, but she received 63 months.

*See* Plea Agreement at 8, *United States v. Winner*, No. 1:17-cr-00034 (S.D. Ga.

Aug. 23, 2018).  In each of these one-count plea agreements, the court departed

downward from the applicable guidelines range at sentencing.

Further, surveying all of the 16 post-2009 cases involving the unauthorized

disclosure of government information to the press or public that resulted in

conviction likewise shows that relatively severe sentences are rare.[4]  As Figure 1 *infra* shows, the most common sentence in these cases is the lightest:  the outcomes for seven defendants ranged from receiving a pardon, probation, or up to 12 months of incarceration.[5]  Two received sentences of 13 to 24 months, and five received sentences between 24 and 48 months.[6]  Only two cases received more than 48 months; one of these was Winner at 63 months, and the other was Chelsea

---

[4]     Amicus includes in this list the Hitselberger case, which involved allegations that the defendant had disclosed classified information to a think tank, not the press; the Sours case, which was prosecuted under bank secrecy laws; and the Fry case, which was also prosecuted under bank secrecy laws.  But, even exempting those three, the median sentence for the remaining 13 cases that have resulted in conviction is 30 months.

[5]     Those are:  Thomas Drake (pled to one misdemeanor computer crime count, probation); James Hitselberger (pled to one misdemeanor count of unauthorized removal and retention of classified documents, time served of 10 months); David Petraeus (pled to one misdemeanor count of mishandling classified information, probation); James Cartwright (pled to false statements offense, pardoned); James Wolfe (pled to false statement offense, two months); Natalie Sours Edwards (pled to one count of violating treasury regulations, six months); John Fry (pled to one count of violating treasury regulations, probation).  *See* Unauthorized Disclosures Chart, *supra*.

[6]     These are:  Shamai Leibowitz (pled to one count of violating § 798(a) of the Espionage Act, 20 months), Stephen Jin-Woo Kim (pled to one count under the Espionage Act, 13 months); Donald Sachtleben (pled to two counts under the Espionage Act, 43 months); John Kiriakou (pled to one count under Intelligence Identities Protection Act, 30 months); Jeffrey Sterling (convicted on nine counts, seven of which were under the Espionage Act, 42 months); Terry Albury (pled to two counts under the Espionage Act, 48 months); Henry Frese (pled to one count under the Espionage Act, 30 months).  *See* Unauthorized Disclosures Chart, *supra*.

Manning, who was court-martialed and sentenced to 420 months (later commuted to time served plus 120 days).  Overall, the median sentence length for these 16 cases is 16.5 months.

**Figure 1**



It also bears noting that the highest-ranking defendants in this list also received the lightest punishment.  General David Petraeus, the former commander of NATO and U.S. forces in Afghanistan and director of the Central Intelligence Agency, received probation for mishandling classified information in violation of 18 U.S.C. § 1924.  General James Cartwright, the former vice chairman of the Joint Chiefs of Staff, was pardoned by President Obama before sentencing after he pled guilty to one count of making false statements under 18 U.S.C. § 1001(a)(1).

13

As amicus noted in the earlier brief before this Court, the possibility of selective
enforcement against lower-ranking government employees and contractors is also
potentially relevant to the constitutionality of the Espionage Act.  Unopposed Br.
at 12-14; *cf.* Moynihan Letter ("I have been told, though I do not know it to be
true, that his rank—not too high, not too low—was a consideration in the decision
to seek prosecution.")

In sum, assuming the application of § 2M3.3, even the low end of the
recommended range in Defendant's case—87 months—would be aberrational, and
the Court has discretion to consider the disposition of like cases in sentencing here.

## III.   Sentencing mitigation on constitutional grounds may be appropriate in unauthorized disclosure cases.

Finally, historical precedent supports judicial discretion to mitigate
sentences on constitutional grounds in cases involving strong First Amendment
concerns.  Although constitutional rights typically function as a defense to
prosecution, where that route has been foreclosed, courts have, under certain
circumstances, considered the relevance of First Amendment considerations at
sentencing.  *See* Mailyn Fidler, *First Amendment Sentence Mitigation: Beyond a
Public Accountability Defense for Whistleblowers*, 11 Harv. Nat'l Sec. J. 214, 218
(2020).  Cases involving the use of the espionage statutes to prosecute individuals
who disclosed newsworthy information to the press may be the type of case where
constitutional mitigation would be appropriate, particularly given the danger that

14

severe sentences could harm newsgathering by dissuading sources from speaking to members of the news media.

Typically, courts mitigate sentences on a constitutional basis when statutory efforts to craft a defense have failed and when motive has been generally ruled inadmissible at the trial stage. *Id*. at 223 n.45; 247-49. For example, both factors were present in cases involving absolutist conscientious objectors during the Vietnam War and rescuers who violated the Fugitive Slave Act. In both instances, courts mitigated sentences on the basis of the First Amendment rights at stake.

Examining the absolutist conscientious objector cases is instructive. Four key cases in the 1970s involved defendants each given the maximum sentence for failing to meet their obligations under the draft. *See id*. at 241-45 (collecting cases); *see also* Mailyn Fidler, *Conscientious Objectors and Whistleblowers: Sentencing Should Recognize First Amendment Interests*, Just Security (Oct. 18, 2018), https://perma.cc/9E9Y-YLMV. Although each legitimately claimed conscientious objector status, their particular beliefs prohibited them from accepting the alternative civilian service required of objectors, rendering them in violation of the law. Fidler, *First Amendment Sentence Mitigation*, *supra*, at 239. On appeal, courts overturned the maximum sentences in each case, concluding that First Amendment interests required crafting an appropriately individualized mitigated sentence. In one case, the Sixth Circuit wrote that the individual at hand

was motivated solely by protected religious beliefs and that sentencing him

"without particular reference to the[se] circumstances surrounding the commission

of the crime" ran contrary to Supreme Court guidance on sentencing. *United*

*States v. Daniels*, 446 F.2d 967, 971 (6th Cir. 1971) (citing *Williams v. New York*,

337 U.S. 241, 248 (1949); *Williams v. Oklahoma*, 358 U.S. 576, 585 (1959)).

Antebellum courts likewise mitigated the sentences of rescuers who violated the

Fugitive Slave Act.  There, the underlying law had been upheld by the Supreme

Court as constitutional, but sentence mitigation based on claims of conscience still

occurred. *See* Fidler, *First Amendment Sentence Mitigation*, *supra*, at 230-36

(discussing Fugitive Slave Act sentence mitigation and collecting cases).

The Espionage Act as applied to press leaks also involves these two

constitutional mitigation factors.  Congress has not enacted a statutory defense

capturing the First Amendment concerns in these cases. *See id.* at 223.  And courts

have ruled evidence of intent inadmissible at the guilt stage. *See, e.g., United*

*States. v. Kiriakou*, 898 F. Supp. 2d 921, 926–27 (E.D. Va. 2012).  Although the

First Amendment equities at issue here are related to the speech and press clauses,

rather than the religion clause, these historical precedents demonstrate that courts

have the discretion to consider the constitutional implications of severe sentences

in cases raising those equities.  Fidler, *First Amendment Sentence Mitigation*,

*supra*, at 215.

16

## CONCLUSION

For all these reasons, amicus respectfully urges the Court to consider at sentencing the potential chill on public interest newsgathering that could flow from severe punishments in journalistic source prosecutions under the espionage laws.

Dated:  July 13, 2021

Respectfully submitted,
BALLARD SPAHR LLP

*Of Counsel:*

Bruce D. Brown
Katie Townsend
Gabe Rottman
Mailyn Fidler
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

Jay Ward Brown, VSB No. 34355
Mara Gassmann, VSB No. 82131

1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Telephone (202) 508-1136
Facsimile (202) 661-2299
brownjay@ballardspahr.com
gassmannm@ballardspahr.com

*Counsel for Amicus*