IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO. 1:19cr 59 |
| | ) | |
| DANIEL EVERETTE HALE | ) | |

### POSITION OF THE UNITED STATES ON SENTENCING

Daniel Hale abused the trust placed in him by the U.S. government. While enlisted in the United States Air Force, Hale befriended a group of journalists interested in his work on highly classified programs. To ingratiate himself with those journalists, after leaving the Air Force, Hale sought a new position with access to classified information so that he could steal and disclose it to them. Shortly after obtaining a position at the National Geospatial-Intelligence Agency ("NGA") - - which afforded him access to "Top Secret" information - - Hale stole classified information and provided it to a particular reporter ("Reporter"). None of the information Hale stole and provided to Reporter was related to Hale's work at NGA, and little was related even to his work in the Air Force.

Hale knew that his actions were wrong. Indeed, after enlisting in the Air Force, Hale received multiple security briefings in which he acknowledged that the unauthorized retention and disclosure of classified information risked harm to U.S. national security (and, of course, criminal prosecution). In some of those briefings, Hale promised to report any unauthorized person attempting to obtain classified information from him. Despite those briefings and his own promises - - and after receiving even more security briefings - - Hale started searching for

documents (including ones marked "Secret" and "Top Secret") to steal from NGA barely three weeks after starting his job there. Hale then gave these documents to Reporter, who published them for the world to see.

When Hale took these actions, he *knew* that his superiors had determined that the disclosure of those documents risked causing serious, and in some cases exceptionally grave, damage to the national security of the United States. In fact, these documents contained specific details that adversaries could use to hamper and defeat actions of the U.S. military and the U.S. intelligence community. Indeed, they were of sufficient interest to ISIS for that terrorist organization to further distribute two of those documents in a guidebook for its followers.

To curry favor from Reporter, Hale chose to betray the trust of his country and jeopardize U.S. national security. A significant sentence is necessary to account for Hale's brazen conduct. Even more important, such a sentence also is necessary to deter other members of the intelligence community who may be inclined to breach the trust our country has placed in them.

I. Procedural Background

On March 7, 2019, a grand jury in this District returned an indictment against Hale. The indictment charged Hale with one count of obtaining national defense information, in violation of 18 U.S.C. § 793(c); one count of retaining and transmitting national defense information, in violation of 18 U.S.C. § 793(e); one count of causing the communication of national defense information, in violation of 18 U.S.C. § 793(e); one count of disclosing classified communications intelligence information, in violation of 18 U.S.C. § 798(a)(3); and one count of theft of government property, in violation of 18 U.S.C. § 641. On May 9, 2019, another grand jury returned a superseding indictment against Hale that alleged the same five offenses. That same day, Hale was arrested.

Hale was released pending trial, but the trial was preceded by extensive motions litigation and also delays due to the pandemic. Then, on March 31, 2021, shortly before trial was to begin, Hale pled guilty to retaining and transmitting classified information, as alleged in Count 2 of the Superseding Indictment, and in violation of 18 U.S.C. § 793(e).[1] Hale pled guilty without any plea agreement, and submitted his own Statement of Facts. Def.'s Statement of Facts, Dkt. 197 ("SOF"). In this Statement of Facts, Hale admitted that he stole and transmitted to Reporter documents that contained "national defense information" marked "Secret" and "Top Secret", but he did not admit that the disclosure of the stolen documents risked serious, and in some cases, exceptionally grave damage to the national security of the United States.

Although the Court initially released Hale pending sentencing, the Court later accepted the Probation Office's recommendation that his release be revoked. Presentence Investigation Report ("PSR") ¶ 18. Hale was taken into custody on April 28, 2021. Hale has, as a result, been detained at Alexandria Detention Center for approximately 90 days.

II. Factual Background

In choosing to steal sensitive information from NGA and then disclose it to Reporter, Hale broke not only the law but also many promises he made to his country. His deliberate actions were the culmination of a course of conduct that began shortly before he left the Air Force. One of the most shocking facts - - and one that demonstrates the need for a significant sentence in this case -- is that Hale began searching for documents to steal barely three weeks after he was hired at NGA and regained access to classified information. Indeed, the sequence of

---

[1] Decisions regarding the disposition of the remaining counts of the superseding indictment were deferred until after Hale was sentenced.

events indicates that Hale sought and obtained employment at NGA so that he could steal and disclose classified information to Reporter.

          A.      Hale First Gains Access to Classified Information

Security clearance holders must enter into non-disclosure agreements as a condition of gaining access to classified information.[2] PSR ¶¶ 23, 26-29. Hale was first granted a TOP SECRET//SCI security clearance while serving in the Air Force, and he signed seven non-disclosure agreements ("NDAs") during his four years of military service. GX 303 (appended to his pleading as Exhibit I). Through these agreements, Hale memorialized his obligations as a clearance holder. He promised, for instance, not to disclose classified documents "to any person who is not authorized to have access to them until I have received written authorization from the NSA that such disclosure is permitted . . ." *Id.* Similarly, he acknowledged that "[u]nless and until I am released in writing by an authorized representative of the United States Government, I understand that all conditions and obligations imposed upon me by this Agreement apply during the time I am granted access to classified information, and at all times thereafter." *Id.*

Hale, moreover, knew that the unauthorized disclosure of classified information can harm U.S. national security. For example, in several of the NDAs he signed, he acknowledged that he had been "advised that the unauthorized disclosure, unauthorized retention . . . of classified information . . . could cause damage or irreparable injury to the United States or be used to the advantage of a foreign nation." PSR ¶¶ 23-24; GX 303. Hale also was advised of the different

---

[2] In addition to signing a non-disclosure agreement, an individual cannot access classified information at any level unless he or she: (1) is determined by an appropriate U.S. government official to be eligible to access the classified information at issue; and (2) has a "need to know" the classified information in order to perform or assist in a lawful and authorized government function. PSR ¶¶ 27-30.

4

levels of classification. Thus, he knew that (i) the unauthorized disclosure of "Secret" information reasonably could be expected to cause serious damage to the national security of the United States; and (ii) the unauthorized disclosure of "Top Secret" information reasonably could be expected to cause exceptionally grave damage to the national security of the United States. PSR ¶¶ 23-24.

> B. Hale Attempts to Ingratiate Himself with Reporters

Hale's vanity overrode the commitments he made to his country. Hale was enamored of journalists. As he explained in a chat recovered from his email account, he "looked up to [journalists] like rock stars." GX 811 (appended to this pleading as Exhibit J). Wanting to be one himself, he imagined that following such a path would enable him to "speak truth to power" while "hav[ing] great sex all the time and mak[ing] just enough to live but not too much that [he] [became] a part of the upper crust." *Id.*

It thus is unsurprising that, despite repeatedly promising to protect national defense information, Hale jumped at the chance in 2013 to fraternize with Reporter and Reporter's colleagues. In May 2013, Hale bragged to a friend that Reporter wanted Hale to "tell [his] story about working with drones at the opening screening of [Reporter's] documentary about the war and the use of drones." PSR ¶ 33. Then, on June 8, 2013, Hale appeared with Reporter at Reporter's book event in Washington, D.C. PSR. ¶ 34. Hale also socialized with Reporter and other journalists after the book event. PSR ¶¶ 34–35. And, the next day, on June 9, 2013, Hale received from Reporter an email that contained a link to an article about Edward Snowden. *Id.* Markedly, this all occurred while Hale was still in the Air Force, and just about a week after he signed two more statements acknowledging his obligations to protect classified information even after his access to such information ended. GX 303.

Hale's contemporaneous text messages show how much he enjoyed telling journalists about his experiences in the Air Force, and how much he was interested in connecting with journalists who publish government secrecy stories. In one text message, Hale remarked to a friend how it was "kind of crazy" and "really unexpected" that he "was hanging out with about a half a dozen journalist who were basically hinged to [his] story." PSR ¶ 35. Hale also disclosed to his friend that Reporter and another journalist wanted Hale to appear on a particular television show; Hale mused that "it could mean some life long connections with the people who publish work like this." *Id.*

Hale separated from the Air Force in July 2013, and continued to meet with Reporter and other journalists that same month. PSR ¶¶ 36-37. Around this time, Hale began to tout to Reporter Hale's potential access to classified information. On July 25, 2013, Hale sent Reporter a copy of Hale's resume. PSR ¶ 39. Although Hale previously had told friends he wanted to become a journalist, his resume read, "objective . . . [t]o obtain a position within the Intelligence Community . . . that deploy[ed] abroad" and would have "Counter Terrorism, Counter Intelligence, Electronic Warfare, or . . . SIGINT oriented missions." *Id.* Sending this resume to Reporter signaled to Reporter that Hale was a potential source of classified information.

Hale then undertook further steps to become a source. In August 2013, Hale sent Reporter a series of emails with links to national security related images and news articles. PSR ¶¶ 40-41. Then, on September 20, 2013, Hale and Reporter discussed how to "set up" an account with a service that would encrypt their communications. PSR ¶ 42.

    C.    <u>Hale Discloses Classified Information Stolen from NGA</u>

On December 16, 2013, after obtaining employment at NGA, Hale acknowledged yet again his obligations to protect classified information. GX 303. On January 3, 2014, Hale used

6

his network account at NGA to access the classified document identified in the Superseding Indictment as Document E. PSR ¶ 50.

Even after arriving at NGA, Hale made more efforts to solidify himself as a source of classified information for Reporter. On January 24, 2014, Hale told Reporter that Reporter had "a couple of fans in Big Brother." PSR ¶ 48. On January 31, 2014, Hale advised Reporter that they "should talk if [Reporter] [had] time [the upcoming] weekend." PSR ¶ 49. And, on February 2, 3, and 27, 2014, Hale and Reporter discussed communicating on an encrypted chat platform. PSR ¶¶ 42, 47, 51.

Soon thereafter, Hale began printing documents unrelated to his work at NGA, including those marked "Secret" and "Top Secret". PSR ¶ 52. On February 28, 2014, while at NGA, Hale printed the classified documents identified in the Superseding Indictment as Documents A, B, C, D, E, and F. *Id.* He then texted Reporter, asking if Reporter could "stop by D.C." on "Monday." PSR ¶ 53. Hale later connected with Reporter and provided Reporter with copies of all six of the documents he printed on February 28, 2014. SOF ¶ 6.

Hale continued to print and remove highly sensitive documents from NGA that Reporter subsequently published.[3] Specifically, between April 3, 2014, and August 5, 2014, Hale printed 17 additional documents unrelated to his work at NGA.[4] PSR ¶ 59. Hale ultimately gave Reporter copies of at least 17 of the 23 documents he printed, eleven of which were classified

---

[3] With respect to the document identified as Document K in the Superseding Indictment, Hale also spliced together classified documents by cutting-and-pasting them into a word processing application. We do not know why Hale took this step, but suspect he thought doing so would help obfuscate his actions.

[4] Hale was employed at NGA for approximately eight months. During this time, he used his Top Secret network account at NGA to print out 32 documents. Only nine of those documents pertained to his job as a Chinese language toponymist. PSR ¶ 56.

"Secret" or "Top Secret".  SOF ¶ 6; PSR ¶ 67.  Moreover, in June 2014, Hale took at least one of the documents he stole home and scanned a copy of it onto his home computer.  PSR ¶¶ 66-67.

On Hale's last day of work at NGA, August 8, 2014, the FBI searched Hale's house. Hale, however, showed no remorse for his conduct or acknowledgement of the serious, or exceptionally grave damage his actions risked to the national security of the United States. Rather, at some point after the search, Hale agreed to contribute a chapter to a book that Reporter published.  SOF ¶ 9; PSR ¶ 88.  The book compiled many of the documents Hale stole and disseminated.

In the chapter written by Hale, he explained why he leaked government information, but in doing so, referred only to documents that he stole and disclosed that were *not* classified.[5]  PSR ¶ 88.  Yet, as explained in the declarations submitted as Exhibits A, B, and C in connection with this pleading,[6] the documents that Hale stole and disclosed contained specific details that could help adversaries of the United States (both foreign governments and terrorist groups) to hinder or defeat efforts of the American military and intelligences agencies.  As set forth in the declarations, these disclosures had the potential to cause serious, and in some cases exceptionally grave, damage to the national security of the United States.

As the Presentence Report reflects, Hale declined to discuss the details of the offense with the Probation Officer, and included his statement that he explained in the chapter of Reporter's book the reasons that he committed the crime:

---

[5] As noted in the Presentence Report, Hale declined to discuss the details of the offense with the Probation Officer, but referred the Officer to his statement in the chapter of Reporter's book for the reasons that he committed the crime.  PSR ¶ 88.

[6] The potential damage risked by Hale's thefts and disclosures are described in Exhibits A, B, and C filed in connection with this pleading through the Classified Information Security Officer, and Exhibits E and F filed in unclassified form but under seal.

8

> "I admit to the facts in the statement of facts. I did take classified documents and give them to a reporter. I knew those documents were classified and that it was illegal for me to give them to the reporter. I explained why I did this in a chapter I wrote for the reporter's book, but I acknowledge that what I did violated the law and I accept responsibility for that."

PSR ¶ 88.

The justification for his actions that Hale provided in his book chapter - - and by reference, to this Court through the Probation Officer - - does not even purport to address the scope of his criminal activity; it purported to explain only why he leaked the *unclassified* Document L, but not any "Secret" or "Top Secret" documents. Moreover, as can be seen from Documents A, B, C, D, E, F, G, I, J, and K (as well as from the description of those documents in the Superseding Indictment, in Paragraph 60 of the Presentence Report, and in Exhibits A, B, and C filed through the CISO), the "Secret" and "Top Secret" documents that he leaked had virtually nothing to do with what Hale described in the chapter of Reporter's book; instead (with the exception of Document M), they described U.S. military and intelligence capabilities and operations overseas.

In the rationale that Hale provided in his chapter and to the Probation Officer, Hale did not acknowledge the risk of harm that he caused to the men and women, including his former Air Force colleagues, who serve in the U.S. military. He did not address why it should be his decision to provide foreign nations and terrorist groups access to this country's sensitive and technical military capabilities, or intelligence-gathering methods and techniques that protect United States citizens from terrorist attacks. Nor did he mention that documents he had stolen and disseminated appeared in an internet compilation designed to aid ISIS fighters in avoiding

9

detection and targeting by the U.S. military. PSR ¶ 69. *See* Exhibits D and G.[7] Of course, even if Hale had attempted to reckon with the consequences of his actions, the reality is that his betrayal of the promises he made and the trust placed in him was indefensible.

In short, the statement in the book that Hale incorporated by reference does not even purport to address his reasons for stealing and leaking Documents A,B,C, D, E, F, G, I, J, and K, and he declined to talk to the probation officer about his reasons for stealing and leaking *those* documents. The evidence indicates that this is because he does not want to admit to this Court that he had no reason to steal and leak *those* documents - - other than to cement his connections to reporters who he hoped would help him become a reporter himself.

II. The Sentence

A. The Guidelines

In accordance with Section 6A1.2 of the *Sentencing Guidelines* and this Court's policy regarding guideline sentencing, the government hereby represents that it has reviewed the Probation Office's presentence report and that, except as set forth below, it does not dispute any of the factors or facts set out therein. Properly calculated, Hale's sentencing guideline range likely will be 108 to 135 months in prison.

This sentencing is in an unusual posture because the probation officer has not seen some of the key facts of the case. PSR ¶ 20. The key facts that the probation officer has not seen are the facts that establish that disclosure of the documents that Hale provided to Reporter had the potential to cause "serious" or "exceptionally grave" damage to the national security as alleged throughout the indictment (and incorporated in Count 2). These facts are established, however,

---

[7] Exhibit D, filed with the CISO a supplement to this pleading, is a portion of the internet compilation designed to aid ISIS; Exhibit G, filed under seal, is an expert witness's report explaining the significance of that internet compilation and its attribution to ISIS.

through Exhibits A, B, C, D, and F, filed in connection with this pleading through the CISO (or under seal). Based on those exhibits, the Court should find that disclosure of the documents that Hale provided to Reporter had the potential to cause "serious" or "exceptionally grave" damage to the national security as alleged throughout the indictment (and incorporated in Count 2).

Hale, however, apparently does not accept that the documents that he provided to Reporter had the potential to cause such "serious" or "exceptionally grave" damage to the national security. In his statement to the Probation Officer, Hale admitted to the facts in the Statement of Facts. He did not, however, admit to the truth of the facts as alleged in Count 2 of the Indictment (or in the Indictment as a whole). PSR ¶ 88. True, the facts contained in the Statement of Facts were sufficient to support the guilty plea to Count 2 of the Indictment - - but admission to only those facts do not constitute acceptance of responsibility for all the conduct charged in that count.

While Hale admits that he violated the law, and admits that he stole and leaked documents that constituted "national defense information" and that were classified as Secret" and "Top Secret", he appears to contest that the documents that he stole and leaked had the potential to cause "serious" or "exceptionally grave" damage to the national security as alleged throughout

11

the indictment (and incorporated in Count 2). PSR ¶¶ 59, 60. Indeed, he argued to Judge O'Grady just last month that the harm risked by his disclosures likely was minimal.[8]

To trigger a reduction in offense level for acceptance of responsibility, a defendant must establish that he has accepted responsibility for all of the charged criminal conduct in the count of conviction (and, of course, all related conduct). "Pleading guilty is not enough, by itself," to support an acceptance-of-responsibility reduction. *United States v. Carver*, 916 F.3d 398, 404 (4th Cir. 2019). Instead, "[t]he defendant bears the burden of showing he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct[.]" *Id.* (internal quotation marks omitted).

"[I]in order for section 3E1.1 of the guidelines to apply, a defendant must first accept responsibility for all of his criminal conduct." *United States v. Gordon,* 895 F.2d 932, 936 (4th Cir. 1990). *See United States v. Hargrove,* 478 F.3d 175, 203-04 (4th Cir. 2007) ("the rule in *Gordon* - that only if a defendant accepts responsibility "for all of his criminal conduct" (now his guidelines offense of conviction) could a defendant ever be *entitled* to an acceptance of responsibility reduction-remains the law").

---

[8] Undersigned counsel recollects that at the hearing on that motion on June 25, 2021, Hale's counsel argued the fact that documents stolen by Hale were marked "Secret" or "Top Secret" when they were generated did not necessarily mean that the disclosure of those facts still risked serious or severe damage in 2014 when Hale stole and provided them to Reporter. Indeed, Hale's argument was based on a declaration from Harry P. Cooper. Exhibits to Motion for Discovery, Dkt. 209-1 at pp. 13-16. Tellingly, on March 15, 2021, Hale provided the government notice that Cooper would provide expert testimony that much of the information Hale stole was of minimal value because (a) it was stale by the time it was stolen; (b) it was largely incremental in nature pertaining to topics about which much already was known; (c) the technical information was high-level and out of date.

At this stage in the proceeding, we assume that Hale continues to maintain that his disclosures did not risk "serious" or "exceptionally grave" damage to the national security (as alleged throughout the indictment, and incorporated in Count 2). If our assumption is correct, then Hale should not receive a two-level reduction in his offense level pursuant to U.S.S.G. § 3E1.1, as he has not accepted responsibility for all of his offense conduct. In that event, Hale's total offense level should be 31. Given Hale's Category I criminal history, his applicable guidelines range would be 108 to 135 months in prison.

If, on the other hand, Hale does not deny that his disclosures risked "serious" or "exceptionally grave" damage to the national security, then we would not oppose the reduction of two points for acceptance of responsibility. In that event, Hale's offense level would be 29 and his applicable guideline range would be 87 to 108 months in prison.

B.   The 3553(a) Factors

The risk of grave harms to the national security of the United States that Hale caused is central to consideration of the nature of his offenses. Once again, we refer the Court to Exhibits A, B, C, and D filed through the CISO, as well as Exhibit G, the expert report filed under seal regarding the terrorist publication in which the stolen documents were reprinted.

It also is important to recognize that the eleven classified documents cited in the indictment do not take full account of the sheer volume of classified information – more than 150 "Secret" and "Top Secret" pages – that Hale stole and provided to Reporter.

Further, it is important to note the impact that Hale's theft and disclosure of an unclassified document had on national security. Even though Document L was unclassified, it was a sensitive document regarding the tracking of known or suspected terrorists. As detailed in Exhibits E and F filed under seal, the worldwide publication of that document plainly

jeopardized national security given that it provided terrorists insight into U.S. security measures and thus a roadmap for circumventing those measures.[9]

Hale cannot credibly argue that, at the time of his criminal conduct, he was unaware that disclosing the documents at issue risked causing serious and exceptionally grave damage to national security of the United States. He had served overseas and worked at NSA, and was a longtime holder of a top security clearance. In short, he *knew* from his prior work in the military and Intelligence Community that his country's enemies would benefit from his disclosures. Hale plainly was aware that his unauthorized disclosures risked American lives. His actions show a blatant disregard of the immense trust the U.S. government placed in him. He knew that stealing classified documents was illegal, but chose to place his ego above his oaths.

Hale's thefts and disclosures were not only serious, but they also were premeditated. While he was still enlisted in the Air Force, he planned to use encrypted communications with Reporter. Indeed, the facts in the PSR and outlined above indicate that his thefts from NGA and the disclosures he made to Reporter were part of a plan that he formed before he started work at NGA in the first place; they indicate that he sought employment at NGA *so that* he could steal and disclose to Reporter classified information. Alone, his brazen and willful disregard of his promises to protect the national security of the United States demand a sentence of years of incarceration.

To date, Hale has shown no contrition. In his book chapter, Hale entirely ignored the dangerous consequences of his disclosures. Thus far, he has argued only that there is no

---

[9] Just as one discrete example, we point out the significance to a terrorist organization planning an attack against the United States of the information contained at Paragraph 3.14.3 on the page bearing the marking DP 225, attached as Exhibit H in the materials filed under seal.

14

evidence of actual harm to the national security. In effect, Hale attempts to minimize the crime he committed while failing to recognize the consequences of his actions.

The need for general deterrence also requires the imposition of a significant sentence. As Hale's conduct demonstrates, the government places great trust in clearance holders. Unfortunately, no combination of security measures is sufficient to prevent a motivated clearance holder from stealing and disclosing classified information. For those like Hale, who unilaterally decide to disclose classified information, the existence of criminal penalties that are theoretically harsh but practically lenient is not sufficient. Hale and other persons similarly situated seem to believe either that they will not be caught, or that the punishment will be de minimis.

Unauthorized disclosures of classified information can cripple the intelligence community by compromising existing sources of information and making future sources less secure. The result is that, ultimately, we are all less safe. It is particularly important to deter those who, like Hale, might be tempted to gain access to classified information for the sole purpose of disclosing it. Such individuals must see that using positions in the intelligence community for self-aggrandizement will be harshly punished. Thus, a significant sentence is necessary to demonstrate that the unauthorized disclosure of classified information is a serious crime with significant consequences.

The two most recent prosecutions involving unauthorized disclosures of classified information of which we are aware, *United States v. Albury* and *United States v. Winner*, were resolved via plea agreement and resulted in sentences close to but below the applicable guideline ranges. Reality Winner, a former National Security Agency contractor, received a sentence of 63 months. *See United States v. Winner*, 1:17-cr-34-JRH-BKE (N.D. Ga. 2018). Like Hale, Winner

15

disclosed information classified at the "Top Secret" level.  Unlike Hale, Winner disclosed only a single document.  Terry Albury, a former FBI Special Agent, was sentenced to 48 months.  *See United States v. Albury*, (0:18-cr-00067-WMW) (D. Minn. 2018).  Albury was sentenced for retaining 50 classified documents and transmitting some of them to a reporter – but none of the documents Albury disclosed was classified above the "Secret" level.[10]

Hale stole documents from NGA on at least seven different dates over a four-month period, and his thefts were the result of a plan premeditated long before that.  His criminal conduct was not the result of an impulse, or a momentary lapse in judgment.  It significantly imperiled the national security of the United States.

To come up with an appropriate sentence, the Court should first calculate what the punishment for Hale would be were the sole relevant conduct his theft on February 28, 2014, and subsequent transmission to the Reporter of Documents A, B, C, and F, all of which were marked "Secret."  As Hale knew, his superiors in the intelligence community had already determined that disclosure of those documents reasonably could be expected to cause serious damage to the national security.  From his experience in the Air Force, the NSA, and NGA, Hale obviously knew that disclosing to the world those documents was of no news value to the public, but of great benefit to our enemies on the battlefield. [11]

---

[10] We recognize that sentences imposed in some past "leak" cases were not commensurate with the government's view of the seriousness of the defendants' conduct, or nearly serious enough to deter others from engaging in similar conduct.  *See, e.g., United States v. Sterling*, 1:10-cr-00485 (E.D. Va. 2015) (42-month sentence imposed by Judge Brinkema).  We cannot justify or explain such sentences, but only point out that a past court's failure to recognize the significance of the need to deter similar behavior by other individuals should not induce this Court to make the same mistake.

[11] Had this been the extent of Hale's criminal activity, perhaps his situation would have been somewhat similar to that of Terry Albury.

Once the Court has calculated an appropriate punishment for Hale's theft and transmission of Documents A, B, C, and F, it should then consider how that punishment should be enhanced for his theft that same day (February 28, 2014), and transmission to the Reporter of Document E, which was marked "Top Secret." As Hale knew, his superiors in the intelligence community had already determined that disclosure of that document reasonably could be expected to cause exceptionally grave damage to the national security. Hale obviously knew that disclosing to the world that document was of no news value to the public, but of great benefit to our enemies on the battlefield. [12]

The Court should then consider how that punishment should be enhanced for Hale's separate thefts on April 3, 2014 and April 20, 2014, and later transmission of Documents G, I, and J (each of which was marked "Secret"), as well as K, which was marked "Top Secret." Once again, Hale obviously knew that disclosing those documents was of no news value to the public, but of great benefit to our enemies.

In sum, the punishment that Hale deserves is -

    (a) the punishment that he deserves for stealing (on February 28, 2014) and transmitting Documents A, B, C, and F (all marked "Secret"); *plus*

    (b) the punishment that he deserves for stealing (on February 28, 2014) and transmitting Document E (marked "Top Secret"); *plus*

    (c) the punishment that he deserves for stealing (on April 3 and 20, and May 14, 2014) and transmitting Documents G, I, and J (marked "Secret"), as well as K (marked "Top Secret").

---

[12] Had this been the extent of Hale's criminal activity, perhaps his situation would be somewhat similar to that of Reality Winner.

The punishment that Hale deserves is all that - - *plus* that which he deserves for stealing, on April 30, 2014, and transmitting to the Reporter Document L (as well as stealing, on May 14, 2014, Document M, marked "Secret"). While Document L was not marked either Secret or Top Secret, it obviously contained policies and procedures used by the United States to keep the American public safe - - and the distribution to the world of that document obviously undermined the ability of the United States to continue to do so. [13]

In making that calculation, the Court should not allow Hale's excuses to mask the significance of what he did. Exhibit D (filed through the CISO) is an excerpt from an internet compilation designed to assist ISIS fighters avoid detection and targeting. That document contains parts of Documents D and E. In short, as a result of Hale's actions, the most vicious terrorists in the world obtained documents classified by the United States as "Secret" and "Top Secret" - - and thought that such documents were valuable enough to disseminate to their own followers in their own manuals.

Conclusion

Given the seriousness of the offense and the attendant risk to national security, the Court should impose a sentence that accounts for all of the documents, classified and unclassified, that Hale stole and disclosed. A substantial sentence is needed also to account for Hale's blatant disregard for the consequences of his conduct. Only a significant term of imprisonment[14] can in this case adequately promote respect for the law; reflect the seriousness of the offense; afford

---

[13] In short, Hale's criminal conduct was dramatically more extensive than that of either Albury or Winner.

[14] A significant term of imprisonment would be one that is significantly longer than the one imposed on Reality Winner for stealing and disclosing only one document.

adequate deterrence to criminal conduct; protect the community; and provide just punishment for the defendant's offense.

                        Respectfully submitted,

                        Raj Parekh
                        Acting United States Attorney

By:     /s/
        Gordon Kromberg
        Alexander P. Berrang
        Assistant United States Attorneys
        United States Attorney's Office
        Eastern District of Virginia
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        (703) 299-3700
        Gordon.Kromberg@usdoj.gov
        Alexander.P.Berrang@usdoj.gov

By:     /s/
        Heather M. Schmidt
        Senior Trial Attorney
        National Security Division
        United States Department of Justice
        950 Pennsylvania Ave., NW
        Washington, D.C. 20530
        Tel.: (202) 233-2132
        Fax: (202) 233-2146
        Heather.Schmidt@usdoj.gov

Certificate of Service

I hereby certify that on July 19, 2021, I electronically filed the foregoing POSITION OF THE UNITED STATES ON SENTENCING with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

I also certify that on or about July 20, 2021, I will cause the filing of a sealed addendum in the Clerk's Office (which will be emailed to counsel for the defendant), and a classified addendum through the Classified Information Security Officer.

\_\_\_\_\_/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov