# **Exhibit A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:19-cr-59 |
| v. | Hon. Liam O'Grady |
| DANIEL E. HALE, | |
| Defendant | |

**MEMORANDUM OF *AMICI CURIAE* SCHOLARS OF
CONSTITUTIONAL LAW, FIRST AMENDMENT LAW AND MEDIA LAW**

*Of Counsel:*

Heidi Kitrosser
NORTHWESTERN -- PRITZKER SCHOOL OF LAW
NORTHWESTERN UNIVERSITY
375 East Chicago Avenue
Chicago, IL 60611

David A. Schulz
MEDIA FREEDOM AND
 INFORMATION ACCESS CLINIC
ABRAMS INSTITUTE
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511

Jay Ward Brown, VSB No. 34355
Matthew E. Kelley, VSB No. 84045
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, D.C. 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
brownjay@ballardspahr.com
kelleym@ballardspahr.com

*Counsel for Amici*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

INTEREST OF *AMICI CURIAE* AND SUBJECT OF THIS SUBMISSION ................ 2

ARGUMENT .................................................................................................................... 2

I.     CONGRESS NEVER INTENDED THE ESPIONAGE ACT TO
CRIMINALIZE WHISTLEBLOWING, AND USING THE ACT TO
PROSECUTE PRESS LEAKERS RAISES SUBSTANTIAL FIRST
AMENDMENT CONCERNS ................................................................................ 2

     A.     The Espionage Act Is Not An Official Secrets Act ................................. 3

          1.     Congress passed the Espionage Act to protect the nation from
spies, not to criminalize the disclosure of information vital to
the American public ..................................................................... 4

          2.     Recent administrations have nonetheless used the Espionage
Act as an official secrets act ........................................................ 6

     B.     The Use of the Espionage Act to Prosecute Leakers Like Mr. Hale
Raises Substantial First Amendment Concerns ....................................... 8

          1.     Using the Espionage Act as an official secrets act is
constitutionally suspect under established First Amendment
doctrine ......................................................................................... 8

          2.     Using the Espionage Act as an official secrets act chills
valuable, public interest whistleblowing and reporting ............. 11

     C.     New Technologies Have Blunted the Courts' Historic Ability to
Apply First Amendment Considerations Earlier in Leak Prosecutions ................ 13

II.    THE SENTENCE IMPOSED ON MR. HALE SHOULD RESPECT THE
SIGNIFICANT FIRST AMENDMENT INTERESTS AT STAKE .................... 17

     A.     Classification Alone Does Not Predict Either the Harm Disclosure
Will Cause to the Nation or the Importance of the Information to the
Public .................................................................................................... 19

     B.     To Protect First Amendment Interests, the Context, Content and
Impact of Mr. Hale's Leak Are All Properly Weighed in Setting a Just
Sentence ................................................................................................ 23

CONCLUSION .............................................................................................................. 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C.L.U. v. Department of Defense,*
  584 F. Supp. 2d 19 (D.D.C. 2008) ........................................................................... 20

*Allentown Mack Sales & Service, Inc. v. N.L.R.B.,*
  522 U.S. 359 (1998) ................................................................................................. 26

*Biro v. Conde Nast,*
  807 F.3d 541 (2d Cir. 2015) .................................................................................... 27

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) ................................................................................................. 10

*Branzburg v. Hayes,*
  408 U.S. 665 (1972) ................................................................................................. 14

*Citizens United v. Fed. Election Commission,*
  558 U.S. 310 (2010) ................................................................................................. 10

*City of Lakewood v. Plain Dealer Publishing Co.,*
  486 U.S. 750 (1988) ................................................................................................. 27

*Epona, LLC v. County of Ventura,*
  876 F.3d 1214 (9th Cir. 2017) ................................................................................. 27

*First National Bank of Boston v. Bellotti,*
  435 U.S. 765 (1978) ................................................................................................... 8

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ................................................................................................. 11

*Gertz v. Robert Welch, Inc.,*
  418 U.S. 323 (1974) ................................................................................................. 27

*Globe Newspaper Co. v. Superior Court for Norfolk County,*
  457 U.S. 596 (1982) ................................................................................................. 27

*In re Grand Jury Subpoena, Judith Miller,*
  438 F. 3d 1141 (D.C. Cir. 2005) ....................................................................... 14, 15

*Grosjean v. American Press Co.,*
  297 U.S. 233 (1936) ................................................................................................... 9

*Halperin v. Kissinger,*
      606 F.2d 1192 (D.C. Cir. 1979) ...............................................................................22

*Koon v. United States,*
      518 U.S. 81 (1996) .........................................................................................................18

*Lane v. Franks,*
      134 S. Ct. 2369 (2014)...................................................................................................11

*Mills v. Alabama,*
      384 U.S. 214 (1966) .......................................................................................................26

*New York Times v. DOJ,*
      756 F.3d 100 (2d Cir. 2014)........................................................................................22

*New York Times v. Sullivan,*
      376 U.S. 254 (1964) .............................................................................................8, 9, 11

*Pepper v. United States,*
      562 U.S. 476 (2011)........................................................................................................18

*Ray v. Turner,*
      587 F.2d 1187, 1209 (D.C. Cir. 1978) ......................................................................22

*Reno v. ACLU,*
      521 U.S. 844 (1997).......................................................................................................24

*Richmond Newspapers v. Virginia,*
      448 U.S. 555 (1980)..........................................................................................................8

*Texas v. Johnson,*
      491 U.S. 397 (1989).........................................................................................................9

*Thornhill v. Alabama,*
      310 U.S. 88 (1940)........................................................................................................3, 9

*United States v. Kim,*
      808 F.Supp. 2d 44 (D.D.C. 2011) ................................................................................7

*United States v. Alvarez,*
      567 U.S. 709 (2012)........................................................................................................10

*United States v. Morison,*
      844 F.2d 1057 (4th Cir. 1988) .......................................................................... *passim*

*United States v. Rosen,*
      445 F. Supp. 2d 602 (E.D. Va. 2006) ...............................................................6, 7, 26

*United States v. Stevens,*
    559 U.S. 460 (2010)................................................................................10

*Unites States v. Rybicki,*
    96 F.3d 754 (4th Cir. 1996) ................................................................18

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976)................................................................................26

*In re Washington Post,*
    807 F.2d 383 (4th Cir. 1986) ..............................................................23

**Statutes**

18 U.S.C. § 793................................................................................................7

18 U.S.C. § 3553............................................................................................18

**Other Authorities**

108 CONG. REC. S9714 (2004) (statement of Thomas S. Blanton, National
    Security Archive, George Washington University) ..............................21

108 CONG. REC. S9714 (2004) (statement of Sen. Wyden)..........................21

2020 REPORT TO THE PRESIDENT (2021),
    https://www.archives.gov/files/isoo/reports/fy-2020-isoo-annual-report-to-the-
    president-final.pdf................................................................................20

A. Goldman, N. Fandos & K. Benner, *Ex-Senate Aide Charged in Leak Case
    Where Times Reporter's Records Were Seized,* N.Y. TIMES (June 7, 2018)..........................16

Adam Goldman, *Trump Justice Dept. Seized CNN Reporter's Email and Phone
    Records,* N.Y. TIMES (May 20. 2021)................................................16

Adam Liptak, *A High-Tech War on Leaks,* N.Y. TIMES (Feb. 11, 2012) ......................16

Aff. in Support of Application for Search Warrant, *Application for Search
    Warrant,* 10-mj-00291 (D.D.C. filed Nov. 7, 2011), *available at*
    https://fas.org/sgp/jud/kim/warrant.pdf..............................................16

*Amending the Department of Justice subpoena guidelines,* REPORTERS COMM.
    FOR FREEDOM OF THE PRESS, https://www.rcfp.org/attorney-general-
    guidelines/..........................................................................................15

Avi Asher-Schapiro, *Leak Prosecutions Under Trump Chill National Security
    Beat,* COMMITTEE TO PROTECT JOURNALISTS (March 2019),
    https://cpj.org/2019/03/leak-prosecutions-trump-national-security-beat/ ..............................12

Betsy Reid (Ed.), *The Drone Papers,* INTERCEPT, https://theintercept.com/drone-papers/ .................................................................................................................. 24

Charlie Savage & Katie Benner, *Trump Administration Secretly Seized Phone Records of Times Reporters,* N.Y. TIMES (June 2, 2021) https://www.nytimes.com/2021/06/02/us/trump-administration-phone-records-times-reporters.html; .................................................................................................... 16

Chip Gibbons, *Daniel Hale Blew the Whistle on the US's Illegal Drone Program. He's a Hero, Not a Criminal,* JACOBIN (Apr. 10, 2021), https://www.jacobinmag.com/2021/04/daniel-hale-whistleblower-us-drone-program-papers-intercept-espionage-act ................................................................ 17

Chris Hedges, *A "traitor" to the American death machine faces years in prison— while the killing goes on,* SALON (July 13, 2021) ................................................ 18

Comm'n on Gov't Sec., 84th Cong., REPORT OF THE COMMISSION ON GOVERNMENT SECURITY (1957) .............................................................................. 20

Comm'n on Protecting and Reducing Gov't Secrecy, REPORT OF THE COMMISSION ON PROTECTING AND REDUCING GOVERNMENT SECRECY, S. Doc. No. 105-2 (1997) .............................................................................................................................. 20

Comm'n to Review DOD Sec. Policies and Practices, KEEPING THE NATION'S SECRETS: A REPORT TO THE SECRETARY OF DEFENSE (1985) .................................. 20

Devlin Barrett, *Trump Justice Department secretly obtained Post reporters' phone records,* WASHINGTON POST (May 7, 2021) ....................................................... 17

David Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information,* 127 HARV. L. REV. 512 (2013) ....................................................................................................................... 4, 12

Def. Dep't Comm. on Classified Info., REPORT TO THE SECRETARY OF DEFENSE (1956) .............................................................................................................................. 20

Def. Sci. Bd. Task Force on Secrecy, REPORT OF THE DEFENSE SCIENCE BOARD TASK FORCE ON SECRECY (1970) ........................................................................... 20

E. Macaskill & G. Dance, *NSA Files Decoded,* THE GUARDIAN (Nov. 1, 2013), http://www.theguardian.com/world/interactive/2013/nov/01/snowden-nsa-files-surveillance-revelations-decoded ......................................................................... 22

Elizabeth Goitein and David M. Shapiro, *Reducing Overclassification Through Accountability,* BRENNAN CENTER FOR JUSTICE (Oct. 5, 2011) (the "Brennan Center Report"), https://www.brennancenter.org/publication/reducing-overclassification-through-accountability ......................................................... 19, 21, 22

Erwin N. Griswold, Op-Ed., *Secrets Not Worth Keeping: The Courts and Classified Information*, WASH. POST (Feb 15, 1989) ................................................................22

*Espionage Act and the Legal and Constitutional Issues Raised by Wikileaks*, HEARING BEFORE THE H. COMM. ON THE JUDICIARY, 111TH CONG. (2010) (statement of Abbe D. Lowell, Partner, McDermott Will & Emery LLP) ............21

Exec. Order No. 13,526 ...............................................................................................19

*Federal Cases Involving Unauthorized Disclosures to the News Media, 1778 to the Present*, Reporters Committee for Freedom of the Press, https://www.rcfp.org/resources/leak-investigations-chart/ (last visited July 15, 2021) ................................................................................................................6

*Free Flow of Information Act of 2007: Hearing on H.R. 2102 Before the H. Comm. on the Judiciary*, 110th Cong. (2007) ................................................15

Gabe Rottman, *A Typology of Federal News Media "Leak" Cases*, 93 TUL. L. REV. 1147 (2019) ................................................................................................6

Geoffrey Stone, PERILOUS TIMES: FREE SPEECH IN WARTIME (W.W. NORTON, 2011) ................................................................................................................10

Harold Edgar & Benno C. Schmidt Jr., *The Espionage Statutes and Publication of Defense Information*, 73 COLUM. L. REV. 934 (1973) ........................................4, 5

Heidi Kitrosser, *Free Speech Aboard the Leaky Ship of State: Calibrating First Amendment Protections for Leakers of Classified Information*, 6 J. NAT'L. SECURITY L. & POL'Y 409 (2013) ..............................................................11

Heidi Kitrosser, *Leak Prosecutions and the First Amendment: New Developments and a Closer Look at the Feasibility of Protecting Leakers*, 56 WM. & MARY L. REV. 1221 (2015) ................................................................................15

Heidi Kitrosser, RECLAIMING ACCOUNTABILITY (U. CHICAGO P. 2015) ....................8

Heidi Kitrosser & David Schulz, *A House Built on Sand: The Constitutional Infirmity of Espionage Act Prosecutions for Leaking to the Press*, 19 FIRST AMEND. L. REV. 153 (2021) ................................................................4

Ian MacDougall, *The Leak Prosecution That Lost the Space Race*, THE ATLANTIC (Aug. 15, 2016), *available at* https://www.theatlantic.com/politics/archive/2016/08/the-leak-prosecution-that-lost-the-space-race/495659/ ................................................................5

Information Security Oversight Office, 2017 REPORT TO THE PRESIDENT (2018) (the "ISOO 2017 REPORT"), https://www.archives.gov/files/isoo/reports/2017-annual-report.pdf ................................................................20

vi

Information Security Oversight Office, 2020 REPORT TO THE PRESIDENT (2021)..........................19

Jack Goldsmith, *Thoughts on Today's Important Drone FOIA Oral Argument in DC Circuit*, LAWFAREBLOG.COM (Sept. 20, 2012), https://www.lawfareblog.com/thoughts-todays-important-drone-foia-oral-argument-dc-circuit......................................................................................................13

Jeremy Scahill & Ryan Devereaux, *The Secret Government Rulebook for Labeling You a Terrorist*, THE INTERCEPT (July 23, 2014), https://theintercept.com/2014/07/23/blacklisted/.......................................24

Jeremy Scahill, *The Assassination Complex* (Simon & Schuster, 2016).......................................24

Joint Sec. Comm'n, REDEFINING SECURITY: A REPORT TO THE SECRETARY OF DEFENSE AND THE DIRECTOR OF CENTRAL INTELLIGENCE (1994)............................................20

Lee Levine et al., 2 NEWSGATHERING AND THE LAW § 20.02 (5th ed. Matthew Bender & Co. 2018)..................................................................................................14

Leonard Downie Jr., *The Obama Administration and the Press*, COMMITTEE TO PROTECT JOURNALISTS (Oct. 10, 2013), https://cpj.org/?p=23307 ...........................12

Mailyn Fidler, *First Amendment Sentence Mitigation: Beyond a Public Accountability Defense for Whistleblowers*, 11 HARV. NAT'L SEC. J. 214 (2020)................................................................................................................25

Martin Arnold, *Pentagon Papers Charges are Dismissed: Judge Byrne Frees Ellsberg and Russo, Assails "Improper Government Conduct,"* N.Y. TIMES (May 12, 1973)............................................................................................5

Mary-Rose Papandrea, *Lapdogs, Watchdogs, and Scapegoats: The Press and National Security Information*, 83 IND. L.J. 233 (2008)...........................................12

Mary-Rose Papandrea, *Leaker Traitor Whistleblower Spy: National Security Leaks and the First Amendment,* 94 B.U. L. REV. 449 (2014) .................................15

Matt Apuzzo, *Times Reporter Will Not Be Called To Testify in Leak Case*, (N.Y. TIMES, Jan. 12, 2015), https://www.nytimes.com/2015/01/13/us/times-reporter-james-risen-will-not-be-called-to-testify-in-leak-case-lawyers-say.html...........................................................................................................17

Nat'l Comm'n on Terrorist Attacks Upon the U.S., THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES (2004)...........................................................20

Neil A. Lewis & David Johnston, *U.S. to Drop Spy Case Against Pro-Israel Lobbyists*, N.Y. TIMES (May 1, 2009)......................................................................6

Sam Lebovic, *From Censorship to Classification, The Evolution of the Espionage Act, in* WHISTLEBLOWING NATION, The History of National Security Disclosures and the Cult of State Secrecy (Kaeten Mistry & Hannah Gurman eds., 2020)..................................................................................................................4

Special Subcomm. on Gov't Info., REPORT OF THE SPECIAL SUBCOMMITTEE ON GOVERNMENT INFORMATION, H.R. REP. NO. 85-1884 (1958) ...............................................20

*Statement by the President on Disapproving H.R. 4392, the "Intelligence Authorization Act for Fiscal Year 2001*, THE WHITE HOUSE (Nov. 4, 2000), *available at* https://fas.org/sgp/news/2000/11/wh110400.html................................................3

Steven V. Roberts, *Ellsberg Indicted Again in Pentagon Case*, N.Y. TIMES (Dec. 31, 1971) .................................................................................................................5

Ted Gup, NATION OF SECRETS: THE THREAT TO DEMOCRACY AND THE AMERICAN WAY OF LIFE (RANDOM HOUSE 2007) .......................................................................21

Uri Friedman, *Good Leak, Bad Leak,* FOREIGN POLICY (June 8, 2012), https://foreignpolicy.com/2012/06/08/good-leak-bad-leak/ ....................................13

Valerie Strauss, *Navy Analyst Morison Receives a Pardon*, WASH. POST (Jan. 21, 2001) ........................................................................................................................6

Yochai Benkler, *A Public Accountability Defense for National Security Leakers and Whistleblowers*, 8 HARV. L. & POL'Y REV. 281 (2014).......................................13

## PRELIMINARY STATEMENT

Daniel Hale is being prosecuted for revealing to an investigative reporter information of intense and legitimate interest to the American public. The documents he disclosed revealed the bureaucratic process by which targets were being selected for summary execution by U.S. drones, outside of the field of battle. The ensuing news reports raised substantial questions about the propriety of the government's program of "targeted killings," the accuracy of the drones' strikes, and the number of unintended civilian victims of these strikes.

Daniel Hale is a classic whistleblower, who acted in good faith to alert the public of secret government policies that deserved to be debated by the citizens in a truly functioning democracy. His prosecution for leaking information to the press under a century old law, intended only to criminalize spying for foreign governments, raises substantial First Amendment concerns. A nearly 40-year old ruling of the Fourth Circuit is the *only* Court of Appeals decision thus far to address the First Amendment ramifications of prosecuting a citizen for leaking true, newsworthy information to the press.[1] While it upheld the conviction of a Defense Department employee who sold a secret spy satellite photo to a foreign magazine, it did so given substantial evidence of bad faith and economic motive not present here. And in so doing, two of the three panel judges wrote separately to underscore the need for case-by-case consideration of the constitutional questions raised by Espionage Act prosecutions of press leakers and flagged important First Amendment considerations that properly belong in the mix at sentencing.

To be sure, Mr. Hale has pleaded guilty to disclosing classified information. But, as demonstrated below, his prosecution for leaking to the press is far outside the heartland of the Espionage Act's focus on spies and traitors. A just sentence should necessarily take into account

---

[1] *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988).

the First Amendment interests at stake when the Executive uses the Act in this unanticipated way—weighing any harm caused by disclosure of the classified information at issue against the importance of the disclosure to informed public discourse and democratic accountability.

## INTEREST OF *AMICI CURIAE* AND SUBJECT OF THIS SUBMISSION

*Amici* are 17 law professors, scholars and law school clinicians whose work focuses on constitutional law, First Amendment law and media law, as well as the Knight First Amendment Institute at Columbia University.[2] As educators and specialists in these fields, amici have a vital interest in ensuring the continued operation of the type of robust system of free expression that a functioning democracy requires.

This memorandum highlights for the Court issues that fall directly within *amici's* area of expertise, specifically (1) the substantial First Amendment concerns raised when, as here, the government uses the Espionage Act to punish individuals who have not passed information to foreign governments but rather disclosed information of legitimate public concern to the American people, and (2) the need for this Court to address these First Amendment concerns in fashioning a truly just sentence to be imposed on Mr. Hale.

## ARGUMENT

### I.

### CONGRESS NEVER INTENDED THE ESPIONAGE ACT TO CRIMINALIZE WHISTLEBLOWING, AND USING THE ACT TO PROSECUTE PRESS LEAKERS RAISES SUBSTANTIAL FIRST AMENDMENT CONCERNS

Empowering prosecutors to indict speakers whenever they convey to the press classified information of any sort, for any purpose, undeniably raises First Amendment concerns—concerns that are compounded by a bloated and largely unconstrained classification system. Yet, in recent

---

[2] Identification of the *amici*, who are participating in their individual capacities and not as representatives of the institutions with which they are affiliated, appears in the Appendix to this memorandum.

years the Espionage Act of 1917 has been transformed by federal prosecutors into just such a blunt instrument, one that uncomfortably abuts our constitutional commitment to "supply[ing] the public need for information and education with respect to the significant issues of the times."[3]

At the same time, digital communications technologies have made it easier to wield this prosecutorial tool without consideration of the First Amendment interests at stake. Historically, any First Amendment limitations were addressed when prosecutors sought to compel reporters to disclose their sources in a leak prosecution, but new technologies mean reporters' testimony is no longer needed. The First Amendment implications of press leak prosecutions should thus properly be considered at sentencing, particularly given that Congress, in enacting and amending the Espionage Act, never contemplated or condoned the use of the Act in this manner.

## A.   The Espionage Act Is Not An Official Secrets Act

Because of our constitutional commitment to the freedoms of speech and the press, the United States has never enacted a law seeking to broadly criminalize the unauthorized disclosure of any classified government information. In 2000, Congress did pass such a law that would have permitted a felony prosecution of any person who disclosed classified information to anyone not cleared to receive it, but President Clinton vetoed it. Citing the First Amendment, Clinton deemed it his "obligation to protect not only our Government's vital information from improper disclosure, but also to protect the rights of citizens to receive the information necessary for democracy to work."[4] His veto affirmed the widely held view that the United States "would never abide . . . a

---

[3] *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940).

[4] *Statement by the President on Disapproving H.R. 4392, the "Intelligence Authorization Act for Fiscal Year 2001*, THE WHITE HOUSE (Nov. 4, 2000), *available at* https://fas.org/sgp/news/2000/11/wh110400.html.

sweeping criminal prohibition" like the United Kingdom's Official Secrets Act, which "broadly criminalizes the dissemination and retention of numerous classes of government information."[5]

### 1. Congress passed the Espionage Act to protect the nation from spies, not to criminaliz the disclosure of information vital to the American public.

Clinton's veto reinforced a decision made by Congress generations earlier when it first drafted the Espionage Act of 1917.[6] Passed on the eve of the United States' entry into World War I, the Act sought to protect the nation from spying by foreign governments by criminalizing the unauthorized disclosure of national security information that could foreseeably aid a foreign government or harm the United States.[7] In formulating the Act, both the House and the Senate rejected a provision that the Wilson administration had drafted and for which it actively lobbied that would have empowered the President to designate information that could not legally be communicated, including to or by the American press.[8] The provision's opponents, who carried the day, insisted that the costs of punishing communications made for innocent purposes, including those made to or by the press to inform the public, outweighed the countervailing interests.[9]

When Congress amended the Espionage Act in the 1950 Internal Security Act, Senator Kilgore expressed concern once again that the Act might be construed to cover innocent

---

[5] David Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 HARV. L. REV. 512, 516, 626 (2013) ("Pozen").

[6] Much of the historical discussion that follows, including citations, is drawn from Heidi Kitrosser & David Schulz, *A House Built on Sand: The Constitutional Infirmity of Espionage Act Prosecutions for Leaking to the Press*, 19 FIRST AMEND. L. REV. 153 (2021) ("Kitrosser & Schulz").

[7] Sam Lebovic, *From Censorship to Classification, The Evolution of the Espionage Act, in* WHISTLEBLOWING NATION, The History of National Security Disclosures and the Cult of State Secrecy 47-55 (Kaeten Mistry & Hannah Gurman eds., 2020) ("Lebovic").

[8] Harold Edgar & Benno C. Schmidt Jr., *The Espionage Statutes and Publication of Defense Information*, 73 COLUM. L. REV. 934, 1077 (1973) ("Edgar & Schmidt"); Lebovic, at 51-52.

[9] Edgar & Schmidt, at 954-58.

communications to the press.  The bill's sponsor, Senator McCarren, concurred and to assuage this worry added language to the final bill making clear that the Espionage Act was not to be construed to "limit or infringe upon freedom of the press or of speech as guaranteed by the Constitution of the United States."[10]

It was only as the memories of 1917 and 1950 receded, and as a permanent classification infrastructure later took shape and grew, that the notion of using the Espionage Act to prosecute media leaks became palatable.  The first, now largely forgotten prosecution was brought in 1957 against Army Colonel Jack Nickerson, who had revealed the results of an Army missile program launch to the press in an effort to demonstrate that Defense Secretary Charlie Wilson had acted improperly by rejecting the Army missile in favor of an inferior Air Force missile manufactured by GM, Wilson's former employer.[11]  Amidst a public outcry over the effort to punish the whistleblower, the government dropped the Espionage Act charge; Nickerson pled guilty to violating several Army security regulations and lost his security clearance for a year.[12]  The government did not pursue another Espionage Act leak prosecution until 1971, when the Nixon Administration indicted Daniel Ellsberg and Anthony Russo for leaking the Pentagon Papers.[13] The district court dismissed that case due to prosecutorial misconduct.[14]

---

[10] *Id.* at 1026-27; *see also* Lebovic at 59.

[11] Ian MacDougall, *The Leak Prosecution That Lost the Space Race*, THE ATLANTIC (Aug. 15, 2016), *available at* https://www.theatlantic.com/politics/archive/2016/08/the-leak-prosecution-that-lost-the-space-race/495659/.

[12] *Id.*

[13] Steven V. Roberts, *Ellsberg Indicted Again in Pentagon Case*, N.Y. TIMES at 1 (Dec. 31, 1971).

[14] Martin Arnold, *Pentagon Papers Charges are Dismissed: Judge Byrne Frees Ellsberg and Russo, Assails "Improper Government Conduct,"* N.Y. TIMES at 1 (May 12, 1973).

Only two more cases were brought against press leakers under the Espionage Act between the dismissal of the Pentagon Papers case and the Obama administration three decades later. The first, during the Reagan administration, targeted a Navy intelligence analyst, Samuel Morison, who was prosecuted for disclosing a military satellite photograph to a British publication in exchange for payment.[15] Morison was convicted and was later pardoned by President Clinton.[16] The second, during the George W. Bush administration, targeted a Defense Department analyst for leaking information to two lobbyists, and the lobbyists for passing the leaked information to "members of the media, foreign policy analysts, and officials of a foreign government."[17] The charges against the lobbyists were ultimately dropped.[18]

### 2. Recent administrations have nonetheless used the Espionage Act as an official secrets act.

The long era of prosecutorial restraint is over. The Obama Administration brought more than twice as many Espionage Act leak prosecutions against press leakers as had all previous administrations combined,[19] and the Trump Administration brought nearly as many prosecutions in four years as his predecessor had brought in eight.[20] Mr. Hale's indictment is among the latter.

---

[15] *Morison*, 844 F.2d at 1060-62.

[16] Valerie Strauss, *Navy Analyst Morison Receives a Pardon*, WASH. POST (Jan. 21, 2001), https://www.washingtonpost.com/archive/politics/2001/01/21/navy-analyst-morison-receives-a-pardon/00e0ddb7-3b6c-4a36-b4c7-4b0ebfbbbe43/.

[17] *United States v. Rosen*, 445 F. Supp. 2d 602, 607-10 (E.D. Va. 2006), *aff'd* 557 F.3d 192 (4th Cir. 2009).

[18] *See* Neil A. Lewis & David Johnston, *U.S. to Drop Spy Case Against Pro-Israel Lobbyists,* N.Y. TIMES (May 1, 2009), https://www.nytimes.com/2009/05/02/us/politics/02aipac.html.

[19] *See* Gabe Rottman, *A Typology of Federal News Media "Leak" Cases*, 93 TUL. L. REV. 1147, 1182–85, Table 1 (2019) (counting only the prosecutions brought under Section 793).

[20] *Federal Cases Involving Unauthorized Disclosures to the News Media, 1778 to the Present*, Reporters Committee for Freedom of the Press, https://www.rcfp.org/resources/leak-investigations-chart/ (last visited July 15, 2021).

These prosecutions have proceeded under an expansive reading of certain provisions of the

Espionage Act that, taken together, would indeed make it a crime to disclose virtually any

classified document, for any purpose, to anyone not cleared by the government to receive it.  Mr.

Hale was charged under one of these provisions, § 793(e), which authorizes criminal penalties for

anyone who:

> having unauthorized . . . access to . . . any document . . . relating to the national
> defense, or information relating to the national defense which information the
> possessor has reason to believe could be used to the injury of the United States or
> to the advantage of any foreign nation, willfully communicates, delivers [or]
> transmits . . . the same to any person not entitled to receive it, or willfully retains
> the same and fails to deliver it to the officer or employee of the United States
> entitled to receive it.[21]

The few courts that have interpreted § 793(e), and its similarly worded counterpart in § 793(d),[22]

have read the "not entitled to receive" information "relating to the national defense" language to

incorporate the entire, bloated classification system.[23]  Given the broad and malleable nature of

the remaining terms in § 793(d) and (e),[24] virtually any unauthorized leak of classified information

---

[21] 18 U.S.C. § 793(e).

[22] The two provisions are nearly identical, with § 793(d) applying to persons with lawful access to the information, and § 793(e) applying to those with unauthorized access to the information. 18 U.S.C. § 793(d) & (e).

[23] *Morison*, 844 F.2d at, 1074-75; *U.S. v. Kim*, 808 F.Supp. 2d 44, 54-55 (D.D.C. 2011).

[24] The few decisions interpreting these provisions have defined documents "relating to the national defense" to mean those that "'directly or may reasonably be connected with the defense of the United States,' the disclosure of which 'would be potentially damaging to the United States or might be useful to an enemy of the United States' and which had been 'closely held' by the government and was 'not available to the general public.'" *Morison*, 844 F.2d at 1076; *Rosen*, 445 F.Supp.2d at 620-21. In cases where the defendants are accused of communicating information orally rather than transmitting documents, one court has held that the government also must prove that the "information was communicated 'with reason to believe it could be used to the injury of the United States or to the advantage of any foreign nation.'" *Rosen*, 445 F. Supp. 2d at 625-26 (quoting 18 U.S.C.§ 793(d) & (e)).

to the media could be prosecuted under the Act.  In short, the Act is now being used as an Official Secrets Act.

**B.**    **The Use of the Espionage Act to Prosecute Leakers Like Mr. Hale Raises Substantial First Amendment Concerns**

     **1.**  **Using the Espionage Act as an official secrets act is constitutionally suspect under established First Amendment doctrine.**

The government's aggressive uses of the Espionage Act to target media leakers is troubling not only from a policy standpoint, but as a matter of constitutional doctrine and theory.  Several settled First Amendment principles make clear that leaks to the press present First Amendment concerns—concerns that remain relevant at sentencing.[25]  They include requirements that (1) speech about the actions of our government receives the highest level of constitutional protection, and (2) heightened scrutiny is necessary when the government seeks to shield particular information about itself from public view.

Neither of these principles can be in serious dispute.  The Supreme Court has made clear that speech on matters of public importance lies at the heart of the First Amendment.[26]  Such speech not only benefits speakers, but the citizen-audiences who have a right to receive it, and their press surrogates who play a "structural role" in bringing it to them.[27]  These rights are fundamental to maintaining our constitutional republic.  If elections and inter-branch checks and

---

[25] This section draws substantially from Heidi Kitrosser, RECLAIMING ACCOUNTABILITY 140-41 (U. CHICAGO P. 2015).

[26] *See, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254, 269-71, 273-76 (1964).

[27] *See, e.g.*, *Richmond Newspapers v. Virginia*, 448 U.S. 555, 575-76 (1980) (plurality op. of Burger, J.) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." (*quoting First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)); *id.* at 587 (Brennan, J., concurring) ("the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government").

balances are to be meaningful, the People must have opportunities to learn and convey information about the actions of government. As the Supreme Court put it:

> The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. The exigencies of the colonial period and the efforts to secure freedom from oppressive administration developed a broadened conception of these liberties as adequate to supply the public need for information and education with respect to the significant issues of the times. [28]

The First Amendment vigorously protects speech about government and public affairs in part because of concerns that the government will abuse its censorial powers to target speech that it dislikes or that threatens its interests or credibility. Prosecutions that target leaks to the media directly raise these concerns. The Supreme Court has repeatedly recognized the very real risk—and long history—of such abuse as important factors underlying its free speech rulings.[29] Indeed, First Amendment doctrine takes this threat so seriously that it forbids the government from punishing or prohibiting speech based on its content or viewpoint unless the restriction satisfies the most stringent constitutional scrutiny.[30]

Long experience also demonstrates the special risks posed where government seeks to punish speech that ostensibly threatens national security. From World War I through the early Cold War years, the Court regularly upheld prosecutions for antiwar, communist, and socialist speech. But the consensus judgment of history has deemed those prosecutions poorly justified and

---

[28] *Thornhill*, 310 U.S. at 95, 101-02; *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 243, 249-50 (1936).

[29] *See, e.g., Sullivan*, 376 U.S. at 276 ("[a]lthough the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history.").

[30] *See, e.g., Texas v. Johnson*, 491 U.S. 397, 410-20 (1989).

9

the Court's deference to the government undue.[31]  The Supreme Court internalized these lessons when it announced in *Brandenburg v. Ohio* in 1969 that a person cannot constitutionally be punished for speech linked to terrorism or to other dangerous activity unless the speech is intended to incite, and likely to incite, imminent, lawless action.[32]  *Brandenburg* erected a very high bar to prosecutions of speech deemed subversive or threatening, and in so doing the Supreme Court emphasized the duty of the judiciary to protect First Amendment freedoms even in the face of security threats, notwithstanding the separation-of-powers concerns that lurk in these issues.

The Supreme Court has further recognized the need to protect public discussion and deliberation in cases involving poorly tailored, unpredictable, or overbroad restrictions that create a "chilling effect" on speech.[33]  The Court has repeatedly observed that free speech is harmed not only by unwarranted punishments, but also by the self-censorship of those who must decide whether to risk punishment in the face of uncertainty.  Speakers may play it safe when confronted by vague or far-reaching laws, not to mention the perceived risks of angering powerful members of society.  Such concerns are central, for example, to the Supreme Court's decisions conforming state libel laws to constitutional principles.  The Court explained that it would rather craft speech

---

[31] *See, e.g.*, Geoffrey Stone, PERILOUS TIMES: FREE SPEECH IN WARTIME 179-207, 403-11 (W.W. NORTON, 2011).

[32] *Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969).

[33] *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (explaining that a governmental power to regulate all false speech is so broad  that its "mere potential . . . casts a chill"); *Citizens United v. Fed. Election Comm'n*,  558  U.S. 310, 324 (2010) (noting that prolix laws, like vague laws, chill speech due to uncertainty about their meanings and applications); *United States v. Stevens*, 559 U.S. 460, 483-84 (2010) (Alito, J. dissenting) ("Because an overly broad law may deter constitutionally protected speech, the overbreadth doctrine allows a party to whom the law may constitutionally be applied to challenge the statute on the ground that it violates the First Amendment rights of others.").

10

protections so strong that some defamatory speech will go unpunished, than so weak that "would-be critics of official conduct may be deterred from voicing their criticism."[34]

These concerns are particularly salient in prosecutions of whistleblowers like Mr. Hale. As the Supreme Court recently reaffirmed, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment."[35]   Although rank-and-file government employees and contractors play a crucial role in informing public discussion about the actual activities of government, they lack the political power of an authorized, high-level official, or the resources of corporate publishers.  They are thus vulnerable to the threat of retaliatory prosecution for disclosures of questionable, embarrassing or otherwise inconvenient truths.

In sum, an Espionage Act prosecution of a whistleblower or leaker to the press is something never envisioned by those who enacted and amended the Act, and the use of the Act in this way threatens the flow of important information to the public.  Such prosecutions demand a judicial response that safeguards the important First Amendment interests at stake.

## 2. Using the Espionage Act as an official secrets act chills valuable, public interest whistleblowing and reporting.

The broad reach of the transformed Espionage Act, combined with rampant overclassification, endangers the ability of the public to learn through the press information that is

---

[34] *Sullivan*, 376 U.S. at 279.

[35] *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014); *see also Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) (recognizing the important public interest "in receiving the well-informed views of government employees engaging in civic discussion").  The constitutional values the Court considered important in public employee speech cases are very much at issue. *See* Heidi Kitrosser, *Free Speech Aboard the Leaky Ship of State: Calibrating First Amendment Protections for Leakers of Classified Information*, 6 J. NAT'L. SECURITY L. & POL'Y 409, 440-45 (2013) (demonstrating the need for a higher burden on the government to justify a leak prosecution than to impose employment-based punishment).

11

essential to self-government.  Compelling anecdotal evidence shows that investigative reporters have lost sources of important classified and unclassified information since the Obama administration launched its unprecedented volley of media-leak prosecutions:

- Scott Shane, a Pulitzer-winning journalist at *The New York Times*, observed in 2013 that "[m]ost people are deterred by those leak prosecutions. They're scared to death. There's a gray zone between classified and unclassified information, and most sources were in that gray zone. Sources are now afraid to enter that gray zone. It's having a deterrent effect."[36]

- *Washington Post* reporter Rajiv Chandrasekaran remarked that same year that "one of the most pernicious effects [of the leak crackdown] is the chilling effect created across government on matters that are less sensitive but certainly in the public interest as a check on government and elected officials."[37]

- Adam Goldman, who covers national security for *The New York Times*, put it very simply in a 2019 interview: "Are there people who talked to me, who've stopped talking to me? Yes."[38]  In a 2020 report, Shane and other journalists confirmed that news sources remain fearful in light of the continuing stream of Espionage Act prosecutions.[39]

Worse, this extraordinary breadth invites political retaliation, disproportionately deterring sources from disclosing information that might politically embarrass or anger an incumbent administration. Although many leaks come from high-level officials, including the President and political appointees,[40] those powerful figures have relatively little to fear from an uptick in leak

---

[36] Leonard Downie Jr., *The Obama Administration and the Press*, COMMITTEE TO PROTECT JOURNALISTS (Oct. 10, 2013), https://cpj.org/?p=23307.

[37] *Id.*

[38] Avi Asher-Schapiro, *Leak Prosecutions Under Trump Chill National Security Beat*, COMMITTEE TO PROTECT JOURNALISTS (March 2019), https://cpj.org/2019/03/leak-prosecutions-trump-national-security-beat/.

[39] Downie, *supra* n.36.

[40] *See, e.g.,* Pozen, 127 HARV. L. REV. at 529-530; Mary-Rose Papandrea, *Lapdogs, Watchdogs, and Scapegoats: The Press and National Security Information*, 83 IND. L.J. 233, 250-54 (2008).

prosecutions.[41]  The drone program itself was the subject of "many purposeful leaks to the press
by unnamed senior officials that contain[ed] many (often self-serving) details," as well as "many
(un-denied and unpunished) overt statements by former officials about CIA involvement in the
drone program."[42]

Aggressive prosecutions of less politically protected public servants like Mr. Hale, by
contrast, send a pointed message to career insiders who contemplate exposing abuses or illegality,
or sharing information that casts an administration in a bad light.  The recent rise in rank-and-file
leak prosecutions affirms a perverse incentive on the part of administrations: to combat "public
accountability leaks" that "expose systemic illegality, incompetence, error, or malfeasance."[43]

C.      **New Technologies Have Blunted the Courts' Historic Ability to Apply First
        Amendment Considerations Earlier in Leak Prosecutions**

There is yet a further reason why First Amendment concerns are properly addressed at
sentencing in Espionage Act prosecutions of those who disclose information to the press.  Until
recently, a federal prosecutor contemplating an Espionage Act prosecution based upon a leak to
the press confronted the reality that identifying the source of a leak was likely to require evidence
from the reporter who received the leaked information.  This reality built a kind of "First
Amendment friction" into the use of the Act against leakers because, after the Supreme Court's

---

[41] *See, e.g.*, Uri Friedman, *Good Leak, Bad Leak,* FOREIGN POLICY (June 8, 2012),
https://foreignpolicy.com/2012/06/08/good-leak-bad-leak/.

[42] Jack Goldsmith, *Thoughts on Today's Important Drone FOIA Oral Argument in DC Circuit*,
LAWFAREBLOG.COM (Sept. 20, 2012), https://www.lawfareblog.com/thoughts-todays-important-
drone-foia-oral-argument-dc-circuit.

[43] Yochai Benkler, *A Public Accountability Defense for National Security Leakers and
Whistleblowers*, 8 HARV. L. & POL'Y REV. 281, 283-84, 303-04 (2014).

ruling in *Branzburg v. Hayes*, 408 U.S. 665 (1972), federal courts had widely recognized a qualified reporter's privilege.[44]

Although the articulation of the privilege varied in different federal circuits, assessing whether to overcome the privilege typically involved weighing the prosecutor's need for the information and afforded an opportunity for a judge to assess the competing constitutional concerns asserted by the journalist.[45]  Indeed, in the context of a leak investigation, D.C. Circuit Judge Tatel concluded that the scope afforded to the reporter's privilege needed to "account for the varying interests at stake in different source relationships," and therefore required a balancing test that asked whether "the public interest in punishing the wrongdoers—and deterring future leaks—outweighs any burden on newsgathering, and no privilege covers the communication."[46]

Similar concerns about the need for confidentiality in newsgathering were addressed under Department of Justice guidelines adopted in the 1970s that precluded federal prosecutors from issuing a subpoena to a reporter in a criminal case unless the U.S. attorney seeking the information first demonstrated to the Attorney General personally that (1) the information was essential to a successful investigation or prosecution, (2) all reasonable attempts had been made without success to obtain the information from other sources, and (3) negotiations with the reporter had been

---

[44] Every federal circuit except the Sixth and Seventh have recognized some form of a qualified First Amendment reporter's privilege. *See* Lee Levine et al., 2 NEWSGATHERING AND THE LAW § 20.02 (5th ed. Matthew Bender & Co. 2018).  Forty-nine states also recognize some form of reporters' privilege. *See id.* §19.01 n.14 (41 states have statutory shield laws); *id.* at 20-02 (35 states judicially recognize a reporter's privilege).

[45] *See id.* § 20.02[5][a] (discussing cases).

[46] *In re Grand Jury Subpoena, Judith Miller*, 438 F. 3d 1141, 1174, 1178 (D.C. Cir. 2005) (Tatel, J., concurring).

pursued without success.[47]   The recognition of the constitutional significance of compelling a
reporter to disclose a source through the adoption of these Justice Department guidelines had the
effect of severely limiting the number of subpoenas issued to reporters for several decades.[48]

Recent advances in technology have fundamentally changed a federal prosecutor's
calculations in pursuing a leak prosecution.   The ubiquity of electronic surveillance tools today—
ranging from GPS devices, to cell phone and e-mail records, to security cameras, to bar-coded
entry and exit badges—dramatically eases the government's burden in identifying leakers, and
erases any "First Amendment friction" in prosecutorial decisions to pursue press leak prosecution.

During the Obama Administration, a spokesperson for Attorney General Eric Holder
acknowledged this new reality: "'Before, you needed to have the leaker admit it, which doesn't
happen . . . or the reporter to testify about it, which doesn't happen."[49]   Even the most Luddite
journalist-source meet-ups are now vulnerable to technology: "meetings in dark parking garages a
la Bob Woodward in *All the President's Men* are not safe if a camera captures footage of every
person that comes in and out."[50]   As a result, another Obama administration official suggested that

---

[47] *Id.* These guidelines were revised in 2014 and again in 2015 by Attorney General Eric Holder.
*See Amending the Department of Justice subpoena guidelines*, REPORTERS COMM. FOR FREEDOM
OF THE PRESS, https://www.rcfp.org/attorney-general-guidelines/.

[48] *See Free Flow of Information Act of 2007: Hearing on H.R. 2102 Before the H. Comm. on the
Judiciary*, 110th Cong. 2 (2007) (testimony of Rachel L. Brand, Assist. Att'y Gen., Office of
Legal Policy, U.S. Department of Justice) (testifying that only nineteen DOJ subpoenas to the
press for confidential source information were approved between 1991 and 2007).

[49] Heidi Kitrosser, *Leak Prosecutions and the First Amendment: New Developments and a Closer
Look at the Feasibility of Protecting Leakers,* 56 WM. & MARY L. REV. 1221, 1248 (2015).

[50] Mary-Rose Papandrea, *Leaker Traitor Whistleblower Spy: National Security Leaks and the
First Amendment,* 94 B.U. L. REV. 449, 460 & n.50 (2014).

a subpoena issued to New York Times reporter James Risen in 2008 was "one of the last you'll see . . . . We don't need to ask you who you're talking to. We know."[51]

Investigators now obtain electronic records from third parties to identify alleged leakers, rather than subpoenaing news organizations and affording them an opportunity to raise First Amendment concerns. In 2013, for example, the Obama administration "secretly subpoenaed and seized all records for 20 AP telephone lines and switchboards for April and May of 2012" to investigate a 2012 Associated Press story about a quelled bomb plot, and did not notify the AP that its journalists' records had been seized until many months after the fact.[52] Around that same time, the Justice Department secretly seized the email account of a Fox News reporter in connection with another Espionage Act investigation.[53]

In 2018, the Trump administration notified a reporter for *The New York Times* that it had obtained several years of her telephone and e-mail records to investigate alleged leaks from a Senate Intelligence Committee staffer.[54] Just recently, the Department of Justice disclosed subpoenas issued—with gag orders—seeking information in the hands of third-parties that would reveal the communications of reporters at the New York Times, CNN and the Washington Post, all in aid of leak investigations.[55]

---

[51] Adam Liptak, *A High-Tech War on Leaks*, N.Y. TIMES (Feb. 11, 2012), https://www.nytimes.com/2012/02/12/sunday-review/a-high-tech-war-on-leaks.html.

[52] Downie, *supra* n.36.

[53] *See* Aff. in Support of Application for Search Warrant, *Application for Search Warrant*, 10-mj-00291 (D.D.C. filed Nov. 7, 2011), *available at* https://fas.org/sgp/jud/kim/warrant.pdf.

[54] A. Goldman, N. Fandos & K. Benner, *Ex-Senate Aide Charged in Leak Case Where Times Reporter's Records Were Seized,* N.Y. TIMES (June 7, 2018), https://www.nytimes.com/2018/06/07/us/politics/times-reporter-phone-records-seized.html.

[55] *See* Charlie Savage & Katie Benner, *Trump Administration Secretly Seized Phone Records of Times Reporters,* N.Y. TIMES (June 2, 2021) https://www.nytimes.com/2021/06/02/us/trump-administration-phone-records-times-reporters.html; Adam Goldman, *Trump Justice Dept. Seized CNN Reporter's Email and Phone Records,* N.Y. TIMES (May 20. 2021),

Given current electronic investigative capabilities, it is hardly surprising that in *none* of the seventeen leak prosecutions since 9/11—including this one—did the government need to call a reporter to testify, at the grand jury phase or otherwise.[56]   Indeed, only once—in seeking James Risen's testimony in the prosecution of Jeffrey Sterling—did the government even issue a subpoena for a reporter's testimony, and that subpoena was ultimately abandoned as unnecessary.[57]   The bottom line is that the need to compel a reporter to testify has largely been removed from the equation when the government weighs whether to bring an Espionage Act charge against a leaker.  This has also removed the historic need for a prosecutor to weigh the harm caused by a leak and the public interest in the leaked information before proceeding with a prosecution, making these considerations all the more important at the sentencing phase.

## II.
### THE SENTENCE IMPOSED ON MR. HALE SHOULD RESPECT THE SIGNIFICANT FIRST AMENDMENT INTERESTS AT STAKE

From 2009 to 2013, Mr. Hale served in the US Air Force as an intelligence analyst, where he was involved in identifying targets for the US drone program.   According to a 2016 documentary, Hale became increasingly disturbed by the process of using drones to identify foreign targets because any military age male in the vicinity of a target was considered a legitimate target, even though there was no way of knowing if they were civilian or not.[58]   He is being

---

https://www.nytimes.com/2021/05/20/us/politics/cnn-trump-barbara-starr.html; Devlin Barrett, *Trump Justice Department secretly obtained Post reporters' phone records,* WASHINGTON POST, (May 7, 2021), https://www.washingtonpost.com/national-security/trump-justice-dept-seized-post-reporters-phone-records/2021/05/07/933cdfc6-af5b-11eb-b476-c3b287e52a01_story.html.

[56] *See* Kitrosser & Schulz.

[57] *See* Matt Apuzzo, *Times Reporter Will Not Be Called To Testify in Leak Case,* (N.Y. TIMES, Jan. 12, 2015), https://www.nytimes.com/2015/01/13/us/times-reporter-james-risen-will-not-be-called-to-testify-in-leak-case-lawyers-say.html.

[58] Chip Gibbons, *Daniel Hale Blew the Whistle on the US's Illegal Drone Program.  He's a Hero, Not a Criminal,* JACOBIN (Apr. 10, 2021), https://www.jacobinmag.com/2021/04/daniel-

prosecuted for acting on these concerns and alerting the American people to a concealed program of great public importance. His motivations, any harm his disclosure caused, and the public interest in his information should all factor into Mr. Hale's sentence.

The sentencing phase of a leak prosecution is often the only opportunity for a court to independently weigh the First Amendment implications of the prosecution, and it is crucial to the functioning of our democracy that such an assessment takes place. "Both Congress and the Sentencing Commission [] expressly preserved the traditional discretion of sentencing courts to 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.'"[59] Even within the Guidelines rubric, this Court properly considers whether any circumstances warrant departures from the guidelines range appropriate for a "heartland" offense,[60] and, ultimately, whether the "circumstances of the offense" create a "need" for Guidelines sentencing at all, which necessitates a consideration of whether Guidelines punishment is "just" or necessary "to protect the public from further crimes of the defendant."[61]

Mr. Hale has admitted that he is guilty of violating the Espionage Act, but that reflects more on the indiscriminate breadth of the statute—as construed by the government and a small handful of cases—than it does the gravity of Mr. Hale's crime. Indeed, as construed by the

---

hale-whistleblower-us-drone-program-papers-intercept-espionage-act. *See also* Chris Hedges, *A "traitor" to the American death machine faces years in prison—while the killing goes on,* SALON (July 13, 2021), A "traitor" to the American death machine faces years in prison — while the killing goes on (msn.com)

[59] *Pepper v. United States*, 562 U.S. 476, 489 (2011) (quoting *Tucker*, 404 U.S. at 446).

[60] *Unites States v. Rybicki*, 96 F.3d 754, 757 (4th Cir. 1996) (noting that a downward departure is permitted where "the circumstances or consequences of the offense of conviction appear 'atypical,' such that they potentially take the case out of the applicable guideline's heartland"); *see generally Koon v. United States*, 518 U.S. 81, 93 (1996).

[61] 18 U.S.C. § 3553(a)(1) & (2).

government the statute does not distinguish between disclosures that inflict grave national security harm and disclosures that threaten no valid government purpose, or disclosures that affirmatively protect the public by exposing government misconduct.

Mr. Hale pleaded to conduct well outside the "heartland" of the Espionage Act, which is targeted at disclosures by spies, defectors, and enemies. Moreover, the circumstances of his offense reveal no need to "protect the public" from future offenses by him. Mr. Hale no longer has access to classified information and has lost his security clearance. At a minimum, achieving a just sentence in this prosecution requires assessing Mr. Hale's motivation, any the harm to national security caused by the unauthorized disclosure, and the importance to the public of the information disclosed.

A.      **Classification Alone Does Not Predict Either the Harm Disclosure Will Cause to the Nation or the Importance of the Information to the Public**

One relevant measure of a just criminal sentence in any prosecution is the harm caused by the offender. To assess the gravity of harm caused by Mr. Hale's speech, the Court must look beyond the mere fact that the information he disclosed was classified, given the vast amount of material that is routinely classified with no real justification.[62] It is beyond peradventure that the government routinely classifies information that it has no legitimate basis to keep secret under Executive Order 13,526.[63] It necessarily follows that the classified status of the information

---

[62] *See* Elizabeth Goitein and David M. Shapiro, *Reducing Overclassification Through Accountability* at 1-2, BRENNAN CENTER FOR JUSTICE (Oct. 5, 2011) (the "Brennan Center Report"), https://www.brennancenter.org/publication/reducing-overclassification-through-accountability.

[63] The executive order governing classification is Exec. Order No. 13,526, which was last updated in 2009. Information Security Oversight Office, 2020 REPORT TO THE PRESIDENT 6 (2021). The Order prohibits classifying information to "conceal violations of law, inefficiency, or administrative error," or to "prevent embarrassment to a person, organization, or agency." Exec. Order No. 13526 § 1.7(a)(1)–(2), 75 Fed. Reg. 707, 710 (Dec. 29, 2009). But so long as the classifier can posit some national security implication to disclosure, a motive to hide

Mr. Hale disclosed, standing alone, neither establishes the existence of any actual harm his action may have caused nor negates the existence of any significant public benefit from disclosure.

Overclassification has been a problem since the classification system was created and has only worsened as the volume of classified information has exponentially increased. In 2020, an estimated two to three million persons had authority to classify information,[64] and these individuals collectively made more than 49.5 million decisions to classify information in 2017, the last year in which the federal government reported its total classification decision numbers.[65] Unsurprisingly, every government study of the classification system over the last six decades has found widespread classification of information that the government had no basis to conceal.[66]

Precise numbers are hard to come by, but current and former government officials have provided disturbing estimates. In 1991, Rodney B. McDaniel, the former Executive Secretary of the National Security Council during the Reagan administration, estimated that "only 10% of

---

wrongdoing can be hidden. *See, e.g., A.C.L.U. v. Dep't of Def.*, 584 F. Supp. 2d 19, 24 (D.D.C. 2008), *aff'd*, 628 F.3d 612 (D.C. Cir. 2011).

[64] Information Security Oversight Office, 2020 REPORT TO THE PRESIDENT 9 (2021) (the "ISOO 2020 REPORT"), https://www.archives.gov/files/isoo/reports/fy-2020-isoo-annual-report-to-the-president-final.pdf.

[65] Information Security Oversight Office, 2017 REPORT TO THE PRESIDENT 41, 43 (2018) (the "ISOO 2017 REPORT"), https://www.archives.gov/files/isoo/reports/2017-annual-report.pdf.

[66] *See* Def. Dep't Comm. on Classified Info., REPORT TO THE SECRETARY OF DEFENSE 6 (1956); Comm'n on Gov't Sec., 84th Cong., REPORT OF THE COMMISSION ON GOVERNMENT SECURITY 174–75 (1957); Special Subcomm. on Gov't Info., REPORT OF THE SPECIAL SUBCOMMITTEE ON GOVERNMENT INFORMATION, H.R. REP. NO. 85-1884 4 (1958); Def. Sci. Bd. Task Force on Secrecy, REPORT OF THE DEFENSE SCIENCE BOARD TASK FORCE ON SECRECY 2 (1970); Comm'n to Review DOD Sec. Policies and Practices, KEEPING THE NATION'S SECRETS: A REPORT TO THE SECRETARY OF DEFENSE app. E 31 (1985); Joint Sec. Comm'n, REDEFINING SECURITY: A REPORT TO THE SECRETARY OF DEFENSE AND THE DIRECTOR OF CENTRAL INTELLIGENCE 6 (1994); Comm'n on Protecting and Reducing Gov't Secrecy, REPORT OF THE COMMISSION ON PROTECTING AND REDUCING GOVERNMENT SECRECY, S. Doc. No. 105-2 xxi (1997); Nat'l Comm'n on Terrorist Attacks Upon the U.S., THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES 417 (2004).

classification was for 'legitimate protection of secrets.'"[67]  At a 2004 congressional hearing, J. William Leonard, then director of the Information Security Oversight Office, and Carol A. Haave, then Defense Department's Undersecretary for Intelligence, both put the odds of defensible government classification as a coin toss: "*half* of all classified information is overclassified."[68]  A decade later, the odds had worsened: former New Jersey governor and 9/11 Commission Chairman Thomas Kean said that "three-quarters of the classified material [I] reviewed for the [9/11] Commission should not have been classified in the first place."[69]

As documented by the Brennan Center for Justice in 2011, over-classification results from imbalanced incentives.[70]  Many incentives to classify have nothing to do with national security, while few countervailing incentives exist.  As one retired intelligence official recounted:

> [C]lassification was used not to highlight the underlying sensitivity of a document, but to ensure that it did not get lost in the blizzard of paperwork that routinely competes for the eyes of government officials. If a document was not marked "classified," it would be moved to the bottom of the stack. . . . He observed that a security classification, by extension, also conferred importance upon the author of the document.[71]

---

[67]  108 CONG. REC. S9714 (2004) at 84 (statement of Thomas S. Blanton, National Security Archive, George Washington University) (citing statement of Rodney McDaniel).

[68]  *Espionage Act and the Legal and Constitutional Issues Raised by Wikileaks,* HEARING BEFORE THE H. COMM. ON THE JUDICIARY, 111TH CONG. 27 (2010) (statement of Abbe D. Lowell, Partner, McDermott Will & Emery LLP) (emphasis in original) (citing *Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing,* HEARING BEFORE THE SUBCOMM. ON NAT'L SECURITY, EMERGING THREATS AND INT'L RELATIONS, COMM. ON GOV'T REFORM, 108TH CONG. 82-83 (2004)).

[69]  108 CONG. REC. S9714 (2004) (statement of Sen. Wyden).

[70]  *See* Brennan Center Report at 2-3.

[71]  Ted Gup, NATION OF SECRETS: THE THREAT TO DEMOCRACY AND THE AMERICAN WAY OF LIFE 44 (RANDOM HOUSE 2007) (cited in Brennan Center Report at 22, n.167).

Such incentives are magnified by a culture of secrecy in intelligence institutions, the natural instinct to conceal embarrassing information, the ease of classifying information, a fear of reprisals if adverse information is disclosed, and the lack of accountability for misclassifying information.[72]

Problems of overclassification, in short, run deep within the system. Former U.S. Solicitor General Erwin Griswold put the point memorably when he wrote: "It quickly becomes apparent to any person who has considerable experience with classified material" that "the principal concern of the classifiers is not with national security, but rather with governmental embarrassment of one sort or another."[73] Given this "well-documented practice" of overclassification, the Court of Appeals for the D.C. Circuit cautioned that it would be improper for courts to "conclude automatically that revelation of all 'top secret' documents will endanger national security."[74]

Overclassification is not just unnecessary; it can be affirmatively harmful to democratic accountability. Congress thus cited the "proclivity for overclassification" as its reason for requiring *de novo* judicial review when classified information is withheld in a FOIA case, to guard "against the potential for mischief and criminal activity under the cloak of secrecy."[75] Just as instances of classification to conceal misconduct or avoid embarrassment are well documented, so important public debates have been sparked by disclosures of classified information to the press.[76]

---

[72] *See* Brennan Center Report at 21-32.

[73] Erwin N. Griswold, Op-Ed., *Secrets Not Worth Keeping: The Courts and Classified Information*, WASH. POST (Feb 15, 1989), https://www.washingtonpost.com/archive/opinions/1989/02/15/secrets-not-worth-keeping/a115a154-4c6f-41fd-816a-112dd9908115/?utm_term=.358b76a54e04.

[74] *Halperin v. Kissinger*, 606 F.2d 1192, 1204 n.77 (D.C. Cir. 1979), *aff'd in part by an equally divided court*, 452 U.S. 713 (1981) (per curiam).

[75] *Ray v. Turner*, 587 F.2d 1187, 1209 (D.C. Cir. 1978) (Wright, J. concurring) (quoting *Source Book: Legislative History, Texts & Other Documents* (Comm. Print 1975) at 460-61).

[76] *See, N.Y. Times Co. v. DOJ*, 756 F.3d 100, 104-08 (2d Cir. 2014) (surveying government efforts to shield the legal justifications relied upon in carrying out targeted killing) (subsequent history omitted); E. Macaskill & G. Dance, *NSA Files Decoded,* THE GUARDIAN (Nov. 1, 2013),

This reality has important ramifications for courts, which must not ignore the consequences of executive-branch overclassification. As the Fourth Circuit has cautioned, "[a] blind acceptance by the courts of the government's insistence on the need for secrecy . . . would impermissibly compromise the independence of the judiciary and open the door to possible abuse."[77] In determining an appropriate sentence in this case, the Court should look beyond the fact that the information disclosed was classified, and carefully consider the extent to which disclosure caused any actual damage.

**B.    To Protect First Amendment Interests, the Context, Content and Impact of Mr. Hale's Leak Are All Properly Weighed in Setting a Just Sentence**

Against a realistic view of the harms from disclosure, the Court should weigh the public importance of the information in question and its value to democratic deliberation. Espionage Act prosecutions based upon leaking classified information to the press present unavoidable First Amendment conflicts given the broad reach and undefined terminology of the Espionage Act. Courts are empowered to craft sentences in such cases that reflect the grave constitutional concerns raised when individuals are prosecuted for speaking to the press on matters of serious public importance.

To address these concerns, this Court should weigh such factors as (1) the strength of the decision to classify the information at issue and any actual sensitivity of that information demonstrated by the government; (2) the manner in which Mr. Hale disclosed information – that is, whether he carefully selected the material to be disclosed to the public, either by doing so himself or by effectively delegating that task to the responsible press; (3) whether reasonable

---

http://www.theguardian.com/world/interactive/2013/nov/01/snowden-nsa-files-surveillance-revelations-decoded (mass NSA telephone and email surveillance kept secret from American public by classification).

[77] *In re Wash. Post*, 807 F.2d 383, 392 (4th Cir. 1986).

arguments could be made that the information he disclosed reveals illegal government activity; (4) whether alternative means of disclosure were available to Mr. Hale and would have been effective in informing the public; (5) the public interest in the disclosure and the extent to which the disclosure prompted public del/iberation, debate, or action. Weighing the public interest in the disclosed information as a mitigating factor would also address the Supreme Court's concern that "[t]he severity of criminal sanctions" themselves may "cause speakers to remain silent rather than communicate even arguably unlawful" speech.[78]

Several of these factors favor mitigation of Mr. Hale's sentence. In July 2014, a responsible, nationally recognized news organization published the first of many articles revealing that the Obama administration had approved a secret, unaccountable process for using drones to target and kill people outside of battle zones, including U.S. citizens.[79] Other news organizations later stated that Mr, Hale was the source of that information. Taken together, the disclosed classified documents showed that the government's high-value targeting campaign relied excessively on flawed signals intelligence, imposed an apparently incalculable civilian toll, and reduced the ability to extract potentially valuable intelligence from terror suspects due to a preference for assassination rather than capture.[80] These issues of vital and legitimate public concern may never have been brought to the public's attention without Mr. Hale's disclosures. As one publication has contended, "[f]ar from a spy, Hale is a whistleblower — and a courageous one at that . . . ."[81]

---

[78] *Reno v. ACLU*, 521 U.S. 844, 872 (1997).

[79] Jeremy Scahill & Ryan Devereaux, *The Secret Government Rulebook for Labeling You a Terrorist*, THE INTERCEPT (July 23, 2014), https://theintercept.com/2014/07/23/blacklisted/.

[80] *See, e.g.*, Betsy Reid (Ed.), *The Drone Papers,* INTERCEPT, https://theintercept.com/drone-papers/; Jeremy Scahill, *The Assassination Complex* (Simon & Schuster, 2016).

[81] Gibbons, *supra* n.58.

Undertaking a fact-sensitive consideration at sentencing of the public value of the classified information that was disclosed is entirely consistent with judicial precedent.  Courts have long taken the public interest into account as a factor in sentence mitigation as, for example, with rescuers who violated the Fugitive Slave Act and with absolutist conscientious objectors during the Vietnam War.[82]  A similar judicial accounting of the public interest at sentencing in an Espionage Act leak prosecution is particularly appropriate because Congress, in enacting and amending the Espionage Act, never conceived of it as an official secrets act, and thus did not itself weigh the relevant interests in fashioning the law's scope or penalties.

The U.S. Court of Appeals for the Fourth Circuit did uphold a conviction under the Espionage Act for a leak to the press in *United States v. Morison* – to this day the only appellate court decision to address the constitutionality of media leak prosecutions.  But two of the three judges on the panel – Judges Wilkinson and Phillips -- wrote separately to emphasize that "the first amendment issues raised by [the defendant] are real and substantial,"[83] and to express confidence that trial judges would closely examine the speech value at stake in any future cases.

Judge Wilkinson accepted the idea that courts should provide some amount of deference to executive branch classification judgments in determining the permissible scope of the criminal prohibition on leaks.  But he reached that conclusion only because he was confident that government sources who revealed information of public importance, such as that involving "corruption, scandal, and incompetence in the defense establishment," were unlikely ever to be prosecuted, and that if they were, the situation could be "cured through case-by-case [judicial]

---

[82] Mailyn Fidler, *First Amendment Sentence Mitigation: Beyond a Public Accountability Defense for Whistleblowers*, 11 HARV. NAT'L SEC. J. 214, 215 (2020).

[83] 844 F.2d at 1085 (Phillips, J., concurring); *see also id.* at 1080-81 (Wilkinson, J., concurring);

analysis of the fact situations."[84] Judge Phillips endorsed the view that press leak prosecutions engage serious First Amendment concerns and accepted Judge Wilkinson's "general estimate" that leaks exposing important news would not be punished, an estimate that Phillips called "the critical judicial determination forced by the first amendment arguments advanced in this case."[85]

*Morison* thus not only embraced the need for case-by-case constitutional challenges to Espionage Act prosecutions of press leakers, it flagged important First Amendment considerations that belong in the mix at sentencing. Indeed, the recent spate of leak prosecutions that target disclosures of important, newsworthy information—including this one—suggest that Judge Wilkinson's optimism about the substantive reach of the Espionage Act was misplaced. Leaks of important news *are* being prosecuted, underscoring the need to factor into the sentencing decision the First Amendment interests that he and Judge Phillips identified. These First Amendment concerns include the public's constitutionally protected interest in receiving and debating information about the government's activities,[86] as well as the threat to the press's "important role in the discussion of public affairs"[87] that would result from unbridled prosecutorial latitude to selectively target leaks of any classified information.

---

[84] *Id.* at 1083-84 (Wilkinson, J., concurring).

[85] *Id.* at 1085-86 (Phillips, J., concurring). A subsequent district court confirmed that *Morison* does not preclude First Amendment defenses in Espionage Act prosecutions for leaking classified information. *Rosen*, 445 F. Supp. 2d at 630.

[86] *See, e.g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (citing "numerous" Supreme Court decisions acknowledging the right to receive speech); *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 386–87 (1998) (Rehnquist, J., concurring) ("Our decisions have concluded that First Amendment protection extends equally to the right to receive information").

[87] *Mills v. Alabama*, 384 U.S. 214, 219 (1966)

The Supreme Court has "long eschewed any 'narrow, literal' conception of the [First] Amendment's terms,"[88] and courts accommodate the public's interest in the free flow of information in a wide range of doctrinal contexts. They relax constitutional and third-party limitations on standing.[89] They alter pleading requirements.[90] They limit punitive damages.[91] And, recognizing that receiving information is "necessary to the enjoyment of other First Amendment rights," they constrain judges' authority to bar the press from their courtrooms "to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one."[92]

These principles have no less relevance here, where the Court has largely untrammeled discretion to determine what sentence is just.

## CONCLUSION

*Amici* respectfully urge the Court in determining a just sentence to closely weigh any harm the disclosure actually caused against the benefits to the public and to democratic deliberation that resulted from Mr. Hale's disclosure to the press, and to consider the damage that a severe sentence

---

[88] *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982).

[89] *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (because requiring advance authorization for expression "constitutes a prior restraint and may result in censorship," plaintiffs may bring facial challenges to statutes granting such discretion "even if the discretion and power are never actually abused."); *Epona, LLC v. Cty. of Ventura*, 876 F.3d 1214, 1220 (9th Cir. 2017) (reversing dismissal of facial challenge to prior restraint because parties with business interests affected by unconstitutional restrictions on third parties have standing to challenge them).

[90] *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015) (recognizing heightened defamation-pleading requirements in light of "the First Amendment interests at stake"), *cert. denied* 136 S. Ct. 2015 (2016).

[91] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974).

[92] *Globe*, 457 U.S. at 604-05 ("The First Amendment is thus broad enough to encompass those rights" that are "necessary to the enjoyment of other First Amendment rights").

27

would inflict on the constitutionally protected interest in the flow of information to the citizenry on matters of public importance.

Dated:    July 20, 2021

*Of Counsel:*

Heidi Kitrosser
NORTHWESTERN -- PRITZKER SCHOOL OF LAW
NORTHWESTERN UNIVERSITY
375 East Chicago Avenue
Chicago, IL 60611

David A. Schulz
MEDIA FREEDOM AND
  INFORMATION ACCESS CLINIC
ABRAMS INSTITUTE
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511

Respectfully submitted,

Jay Ward Brown, VSB No. 34355
Matthew E. Kelley, VSB No. 84045
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, D.C. 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
brownjay@ballardspahr.com
kelleym@ballardspahr.com
*Counsel for Amici*

**APPENDIX**

***AMICI CURIAE* SCHOLARS OF CONSTITUTIONAL LAW,
FIRST AMENDMENT LAW AND MEDIA LAW[93]**

Knight First Amendment Institute at Columbia University

Floyd Abrams
Lecturer in Law, Columbia Law School
Visiting Lecturer in Law, Yale Law School
Senior Counsel, Cahill Gordon & Reindel

Sandra Baron
Senior Research Scholar
Visiting Clinical Lecturer in Law
Yale Law School

Alan K. Chen
Thompson G. Marsh Law Alumni Professor
University of Denver Sturm College of Law

Nancy Costello
Director, First Amendment Law Clinic
Michigan State University College of Law

Cortelyou Churchill Kenney
Academic Fellow, Cornell Law School
Affiliated Fellow, Yale Information Society Project

Aziz Huq
Frank and Bernice J. Greenberg Professor of Law
University of Chicago Law School

Jane Kirtley
University of Minnesota
Silha Professor of Media Ethics and Law
Hubbard School of Journalism and Mass Communication, University of Minnesota

Gregg Leslie
Professor of Practice and Executive Director, First Amendment Clinic
Arizona State University – Sandra Day O'Connor College of Law

Jonathan Manes
Adjunct Professor, Northwestern – Pritzker School of Law

---

[93] Institutional affiliations are for identification purposes only. Individual *amici* are participating in their individual capacities and not as representatives of the institutions with which they are affiliated.

Attorney, Roderick & Solange MacArthur Justice Center

Greg Magarian
Thomas and Karole Green Professor of Law
Washington University in St. Louis School of Law

Justin Marceau
Professor and Brooks Institute Faculty Research Scholar of Animal Law and Policy
University of Denver Sturm College of Law

Leonard M. Niehoff
Professor from Practice
University of Michigan Law School

Clare R. Norins
Assistant Clinical Professor
Director, First Amendment Clinic
University of Georgia School of Law

Helen Norton
Professor and Ira C. Rothgerber Jr. Chair in Constitutional Law
University of Colorado Law School

Mary-Rose Papandrea
Samuel Ashe Distinguished Professor of Constitutional Law
University of North Carolina School of Law

Jonathan Peters
Affiliate Professor, School of Law
Associate Professor, College of Journalism and Mass Communication
University of Georgia

Tamara Piety
Professor of Law Emeritus
University of Tulsa College of Law