**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| | ) | **FILED UNDER SEAL** |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 1:19-cr-59** |
| **v.** | ) | |
| | ) | **Hon. Liam O'Grady** |
| **DANIEL EVERETTE HALE,** | ) | |
| | ) | |
| Defendant. | ) | **Sentencing: July 27, 2021** |

## DEFENSE POSITION ON SENTENCING

Mr. Hale is before the Court for sentencing, having fully and candidly acknowledged that he provided classified documents to a reporter. He committed that offense out of a deeply-felt belief that the American people needed to know a truth that was being obscured from them by government secrecy and, worse, by false statements from political leadership. Mr. Hale's participation in the drone program had caused him an irreconcilable moral conflict—the knowledge that he had participated in lethal actions that were described to the public as surgical and precise when he believed from his own experience that drones were indiscriminately killing civilians. He felt extraordinary guilt for having been complicit in what he viewed as unjustifiable killings. As Dr. Lynch (a psychologist and retired Lieutenant Colonel) explains in his separate report submitted under seal, it was this guilt, combined with Mr. Hale's serious underlying mental health conditions—which the government had diagnosed before sending him to Afghanistan—that led Mr. Hale to print and release documents about the drone program, in part to inform the public and in part to atone for what he perceived as his own immoral conduct.

In short, Mr. Hale engaged in a crime of conscience.  Whether one agrees with his reasoning or not, there can be no serious claim that he committed the offense to harm the United States or to seek fame or fortune.  Rather, he wanted to assuage his guilt and inform his fellow citizens in hopes of making America live up to its aspirations.  Informing the public by disclosing documents about the drone program—even though he knew it was illegal to do so—was the only solution he could think of to accomplish those goals.  Nonetheless, he acknowledges that he committed a crime and accepts that there are consequences.  Given the unique facts of this case—including Mr. Hale's lifelong struggles with mental health, the seven years during which he has lived and deteriorated under the cloud of this case, the absence of any harm caused by his disclosures, and the sentences imposed in other "leak" prosecutions of journalist sources—Mr. Hale submits that a sentence in the range of 12 to 18 months is appropriate.

## I.      The Factual Background of Mr. Hale's Case

In 2009, motivated by financial distress and a lack of options, Daniel Hale enlisted in the U.S. Air Force from the small Tennessee town where he grew up.  He did so despite trepidation about his personal safety and the political aims of the two wars in which the nation was then engaged.  Mr. Hale scored high on the entrance test, and was rerouted into language and intelligence training.  As a result, he was issued a security clearance.  Two and a half years into his service, Mr. Hale deployed to Afghanistan.  He was an signals intelligence analyst.  *See* Daniel Hale Ltr., attached as Exhibit A.  His job involved locating targets for drone strikes.

At his computer on Bagram Air Base, Mr. Hale could watch the targeted killings unfold far away.  He followed orders, but he was unsettled by the lack of connection between the people he watched on his screen and any imminent threat to himself or others.  It was not what he had grown up thinking war was:  A battle in which you shoot to protect yourself and others.  This was so removed from the heat of war that Mr. Hale found it cold and calculating and, maybe worse, desensitizing.  Nonetheless, he kept his head down and did his job—and by all reports did so competently and professionally.  His deployment ended in August 2012.  His service term would be up in July 2013.

But, long after he left Afghanistan, what he did there ate at him.  In his post-deployment health assessment, he denied any trauma from the experience.  *See* Report of Dr. Michael Lynch, Lt. Col. US Army (Ret.), attached under seal as Exhibit B.  But it wasn't true: this was what servicemembers were then advised to say to avoid career repercussions.  *Id.* at 2.  In fact, the military knew before deploying Mr. Hale to Afghanistan that he had a history of mental health struggles, ████████████ ████████████████ .  *Id.* at 4-5.   After his deployment, Mr. Hale spoke out as a peace activist and applied to attend college in New York.  He was waiting to hear back from the school when he got a different, unexpected call:  A defense contractor needed to hire an analyst with a security clearance.  The job paid $80,000 a year, a sum Mr. Hale could not turn down; in fact, it was more than anyone he knew was making.  He accepted, planning to leave in six months to attend college (which he eventually did).  PSR ¶ 115.

As he continued to work in the intelligence field, Mr. Hale began ruminating on the victims of the drone strikes in which he had participated. He could not reconcile his conduct in Afghanistan with his rigid sense of right and wrong. Mr. Hale had become acquainted with a reporter he admired at a prominent online news outlet, with whom he stayed in touch. While a contractor at the NGA, Mr. Hale reached an internal breaking point in 2014. In his letter (Exhibit A), he pinpoints the moment this occurred: an after-work gathering with respected peers that devolved into watching drone strikes as a form of entertainment. Mr. Hale determined that he could obtain documents through his job that would shed light on the imprecision of what were publicly touted as surgical strikes; then he reached out to the reporter to let him know what he had found. In all, Mr. Hale disclosed 17 documents to the reporter, who published them in a series of news articles. *See* Superseding Indictment, Dkt. No. 12, ¶ 32. Of those 17 documents, eight were classified "Secret" and three were classified "Top Secret." *See id*. The other six were unclassified. *See id*.

Mr. Hale knew it was illegal to disclose classified documents to someone not entitled to receive the information, as the reporter was not. He also knew that eventually he would probably be discovered. He left the Leidos job when his plans to attend the New School in New York solidified. His home was searched on the same day in August 2014 that he left to attend school. After the search, he waited to be arrested, but that did not come for five years.

The documents Mr. Hale disclosed made headlines and affected public discourse around drone strikes, providing a counterpoint to administration claims that the killings were surgical and aimed only at identified enemy combatants. *See, e.g.*, Conor Friedersdorf, *Obama's Weak Defense of His Record on Drone Killings*, The Atlantic (Dec. 23, 2016).[1]  Although the classification level of the Secret and Top Secret documents predicted serious or exceptionally grave harm to national security if the information was disclosed, the government has not identified any actual harm that occurred as a result of the information's release, as it admitted at the June 25, 2021, hearing on the subject. *See also generally* Govt Response to Def. Motion to Compel Evidence of Actual Harm, Dkt. No. 211.  Moreover, given the well-established policy of conducting damage assessments when damage occurs from an unauthorized disclosure, the absence of any such assessment indicates that no damage in fact occurred.

## II.  Procedural History

Mr. Hale's last day at Leidos was August 8, 2014.  That same day, the FBI raided his Northern Virginia home and took, among other things, all of his electronic devices.  Mr. Hale moved to New York, but the stress of the FBI raid and what would happen to him weighed heavily on him.  PSR ¶ 115.  He failed out of school.  But then, nearly five years passed and no charges were announced.  *See* Defense Classified Appendix 1 (filed contemporaneously with the CISO).  It would not be until May 2019,

---

[1] Available online at <https://www.theatlantic.com/politics/archive/2016/12/president-obamas-weak-defense-of-his-record-on-drone-strikes/511454/>.

after a change in administration and in relevant supervisory personnel within the Department of Justice, that prosecutors received approval to seek an indictment. *Id.* Mr. Hale was then arrested at his home in Nashville, where he had moved.

On May 9, 2019, Mr. Hale made his initial appearance in the Middle District of Tennessee and was released on conditions. He was also ordered to appear in the Eastern District of Virginia on May 17, 2019, which he did. This Court continued Mr. Hale's release on the same conditions. Following a status conference, this Court set a jury trial for December 16, 2019.

Thereafter, however, the parties jointly filed a scheduling order to accommodate CIPA litigation; as a result, the trial was reset to March 16, 2020. *See* Order, Dkt. No. 66. But because CIPA proceedings took longer than anticipated, the Court granted the parties' joint motion to reset the schedule, and trial was continued to June 22, 2020. *See* Dkt. Nos. 121 & 122.

Of course, just a few weeks later, the Covid-19 pandemic swept the country and people were ordered to remain home. Counsel's offices shut down. This Court ceased convening jury trials for a period of months. The June 22 jury trial was vacated, *see* Dkt. No. 134, and later reset to December 1, 2020, *see* Dkt. No. 135. In November 2020, the defense moved to continue the trial in light of the continuing impacts of Covid-19 and newly received discovery from the government. *See* Dkt. No. 156. This Court granted that motion in part, resetting the trial to December 7, 2020. But a week later, the impacts of Covid-19 once again resulted in a cessation of jury trials so Mr. Hale's trial was again delayed to April 5, 2021.

On March 30, 2021, Mr. Hale notified the Court of his intention to plead guilty to Count 2 of the superseding indictment. The following day, Mr. Hale pled guilty to violating 18 U.S.C. § 793(e), as described in a statement of facts admitted to in open court and filed on the public docket. Dkt. Nos. 196 & 197. Mr. Hale did not have a written plea agreement with the government, but his Statement of Facts effectively admitted to the entire course of conduct with which he had been charged. *See* Dkt. No. 197. It acknowledged that the documents Mr. Hale released were classified Secret and Top Secret and, thus, the assumed risk of releasing such documents. *See* Dkt. No. 197 ¶ 5.

At the plea hearing, the Court asked if the government intended to dismiss the remaining four counts of the superseding indictment or to proceed to trial as scheduled on April 5. The government declined to dismiss the remaining counts but also declined to proceed to trial as scheduled; the defense objected to leaving the counts pending. At the very latest, the speedy trial clock in this case ran out on the remaining four counts on June 14, 2021, 70 days from the April 5 trial date. *See* 18 U.S.C. § 3161(c)(1).

At the plea hearing, the parties agreed that the Guidelines likely were not affected by the number of counts of conviction. This Court ordered a presentence investigation and sentencing is now set for July 27, 2021.

## III.  Legal Standard

This Court's primary directive at sentencing is to "impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes" of sentencing—that is, the minimum amount necessary. 18 U.S.C. § 3553(a) (emphasis added). The

Sentencing Guidelines are just that, guidelines.  *See United States v. Booker*, 543 U.S. 220, 259-60 (2005).  Moreover, the Guidelines are only one of more than a half-dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a) that this Court must take into consideration in fashioning the appropriate sentence.[2]

## IV.   **Mr. Hale's Personal History**

Mr. Hale's childhood and the lessons imparted by an ███████████████████████ ███████████████████████████████████████████████████████████████████████ — left Mr. Hale particularly ill-suited for the military, and ill-equipped to manage the type of "moral injury" that can result from military service:  That is, according to the Department of Veteran's Affairs, where a person's deep-seated sense of right and wrong is incompatible with an act that he has undertaken.[3]  Indeed, had the military known Mr. Hale's mental health history before enlisting him, he almost certainly would not have been accepted, and had the military heeded the information it had

---

[2] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. § 3553(a).

[3] *See* Dept. of Veteran's Affairs, PTSD: National Ctr. for PTSD, Moral Injury, available at www.ptsd.va.gov/professional/treat/cooccurring/moral_injury.asp (describing moral injury as when a person "perpetrate[s], fail[s] to prevent, or witness[es] events that contradict deeply held moral beliefs and expectations").

prior to Mr. Hale's deployment it might not have assigned him to a role in the drone program.

### A.  Family Background

Daniel Hale is the oldest of three children born to parents who struggled with substance abuse and had difficulty putting food on the table.  PSR ¶¶ 109-110.





"On a positive note, because of our religion, we were raised with a strong moral upbringing

---

[7] *See* note 4.

and sense of right and wrong." Ruth Bray Ltr. (Exhibit C). That firm moral compass is mentioned by both of Mr. Hale's parents, too: "I said all of this to try to explain to the court that Daniel's attitude towards injustice to be based in Christian values weather he acknowledges it or not." Robert Hale Ltr. (Exhibit C). "I understand why he did what he did in Daniel's Mind he knew it was wrong to kill innocent people if a person sees something and knows in their heart and mind, it's wrong then why shouldn't they speak out about it." Becky Hale Ltr. (Exhibit C). Mr. Hale's friends have seen that unequivocal morality in his everyday life, too. *See, e.g.*, Ltrs. of Brad White ("Daniel, although largely apolitical, always carried with him a strong moral sense of duty and fairness."); Megan Blevins (describing Mr. Hale speaking out at work on behalf of employees not being paid fairly, "[h]e said this caused problems for him at work, but he did it anyway because he thought it was the right thing to do"); Amy Davis ("For Daniel, speaking up is the only option."); Jess Radack ("Daniel . . . has a strong moral conscience. I think he finds himself in the present circumstances because of an overabundance of these traits.") (all attached in Exhibit C).

### B.    Mental Health



████████████  ██  ██████████████████████

██████████████████████████████████

After high school, Mr. Hale struggled to find a path out of Bristol.  *See* Ltrs. of

Sarah Jones (describing limited opportunities in their hometown and Daniel's desire,

like her own, to find his place in the world); Brad White (describing "shared ambitions

and desire to see and do good in the world").  He attempted college, matriculating to

the University of Virginia at Wise, but he could not engage successfully.  His sister

describes Daniel's initial pride at attending university when the family visited him.

*See* Ltr. of Ruth Bray (Exhibit C).  But, as with so many things in the young Mr.

Hale's life, ███████████████████████████████

████████████████.  *See id.*

Mr. Hale returned to Bristol after failing out of UVA-Wise.  He worked as a

general laborer and lived at home.  He made an aborted attempt at a fresh start in

Las Vegas.  Ruth recalls Daniel isolating himself from the family, trying to stay out

of the home as much as he could ████████████████  ██  ██  ██

██  ████████████████████████████

████████████████████████████████

████████████████ Ultimately, he was floating from couch to couch or staying

in his car and decided on the military as his best path forward.  Mr. Hale met with a

recruiter, trepidatious because of the nation's involvement in two wars at the time.

PSR ¶ 114.  He did not disclose his past mental health struggles, knowing that doing

so would almost certainly have disqualified him.  When his father kicked him out of

the house after an argument, Mr. Hale enlisted.  He scored highly on the entrance exam and was funneled into intelligence work.  PSR ¶ 114.

### C.   Military Service

The first three years of Mr. Hale's service were relatively quiet.  He trained at a military language program in Monterrey, California.  He worked for a time in an Air Force dental office in Maryland, while waiting for the security clearance process to complete.  But in 2012, Mr. Hale was deployed to Bagram Air Base in Afghanistan. Mr. Hale was tasked as a signals intelligence analyst.  PSR ¶ 114.  In his own words, his job was helping identify targets for potential drone strike.  *See* Daniel Hale Ltr. (Exhibit A).

During his time in the military, Mr. Hale's mental health had ebbed and flowed.  ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████

Mr. Hale's qualms about the war he had volunteered for began to overwhelm him during his deployment.  He struggled to accept the uncertainty of killing targets who were not returning fire and, therefore, not clearly the enemy.  *See* Ltr. of Sonia Kennebeck (quoting Mr. Hale's narration in the documentary National Bird: "The most disturbing thing about my involvement in drones is the uncertainty if anybody that I was involved in 'kill or capture' was a civilian or not.") (Exhibit C).  He struggled

with the dissonance of identifying a teenager or farmer as an enemy fighter from the relative safety of a computer and office chair.  PSR ¶¶ 121 & 122.  He wrestled to reconcile the killing in which he participated with his view that the conduct was morally wrong because of the collateral damage inflicted on  innocent civilians as well as the lack of clear evidence that the targets were truly threats.  PSR ¶ 121 ████████

████████████████████████████████████████████████████████████

███████████).  *See also* Ltrs. of Sarah Jones ("He was obviously conflicted about his time in the Air Force, and was upset at what he'd been asked to do."); Janet Tran ("Since the day that he left Afghanistan, he has struggled to reconcile his participation in war.") (Exhibit C).

For Mr. Hale, drone killings were too remote to impart the type of certainty about the target's hostility to the U.S. and its interest.  *See* ███████████████████

████████████████████████████████████████████████████████████

███████████████████████.  To Mr. Hale, a young man standing in a field with a Kalashnikov might be an enemy fighter, or he might be a farmer armed to protect his property and family in a hostile country.  Mr. Hale struggled to justify in his own mind the targeting of teenagers, who would have been toddlers on 9/11.  He could not justify the unintended civilian deaths as collateral damage.  *See, e.g.*, Ltr. Stefania Maurizi (describing drone strike that killed two aid workers, apparently by accident), attached as part of Exhibit D.  He was also troubled by the United States' classification of many of those deaths as combatants simply on the basis of their age and gender.

-14-

Mr. Hale returned from Afghanistan in August 2012.  In early 2013, after his deployment and shortly before his separation, █████████████████████ ████████████████████████████ ██ ████████████████ Mr. Hale was honorably discharged from the Air Force on July 20, 2013.  *See* Form DD-214, attached under seal as Exhibit E.  Among other decorations, Mr. Hale received an Air Force Good Conduct Medal. *See id.* █████████████████████████████ ██████████████████████████████ ██ ██████████████████

### D.    Moral Injury

As Dr. Lynch describes at length in his report, "[t]here are an increasing number of PTSD cases that are being processed with moral injuries . . . [, which] 'has recently emerged in the research literature as a separate aspect of trauma exposure, distinct from [PTSD].'"  Lynch Rep. at 13 (citation omitted).  The harm to the individual derives from "perpetrating, failing to prevent, bearing witness to, or learning about acts that transgress deeply held moral beliefs and expectations." *Id.* As Dr. Lynch describes, many service members report struggling with having followed orders with which they were morally uncomfortable.  Indeed, several of Mr. Hale's friends and supporters detail their own similar struggles in their letters, unprompted. *See, e.g.*, Ltrs. of Sarah Jones (describing her veteran husband's struggle to reconcile some of the actions he had to take in combat) (Exhibit C); Mary Wright (retired Colonel who served 29 years in the Army describing resigning due to opposition to claimed basis for war on Iraq), attached as part of Exhibit F; James Hard (veteran describing "the moral and ethical dilemma faced by those who serve in the military and are put in the circumstances of taking the lives of others) (Exhibit

F); Brock McIntosh (veteran describing suicide of mutual friend and veteran due to moral injury) (Exhibit F); Jim Wohlgemuth (Vietnam veteran describing "gratefulness" to whistleblower Daniel Ellsberg for shedding light on mistakes of Vietnam) (Exhibit F); Lisa Ling (veteran describing her own inability to imagine "that the same skills used to help people . . . would be used to kill innocents on the other side of the world") (Exhibit F).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ██ ████████████

████████████████████  Ultimately, Mr. Hale could not reconcile the two.  He felt he needed to act to, in part, assuage his own guilt about the killings in which he had participated.  ██ ██████████████████████████████████

████████████████████████  Ultimately, he believed that he could make a difference in how the U.S. drone program was deployed, particularly with respect to innocent civilians, by leaking the classified documents that are the subject of the superseding indictment.  *See* Ltrs. of Amy Davis ("He saw the drone program as injustice—as more lives being stolen in the darkness—and he couldn't stand for it. . . .  he acted as he felt he had to if it would save innocent lives.") (Exhibit C); Jess Radack ("He did not disclose information for fame, profit, or revenge.  He did so because he believed it was in the public's interest to know that the government was using an overly broad terrorist watch-list for lethal targeting, underreporting civilian

drone casualties, and overstating the surgical precision of drone strikes—all concerns that were later documented and validated . . .") (Exhibit C); Janet Tran ("He was motivated by something many veterans who return from war must face: a guilty conscience.") (Exhibit C).

### E.  The lengthy prosecution of Daniel Hale

The earliest publication of a document Mr. Hale provided to the reporter was in July 2014. *See* Superseding Indictment, Dkt. No. 12, ¶ 32. On August 8, 2014, the same day as his last day of work as a contractor for the National Geospatial-Intelligence Agency, Mr. Hale's home in northern Virginia was searched by the FBI. *See id*. ¶ 39; PSR ¶ 115.  No further investigative steps (prior to trial preparation after an Indictment was returned) appear to have been taken after 2015.  But no prosecution materialized until 2019, nearly five years after the home search and four years after the investigation was complete.  *See* Dkt. No. 11 (Mr. Hale arrested on May 9, 2019).

Mr. Hale attempted to make a life for himself.  He started school in New York in August 2014, but could not focus due to the strain of what he believed to be his impending prosecution.  PSR ¶ 115.  He moved to Nashville and worked in kitchens in the area.  He describes the months before his May 2019 arrest in Nashville as some of his happiest, when he had allowed himself to settle a bit.  He was working in a celebrated restaurant with co-workers who felt like family.  PSR ¶ 142.

After Mr. Hale's arrest, this prosecution dragged on for another two years. These delays, as recounted above in Section II, were not driven by the defense: Rather, the nature of CIPA litigation pushed the original trial date out twice, and

then, of course, the unforeseen coronavirus pandemic resulted in a year of additional delays.

Since his arrest, Mr. Hale's deterioration has been self-evident.  Long prone to self-medicating with alcohol and marijuana, Mr. Hale was arrested for driving under the influence on the same night as his initial appearance in Tennessee.  Just as this Court may have suspected, Mr. Hale's friends have watched him crumple under the strain of this prosecution.  In mid-2019, Mr. Hale relocated to Washington, D.C., to focus on his case.  He moved in with his friend and government-transparency advocate Jesselyn Radack, who writes that "[h]e barely left his room, did not eat, did not interact with others, and had insomnia and erratic sleep patterns."  Ltr. of Jesselyn Radack (Exhibit C).

Despite his mental health struggles, Mr. Hale found work quickly in the restaurant industry.  PSR ¶¶ 140-135.  He worked steadily.  But, as his close friends describe, he "continued to deteriorate."  Ltr. of Jesselyn Radack.  "[Daniel] became emaciated.  He quit shaving and appeared disheveled. . . . His dread seemed all-consuming."  *See id*.  This Court witnessed the same, regularly inquiring into Mr. Hale's mental health over the course of this prosecution and ordering mental health treatment at the direction of the Pretrial Services Office.

Mr. Hale's friends stepped in to support him.  After he lost his job when his October 2020 motorcycle accident made it physically impossible for him to work in a restaurant kitchen, PSR ¶ 134, a friend helped him apply for and obtain disability through the V.A.  *See id*.; Ltr. of Lisa Ling (Exhibit F).  They did so because they have

-18-

seen another side of Mr. Hale, one not necessarily reflected in the narrative of this case: He was a volunteer connecting with younger veterans struggling to get back on their feet who "cared immensely about making sure that they were fed, clothed and housed, [and] also that they felt loved and cared for." Ltr. of Noor Mir (Exhibit C). He was a friend to the homeless men and women near his house, to whom he would bring groceries, water and sanitary supplies even when "he had little to nothing to spare." *Id*. If he stayed with you for a visit, "you could count on a gourmet meal, or waking up to him cleaning and organizing everything in sight." *Id*. He was a caretaker to those around him, even when he himself was struggling, often showing his affection for others through cooking. *See* Ltr. of Amy Davis ("During a time when I constantly felt like I was drowning, Daniel made sure our apartment was clean, the cat was taken care of, and I had something to eat.") (Exhibit C); Ltr. of Jesselyn Radack ("Despite these crushing burdens, Daniel worked multiple jobs, cooked meals for our family, and attended to assorted neighborhood pets.") (Exhibit C). His kind and unassuming manner helped in make friends in unexpected places. *See* Ltr. of Cynthia George (describing a devoted friendship with Mr. Hale that grew out of her agreeing with a mutual friend to care for his cat after his arrest in May 2019) (Exhibit C). And, though it may seem a small thing, Mr. Hale is a doting parent to his beloved cat Leila. *See id*. ("Cats do truly experience loss and Leila is very depressed and suffers whenever she is separated from [Mr. Hale]."). At the time his bond was revoked, Mr. Hale was crushed to be separated from Leila without warning.

Mr. Hale tended and maintained these deep friendships even as he struggled through the years of this prosecution. His upbringing left him without the resiliency and coping skills that might have helped him get through difficult circumstances. *See* Lynch Rep. at 14. Nevertheless, he has continued to seek help when he has struggled.

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████.

In custody since his bond revocation, however, Mr. Hale has not received mental health counseling. Such counseling is not offered through the Alexandria jail, nor through the Bureau of Prisons. Medication for mental health disorders, if a defendant wants to take them, is all that is offered. ████████████████

███████████████████████████████████████████████

████████ ██ ███████████ Long-term therapy would be most effective at helping Mr. Hale adjust to life after this case, which has consumed him for the last seven years.

## V.      Sentencing Argument

A sentence of between 12 and 18 months is sufficient but not greater than necessary for at least three reasons: First, Mr. Hale's personal history, as recounted above, demonstrates the significant role that his ████████ upbringing, his longstanding struggles with mental health, and the trauma from his role in the drone program played in contributing to his conduct. Second, Mr. Hale's offense—the release of 17 secret and top secret documents out of moral conviction for no personal gain—is not aggravated compared to that of other defendants convicted under similar

statutes.  Third, a review of sentences imposed for similar conduct demonstrates that the Guidelines applicable here are far above what courts have deemed warranted.

Moreover, as the Supreme Court has recognized, "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines." *Porter v. McCollum*, 558 U.S. 30, 43 (2009) (reversing and remanding due to counsel's failure to adduce evidence of military service in mitigation).  Mr. Hale's service undoubtedly qualifies.  Not only did he volunteer to serve in the military when our country was actively engaged in two wars, but he served in a role in the drone program that, while not directly in combat, is now widely associated with PTSD and exactly the sort of moral injury from which Mr. Hale suffers.  It is no response to argue, as the government surely will, that Mr. Hale's subsequent conduct renders his service irrelevant.  Rather, it was the government that placed Mr. Hale, knowing his fragile mental state and his mental health history, into the drone program—which exacerbated the conditions from which he already suffered.  The fact that the government did so does not excuse the offense, nor does the fact that those conditions almost certainly contributed to Mr. Hale's decision to engage in the offense conduct.  But that backdrop explains why this Court should not ignore Mr. Hale's service in determining the appropriate sentence.  Mr. Hale voluntarily served his country, he did so ably, and he did so in a war zone resulting in adverse effects from which he continues to suffer to this day.  The Court should not ignore this country's "long tradition" of honoring such service in considering an appropriate sentence.

## A.  The Sentencing Guidelines Are Not Entitled to Deference Where, as Here, the Guideline is Not Based on Empirical Evidence and is Directed at Classic Espionage Rather than Media Leaks.

The advisory Sentencing Guideline range is entitled to little weight in the § 3553 analysis on these facts for three distinct reasons.  First, the Guideline for the instant offense defers entirely to an Executive Branch determination of a document's classification level, thus tying the suggested sentence for an offense to sometimes wrong and very often stale determinations of likely harm to national security.  In other words, the Sentencing Commission accepted the government's determination that any document labeled Top Secret "reasonably could be expected [if released without authorization] to cause exceptionally grave damage to the national security"—and calibrated the sentence for releasing such documents accordingly.[8] But, as the facts of this case show, the assumption that such determinations are accurate was incorrect.  The documents in this case, while highly relevant to informing American citizens' knowledge about actions taken by their government, caused no harm to national security by the time they were released because—as the defense expert (and former top CIA classification expert) has explained—the basis for their classification had almost entirely eroded by the time of their disclosure.

Second, the empirical basis for the Guideline governing § 793—specifically, sentencing practices before the Guideline was written in 1987—does not include "leak" cases.  Instead, the only cases that were prosecuted under § 793 prior to 1987

---

[8] See Exec. Order No. 13526, 75 Fed. Reg. 1013 (Dec. 29, 2009) § 1.2(1) (defining "Top Secret").

were prosecutions of "spies and saboteurs," and these true espionage cases bear little resemblance to "leak" cases that are now commonly prosecuted under §793.

And third, the Sentencing Guideline applicable here has been almost uniformly disregarded by other courts—at least outside of true espionage cases—and is therefore entitled to little deference because reliance on such a Guideline increases rather than avoids unwarranted sentencing disparities.

### 1. The Commission's Deference to the Executive Branch's Classification Determination is Misplaced Where, as Here, the Sensitivity of the Information Was Drastically Reduced by the Passage of Time.

The offense level in this case is determined pursuant to USSG § 2M3.3, which sets the offense level on the basis of the government's classification determination. The reasoning for doing so, according to the Commission, is set forth in the commentary to USSG § 2M3.1. *See* USSG § 2M3.3 App. Note 1. That Guideline, in turn, quotes the definition of "Top Secret" information (information that, if disclosed "could reasonably be expected to cause exceptionally grave damage to the national security"), *see* USSG § 2M3.1 App. Note 1, and notes that the offense level is guided by "the assumption that the information at issue bears a significant relation to the nation's security, and that the revelation will significantly and adversely affect security interests." *Id.*, App. Note 2. Where, however, the information does not actually meet that threshold despite its classification marking, the Commission recognizes that "a downward departure may be warranted." *Id.*

This is just such a case. As noted in the defense Motion to Compel Production of Evidence of Actual Harm, Dkt. No. 209, no evidence of harm has ever been

produced in this case despite numerous documents bearing Secret and Top Secret designations having been disclosed six to seven years ago.  Each of those disclosures, supposedly, could reasonably have been expected to have caused "serious damage" or "exceptionally grave damage" to national security.  Nonetheless, the government has acknowledged that it has no evidence of any actual harm.  And it has acknowledged that it never performed any damage assessment of Mr. Hale's disclosures, despite the existence of Intelligence Community Directive ("ICD") 732, which requires such an assessment (and despite a pre-existing practice in the intelligence community of always performing damage assessments following unauthorized disclosures).  *See* Exhibit B to Dkt. No. 209 (ICD 732) ¶ 2; *Id.* Exhibit C (Decl. of Harry P. Cooper, Jr.) ¶¶ 10-11.  The one exception to that requirement, according both to ICD 732 and to defense expert Harry P. Cooper, Jr., is if there is a determination that no damage occurred.  *See id.* Exhibit B. ¶ 2 (assessment required if disclosure "may cause damage to U.S. national security"); *id.* Exhibit C ¶¶ 10-11 (damage assessments are performed as a matter of course, but "occasionally" not performed where "it can be readily determined that no damage resulted.")

Moreover, according to Mr. Cooper's attached Declaration regarding Mr. Hale's disclosures, the documents Mr. Hale released were what he would call "tactical" documents, the sensitivity of which for national security purposes decreased drastically within days or weeks of their creation.  *See* Cooper Declaration, attached as Exhibit G ¶ 9. Mr. Cooper's expert opinion is that, by the time Mr. Hale released the documents, generally about two years after their creation dates, their release was

likely cause little to no harm to national security. *Id.* ¶¶ 8-11. Of course, Mr. Cooper is extraordinarily experienced in the field of national security information classification, but importantly, his opinion is also corroborated by all the known facts: Despite the release of numerous documents, no evidence of harm exists from their disclosure, and the intelligence community decided not even to do a damage assessment despite the established practice of doing so unless no harm occurred.

Given the lack of actual harm arising from Mr. Hale's disclosures, this is exactly the sort of case the Sentencing Commission envisioned when it noted that a downward variance may be warranted in cases where its assumption, based on a document's classification level, "that the revelation will significantly and adversely affect security interests" proves untrue.[9]

**2.   *The Empirical Evidence on Which the Relevant Sentencing Guideline Is Based Is Flawed Because the Government Now Prosecutes a Wholly Different Type of Cases Under § 793 Than it Did Before the Guidelines Were Enacted.***

As the Supreme Court has explained, Congress established the Sentencing Commission "to formulate and constantly refine national sentencing standards." *Kimbrough v. United States*, 552 U.S. 85, 108 (2007). In its initial development of a sentencing system, the Commission took "an empirical approach that used as a

---

[9] To be clear, this is not to fault the government for over-classifying information that does not merit classification (though that may occur). The issue raised here is that security markings generally remain in force for 25 years, despite the passage of time that often renders the information harmless from a national security perspective much sooner. Because intelligence agencies lack sufficient resources to routinely review and declassify stale information, these markings remain in effect where, as here, the information is not likely to cause substantial harm if released.

starting point data estimating pre-guidelines sentencing practice" drawn from data including 10,000 prior federal criminal sentences.  U.S.S.G., Ch. 1, Pt. A, 1.3 (Nov. 2018).  Given this background, the Supreme Court has held that the weight due a particular Guideline depends on whether the Commission acted in the "exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109.  The Commission's institutional role has two basic components:  (1) reliance on empirical evidence of pre-Guidelines sentencing practice; and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita v. United States*, 551 U.S. 338, 349-50 (2007).  Only the first of these roles is relevant because the Guideline at issue—USSG § 2M3.3—has never been amended since its 1987 inception.[10]

Unfortunately, "not all Guidelines are tied to empirical evidence."  *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007).  When the Guidelines are not based upon an empirical approach, the sentencing court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentence range will 'reflect a rough approximation of sentences that might achieve §3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 109 (quoting *Rita*, 551 U.S. at 350).  In such cases, it is not an abuse of discretion to conclude that the Guideline yields a sentence "greater than necessary to

---

[10]  According to the Sentencing Commission, § 2M3.3 has been amended only once since its adoption in 1987, pursuant to Amendment 481 in 1993.  *See* www.ussc.gov/guidelines/2018-guidelines-manual/annotated-2018-chapter-2-l-x#2m32.  That amendment added an additional statute to the Guideline's purview but did not substantively amend it.  *See* www.ussc.gov/guidelines/amendment/481.

achieve § 3553(a)'s purposes, even in a mine-run case," *Kimbrough*, 552 U.S. at 101,

or that "the case warrants a different sentence regardless," *Rita*, 551 U.S. at 351.

The Guideline applicable here is just such a case.  Section 793(e) covers an

extraordinarily broad range of conduct, and the type of conduct presented here—a

"leak" to a journalist designed to inform public debate on an issue of national

importance—was almost never prosecuted before the Guidelines were enacted.  *See*

Motion to Dismiss the Indictment, Dkt. No. 53, at 16.  That is because, as initially

enacted, the Espionage Act was intended by Congress for use against "spies and

saboteurs."  *Id.* at 14 (quoting Senator managing the Espionage Act on the Senate

Floor prior to passage assuring colleagues that nobody "innocent of any intent to aid

the enemy" would be prosecuted under it); *id.* at 14-15 (quoting Attorney General's

assurance to Congress, prior to enacting the Espionage Act, that only spies, saboteurs

and the like would be prosecuted under it).  And in its first 75 years the Espionage

Act was used only against such defendants, whose offenses are unambiguously

designed to harm the United States (with exceedingly rare exceptions, such as the

unsuccessful prosecution of Daniel Ellsberg for disclosing the Pentagon Papers).  *Id.*

at 16 (in first 75 years after the Espionage Act became law in 1917, there were only

two successful prosecutions of media sources, one of which was later pardoned, but

there have been at least 18 since 2009).

It is, therefore, undisputable that the cases upon which the Sentencing

Commission relied for its empirical analysis of Espionage Act sentencing practices

are categorically different than "leak" cases such as the instant case.  Plainly, the

Congress that enacted the Espionage Act saw cases against spies, saboteurs, and those who intended to "aid the enemy" as categorically different than those who release protected information for other reasons, and it does not even appear that they intended to criminalize the latter category of cases (although the language they ultimately adopted was so inartfully written that it made no such distinction and such prosecutions eventually occurred under it).  And, as shown below in the discussion of comparison cases, there appears to be near uniform recognition among sentencing judges that such prosecutions present a different case for sentencing purposes than true espionage cases, and they almost always result in lower sentences.  Indeed, the government appears to tacitly acknowledge this by not seeking a within-Guidelines sentence.  *See* Govt Position on Sentencing, Dkt. No. 227. Accordingly, the empirical evidence on which USSG § 2M3.3 is based renders the advisory sentencing range particularly unhelpful as a starting point for sentencing cases that do not involve classic espionage.

> **3.**   ***A Central Purpose of the Sentencing Guidelines is to Avoid Unwarranted Sentencing Disparities, But Where a Particular Guideline is Not Regularly Followed, Adherence to it Would Frustrate that Goal.***

"Congress' basic goal in passing the Sentencing Act [and adopting the Sentencing Guidelines] was to move the sentencing system in the direction of increased uniformity." *United States v. Booker*, 543 U.S. 220, 253 (2005).  *See also United States v. Finley*, 531 F.3d 288, 293 (4th Cir. 2008) ("[a]s the Supreme Court has made clear, the primary purpose of the Sentencing Guidelines, even when advisory, is to 'avoid excessive sentencing disparities'" (quoting *Booker*)).  As the

discussion of comparison cases below makes clear, however, courts have regularly disregarded the advisory Guideline range and imposed very substantial downward variances in Espionage Act cases that involve leaks to the media rather than classic espionage.   Accordingly, on these facts, deference to the advisory Guideline range would frustrate, rather than foster, Congress's core purpose in enacting the Guidelines in the first place.   For this additional reason, therefore, the advisory Guideline range should be given little deference in this case.

### B.     The Nature and Circumstances of the Offense Are Unusual for an Espionage Act Prosecution Both Because the Offense Caused No Harm and Because Mr. Hale's Motive Was Not to Harm the United States.

As already noted, and as set forth in more detail in Harry Cooper's Declaration (Exhibit G), Mr. Hale's offense involved documents that were unlikely to seriously harm national security by the time they were released years after their creation. Indeed, the government has conceded that no harm occurred as a result of Mr. Hale's offense.  This differentiates it from many cases involving actual espionage, and even from many involving those who have leaked to the media.   In the case of Jeffrey Sterling, for example, who was tried in this court, convicted by a jury, and sentenced to 42 months, the very first words of the government's Memorandum in Aid of Sentencing were the following quotation from then-National Security Advisor Condoleeza Rice:  "I was deeply concerned because this was not just a sensitive program, but it was one of the only levers that we believed we had, that the President had, to try to disrupt the Iranian nuclear program."  *United States v. Sterling,* 1:10-cr-485 (LMB), Dkt. No. 464, at 1.  The government's memo went on to explain that

the program Mr. Sterling compromised with his disclosure related to "one of the highest priorities of the Bush administration" and that disclosing the program had "endanger[ed] lives and national security by compromising one of the most important, closely held, and sensitive intelligence operations of [Ms. Rice's] entire tenure as National Security Advisor." *Id.* at 2. Indeed, according to the government, Mr. Sterling's disclosure of the program to a reporter "resulted in substantial damage to national security, and placed in harm's way two human assets, their families, and those who worked with them." *Id.* at 4.

As the government's sentencing presentation in *Sterling* makes abundantly clear, the quantum of harm to national security caused by the offense conduct under § 793 is centrally relevant to the nature and circumstances of the offense, just punishment, and the other § 3553(a) sentencing factors. *See id.* (concluding the four-page description of the harm occasioned by the offense conduct by arguing that, "[a]s such, the defendant deserves to be sentenced to a significant and lengthy term of imprisonment")

Similarly, in the case of John Kiriakou, the government supported its arguments regarding the seriousness of the offense (in a case involving the disclosure of the identity of a covert agent, resulting in a Guideline range of 97-121 months including an enhancement for obstruction of the investigation)[11] by reference to the harm caused by the defendant's conduct, arguing that "the disclosure of the identity

---

[11] The Court's finding regarding the Guideline range in *Kiriakou* and the application of the obstruction enhancement can be found in the sentencing transcript. *See United States v. Kiriakou*, 1:12-cr-127 (LMB), Dkt. No. 130, at 4, 9.

of Covert Officer A is particularly compelling from a damage perspective [because it caused] grave damage to national security, but also to Covert Officer A's personal safety and life." *United States v. Kiriakou¸* No. 1:12-cr-127 (LMB), Dkt. No. 124, at 5. Indeed, Mr. Kiriakou's disclosures related not just to Covert Officer A, but also to a second covert agent, Covert Officer B, and "dozens of CIA officers, including numerous covert officers of the National Clandestine Service," beyond the two specifically charged. *Id.* at 6. The harm caused by Mr. Kiriakou's conduct was, in fact, the principal aggravating fact that the government argued at sentencing. *Id.*

Considering its positions in *Sterling* and *Kiriakou* (and the Court's obligation to consider the nature and circumstances of the offense), the government can hardly be heard to now claim that the lack of actual harm caused by Mr. Hale's conduct is irrelevant to sentencing. Rather, while the absence of harm is not a defense to the charge, and while it does not entirely negate the purposes of sentencing, it is plainly relevant to considering the seriousness of the offense, and to evaluating the need for incarceration as compared to sentences imposed in other cases involving violations of the same statute.

In a similar vein, Mr. Hale's motive in disclosing the documents to a reporter distinguishes this case from espionage prosecutions in which a defendant intentionally sets out to harm the United States or to aid an adversary, and even from those defendants who commit the offense for monetary or other personal reasons. The facts regarding Mr. Hale's motive are clear: He committed the offense to bring attention to what he believed to be immoral government conduct committed

under the cloak of secrecy and contrary to public statements of then-President Obama regarding the alleged precision of the United States military's drone program.[12] Indeed, Mr. Hale's decision to commit the offense could not have been more at odds with his personal interests:  He had highly marketable employment qualifications as a civilian with a high-level security clearance, and he knowingly threw that away by releasing classified information to a reporter.[13]  Again, the government acknowledged in *Sterling* that motivations such as Mr. Hale's are distinct and mitigating as compared to those who disclose information for other reasons.  Specifically, the government argued at sentencing that Mr. Sterling was not "motivated by a desire to expose government malfeasance.  Nothing could be further from the truth. . . . the defendant was no whistleblower. . ."  *United States v. Sterling*, 1:10-cr-485 (LMB), Dkt. No. 464, at 16-17.  Rather, the government argued, he committed the offense "to serve his own vindictive means."  *Id*. at 17.  Specifically, the government noted that Mr. Sterling had earlier praised the program he later "blew the whistle" on, but then disclosed the program to retaliate at the government "once it was clear that his [employment-related] litigation efforts were not going to succeed."  *Id*. at 16.  Thus, in *Sterling*, the government held out that very motivation as a factor that would diminish the seriousness of the offense in that case were it true.  It can hardly now

---

[12]  To a lesser extent, and as explained more fully in Dr. Lynch's Report (Sealed Exhibit B) it appears that Mr. Hale's conduct was also motivated by a desire to atone for his own participation in what he considered immoral, unlawful and lethal military action.

[13] It was also almost certain that his conduct would eventually be discovered, as it was.

claim that Mr. Hale's genuine motivation to act as a whistleblower regarding what he perceived to be government malfeasance—whether one agrees with his assessment or not—is irrelevant to sentencing.

Finally, the Court need not rely solely on these defense arguments to find that this case falls at the low end of the spectrum of Espionage Act violations in terms of the importance of the prosecutorial interests at stake.  Shortly before trial, the government produced in discovery a document indicating that some or all of the years-long delay between the conclusion of the FBI's investigation in this case and the decision to prosecute was because the prosecution team lacked the approval of superiors within DOJ.  *See* Defense Classified Appendix 1 (filed separately with the CISO).[14]  Further, it shows that the decision to prosecute was finally made only after a change in supervisory personnel within the DOJ National Security Division.

---

[14]  This is contrary to what the government argued to this Court earlier, when the defense sought a continuance and argued that "[t]he government until recently has not acted as if it was important to bring this case to trial quickly," noting the delay between the investigation ending in 2015 and the initiation of charges in 2019.  *See* Trans. of Mtn Hrg., Nov. 10, 2020, at 8.  In response, the government advised the Court as follows:

> The idea that the government sat on its hands for years is ridiculous. Having been the prosecutor on the case since the beginning, I can tell you that we were struggling throughout to try to deal with the very complex problems posed by the theft of information impacting many different components of the intelligence community.

*Id.* at 9.  The Classified Appendix submitted with this memo demonstrates the inaccuracy of this statement.  Rather, it appears that there was dissension within the Department of Justice as to whether there was a sufficient federal prosecutorial interest in this case to initiate charges.

### C.    The Sentence Requested Here is Supported by the Sentences Imposed in Previous Cases.

A review of previous sentences in comparable Espionage Act prosecutions supports a sentence of 12 to 18 months in this case. The two most directly comparable cases to be prosecuted in this court, *Sterling* and *Kiriakou*, received sentences of 42 months and 30 months, respectively. But, as already noted, the facts of both cases were substantially more aggravated in several important respects. Mr. Sterling not only denied responsibility and went to trial, but he also compromised one of the most sensitive covert operations run by the United States government as well as the identities of two human assets within foreign-adversary governments who had worked covertly for the United States (resulting in a Guideline range, after trial, of 235-293 months). He did so not to inform the public of government wrongdoing but as retribution against his former employer. Similarly, Mr. Kiriakou was convicted of revealing the identities of highly covert agents "to advance his private pecuniary interests,"[15] and was found to have obstructed the investigation into the offense (resulting in a Guideline range of 97-121 months). Moreover, nothing in the public record of either case suggests that Mr. Sterling or Mr. Kiriakou struggled with the sort of mental health challenges that Mr. Hale has faced throughout his life (much less that the United States exacerbated those conditions prior to the offense conduct, as it did in Mr. Hale's case by putting him to work in a controversial, secretive and lethal program after diagnosing him with those serious conditions). In short, the

---

[15] *See United States v. Kiriakou,* 1:12-cr-127 (LMB), Dkt. No. 124 at 2.

instant case—after accounting for all the relevant similarities and differences—merits a sentence substantially below those imposed in *Sterling* and *Kiriakou*.

Indeed, a review of similar cases reveals that courts rarely impose sentences in § 793 cases as high as the Guidelines suggest, and appear never have done so in a case involving a journalistic source as the two charts below demonstrate.

*§ 793 Cases Prosecuted in EDVA Since 2009 (includes related statutes of conviction)*

| Case | Offense | Sentence and USSG Range | Facts |
|---|---|---|---|
| Frese, Henry Kyle<br><br>1:19-cr-304 (LMB) | 18 U.S.C. § 793(d) Disclosure of NDI | 30 months' incarceration; 3 years supervised release<br><br>USSG Range: 151-188 months | Transmitted Top Secret and Secret information to reporters on 12 occasions over 17 months, including running searches as requested by the reporters. According to government's description, disclosures caused actual harm to national security. The defendant also pleaded guilty and received a reduction under USSG § 5K1.1 from Guideline range of 151-188 months. |
| Kiriakou, John<br><br>1:12-cr-127 (LMB) | 50 U.S.C. § 421(a) Disclosure of Classified Information Identifying a Covert Agent | 30 months' incarceration; 3 years supervised release<br><br>(Pursuant to Rule 11(c)(1)(C))<br><br>USSG Range: 97-121 months | Relevant facts set forth in text above. |
| Sterling, Jeffrey Alexander<br><br>1:10-cr-485 (LMB) | 18 U.S.C. §§ 793(d) & (e) Disclosure of NDI (7 counts)<br><br>Also convicted under 18 U.S.C. § 641 (Theft of Government Property) and | 42 months' incarceration; 2 years supervised release<br><br>USSG Range: 235-293 months | Relevant facts set forth in text above. |

| Case | Offense | Sentence and USSG Range | Facts |
|---|---|---|---|
| | 18 U.S.C. § 1512(c)(1) (Obstruction) | | |
| Fondren, James Wilbur  1:09-cr-263 (CMH) | 50 U.S.C. § 783(a) Unlawful Communication of Classified Information by a Government Employee  Also convicted under 18 U.S.C. § 1001 (False Statements) | 36 months' incarceration; 2 years supervised release  USSG Range: 63-78 months | Knowingly disclosed classified information to a foreign government operative for money. Denied offense and was found guilty at trial. Court departed downward upon finding that the information conveyed was not actually harmful to the United States. |
| Shriver, Glenn Duffie  1:10-cr-402 (LO) | 18 U.S.C. § 793(d) and (g) Conspiracy to Communicate NDI to a Person Not Entitled to Receive it | 48 months' incarceration; 2 years supervised release  (Pursuant to Rule 11(c)(1)(C))  USSG Range: 37-46 months | Defendant was paid $70,000 by the Chinese government to apply for positions in the foreign service and with the CIA, with agreement to pass along classified information after receiving employment. Met with PRC agents on several occasions over three years, and smuggled money into the United States. Defendant accepted responsibility and never actually gave classified information. |

*Relevant Out-of-District Prosecutions Under § 793 and Similar Statutes*

| Case | Offense | Sentence and USSG Range | Facts |
|---|---|---|---|
| Leibowitz, Shamai  D. Md. No. 8:09-cr-632 (AW) | 18 U.S.C. § 798(a) Disclosure of Classified Communication Intelligence | 20 months' incarceration; 3 years supervised release  (Pursuant to Rule 11(c)(1)(C))  USSG Range: 46-57 months | While employed as an FBI linguist, transmitted to a blogger five documents containing classified communication intelligence and classified as "Secret." The documents were published on the internet, and the parties agreed that intelligence sources and methods were compromised as a result. |

| Case | Offense | Sentence and USSG Range | Facts |
|------|---------|-------------------------|-------|
| Kim, Stephen Jin-Woo<br><br>D.D.C. No. 1:10-cr-2255 (CKK) | 18 U.S.C. § 793(d) Unlawful Disclosure of NDI | 13 months' incarceration; 1 year supervised release<br><br>(Pursuant to Rule 11(c)(1)(C))<br><br>USSG Range: 120 months (capped by statute) | The defendant, a senior advisor at the State Department and a "sophisticated consumer of intelligence," who disclosed the contents of a "top secret/sensitive compartmentation information" report regarding North Korean military preparedness to a reporter. According to the government, he did not act to expose government misconduct or claim to be acting as a whistleblower. The defendant also lied during the course of the FBI investigation. |
| Petraeus, David<br><br>W.D.N.C. No. 3:15-cr-47 | 18 U.S.C. § 1924 Unauthorized Removal and Retention of Classified Documents | 2 years probation; $100k fine<br><br>USSG Range: 0-6 months | Mr. Petraeus, a retired four-star General and later CIA Director. He disclosed to a personal acquaintance writing a biography about him eight notebooks with classified information such as the identities of covert officers, war strategy, intelligence capabilities and mechanisms, diplomatic discussions, quotes and deliberative discussions from high level National Security Council meetings, and notes of discussions with the President. Much of the information was classified at the highest level of "Top Secret/SCI and codeword." General Petraeus also admitted to lying to the FBI during the investigation. |
| Libby, I. Lewis, a/k/a "Scooter"<br><br>D.D.C. No. 1:05-cr-394 | 18 U.S.C. § 1503 Obstruction of Justice<br><br>18 U.S.C. § 1001 False Statements<br><br>18 U.S.C. § 1623 Perjury | No incarceration (30 months imposed by court but commuted by President); 2 years supervised release<br><br>USSG Range: 30-37 months | The defendant, a senior White House aide, revealed the identity of a covert CIA agent to a reporter in retribution for a critical article written by the agent's husband. The defendant was charged with obstruction and false statements rather than the substantive offense of disclosing classified information, but the Court applied a cross-reference to the substantive |

| Case | Offense | Sentence and USSG Range | Facts |
|---|---|---|---|
| | | | offense of violating the Intelligence Identities Protection Act. |
| Cartwright, James E.<br><br>D.D.C. No. 1:16-cr-188 | 18 U.S.C. § 1001 False Statements | None.  Pardoned by President shortly before sentencing.<br><br>USSG Range:  0-6 months | The defendant, a retired Marine Corps General and Vice Chairman of the Joint Chiefs of Staff, admitted in a Statement of Facts to disclosing Top Secret/SCI information to a journalist about a covert program to sabotage Iranian nuclear centrifuges.  He was permitted to plead guilty to lying about the offense to the FBI rather than the substantive offense.  The government sought a 2-year sentence, but the President pardoned the defendant prior to the sentencing hearing. |
| Albury, Terry<br>D.MN No. 0:18-cr-67 | 18 U.S.C. § 793(e) Disclosure of NDI | 48 months; 3 years supervised release<br><br>USSG Range:  46-57 months | Defendant, an FBI Special Agent, removed more than 70 documents, 50 of which were classified, from FBI computer systems with the intent of providing them to the media (and at least some of them were in fact disclosed to the media and approximately 50 additional documents were found in an envelope with the reporter's name during execution of the search warrant). |
| Winner, Reality<br><br>S.D.Ga. 1:17-cr-34 | 18 U.S.C. § 793(e) Unauthorized Transmission of NDI | 63 months' incarceration; 3 years supervised release.<br><br>(Pursuant to Rule 11(c)(1)(C))<br><br>USSG Range: 87-108 months | Defendant, an N.S.A. contractor and former Air Force linguist, pleaded guilty and agreed to 63 month sentence (the longest sentence ever imposed in federal court on a journalist source) for disclosing an intelligence report classified Top Secret/SCI.  She also "expressed contempt for the United States" and claimed to hate the United States in a series of online posts.  According to the government, the disclosure actually caused "exceptionally grave harm to U.S. national security." |

While each of the above cases is unique in both its facts and sentencing factors, in conjunction they show that courts consistently impose sentences in Espionage Act cases far below that suggested by the advisory Guideline range where the offenses involve leaks to the media or otherwise do not classic involve spying and sabotage.

### D. Consideration of the Types of Sentences Authorized by Congress Under § 793 Suggests that Sentences Near the Statutory Maximum—As the Guidelines Here Suggest—Should be Reserved for the Worst Violations.

Consideration of the kinds of sentences statutorily available, *see* 18 U.S.C. § 3553(a)(3), also supports the sentence requested here. In the case of a violation of 18 U.S.C. § 793(e), Congress authorized courts to impose sentences ranging from probation to ten years in prison. In other words, Congress directed courts to consider sentences as low as probation in cases falling toward the low end of the spectrum of possible violations of the statute, all of which are willful felony offenses. Sentences near the high end of the authorized range, on the other hand, should be reserved for the worst violations—defendants who cause grave harm to national security, who commit the offense solely for personal gain or a desire to harm the United States, and who lack any of the mitigation presented here. In other words, this § 3553 factor, like all others with the exception of the Sentencing Guidelines, supports a sentence toward the lower end of the range statutorily available—and dramatically lower than that recommended by the advisory Guideline range.

### E.   Specific and General Deterrence Do Not Support a Lengthy Sentence; Rather, They are Accomplished Simply By Prosecution and the Fact of a Conviction.

Specific deterrence is already accomplished in this case by the fact of Mr. Hale's prosecution and conviction.   As a felon who admittedly transmitted classified information unlawfully, he will never again have access to classified or sensitive government information, and will never again have an opportunity to commit an offense of this type.   As Dr. Lynch explains it, Mr. Hale's "risk [of reoffending] is negligible."  Lynch Report at 2, 14 (Sealed Exhibit B).

Moreover—aside from the fact Mr. Hale's conviction itself will prevent him from ever again committing the felony he has shown any propensity to commit—the Sentencing Commission's own recidivism statistics show that a person with no prior criminal history such as Mr. Hale presents a minimal risk of reoffending.   In the Sentencing Commission's May 2004 report entitled "Recidivism and the 'First Offender,'" for example, the Commission examined those offenders, like Mr. Hale, who have zero criminal history points (i.e., the low end of Criminal History Category I), and compared those offenders to other Category I offenders as well as to offenders in higher Criminal History Categories.   *See Recidivism and the "First Offender,"* United States Sentencing Commission, May 2004, at 4-5.   The results demonstrate that the re-conviction rate of those like Mr. Hale with zero criminal history points is among the lowest studied—about 50% lower than offenders in Criminal History Categories II through VI.   *See id.* Exhibit 6.[16]

_____

[16]  Indeed, a review of Mr. Hale's record in its entirety suggests that his only realistic risk of recidivism of *any* type would involve substance-use-related misdemeanors,

With respect to general deterrence, research indicates that increases in the *severity* of punishment are far less important to producing deterrent effects than the likelihood of *some* punishment.  *See* Wright, Valerie, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, at 1 (The Sentencing Project, Nov. 2010).[17]  Indeed, virtually no empirical data suggests that lengthier sentences achieve more general deterrence than shorter sentences.  Instead, findings regarding general deterrence are relatively settled:

> The existing data show that in the absence of the threat of punishment for criminal conduct, the social fabric of society would readily dissipate; crime would escalate and overwhelmingly frustrate the capacity of people to lead happy and fulfilled lives. Thus, general deterrence works in the absolute sense: there is *a connection* between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate.… It is counter-intuitive to suggest that higher penalties will not reduce the crime rate. However, the evidence is relatively definitive.

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted).  General deterrence, therefore, "does not require a

---

such as his pending charge in Tennessee.  But that sort of recidivism risk, which is commonly addressed in sentences for offenses such as driving under the influence, almost uniformly results in a sentence measured in days rather than months or years.  Even considering that risk, specific deterrence for that unresolved misdemeanor conduct would not support a sentence in this case longer than what Mr. Hale has already served.

[17]   Available   at   https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/.

particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine or a short prison term." *Id.* at 1205.

Considering that research in the context of the instant case, there can be no question that a person with an otherwise clean record and a top-level security clearance such as Mr. Hale "would seek to avoid" the kinds of consequences Mr. Hale faces as a result of his offense *regardless of any term of incarceration he might receive:* the loss of gainful employment and a lucrative career trajectory, a felony conviction (and all the lifelong consequences that go with it), and a lengthy term of federal supervision with the threat of incarceration for non-compliance.[18]

Accordingly, here, a sentence of 12 to 18 months is more than sufficient to accomplish both specific and general deterrence.

---

[18] As the Supreme Court has noted, probation is itself a significant punishment with an attendant deprivation of liberty. In affirming a sentence of probation in *Gall*, the Supreme Court recognized that while probationary sentences do not require incarceration, "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." 128 S. Ct. at 595. The Court then listed some of these restrictions:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id.* at 595-96 (citation omitted).

## VI.  The defense objects to the vague and unnecessarily broad proposed Standard Condition of Supervision No. 13.

The defense objects to proposed Standard Condition No. 13 because, as worded, it is breathtakingly broad and, thus, improperly delegates a judicial function to the probation officer.  PSR at 18.  Standard conditions are laid out in the Sentencing Guidelines, USSG § 5D1.3(c), but are neither statutory nor mandatory.  *See* 18 U.S.C. §§ 3563 & 3583 (*not* listing broad notification provision among statutory conditions); *United States v. Booker*, 543 U.S. 220, 259-60 (2005) (Sentencing Guidelines are not mandatory).  Delegating this broad decision-making power over Mr. Kelley's liberty on supervised release is impermissible.  *See, e.g.*, *United States v. Shiraz*, 784 F. App'x 141, 143-44 (4th Cir. 2019) (court's delegation to probation officer of what type of business defendant could operate was improper).

Moreover, this is not a case that naturally calls for notification of third parties under specific situations, such as a fraud and drug diversion cases often do.  That said, to the extent that some kind of notification is deemed necessary, the defense would consider agreeing to a more narrowly tailored requirement.  Faced with similar objections this Court and Judge Ellis have agreed to narrow Standard Condition No. 13 to account for the specific conduct in the individual defendant's case.  *See United States v. Kelley*, No. 1:20-cr-82-LO, Dkt. No. 56 (E.D. Va. May 10, 2021); *United States v. Clark*, No. 1:19-cr-332-TSE, Dkt. Nos. 38 & 41 (E.D. Va. Jan. 29, 2021).

## VII.  CONCLUSION

Accordingly, the defense respectfully asks that this Court impose a sentence of no more than 12 to 18 months, and a period of supervised release with mental health

counseling consistent with that recommended by Dr. Lynch.  *See* Lynch Rep. (Sealed Exhibit B) at 15.

Respectfully submitted,

DANIEL EVERETTE HALE
By counsel,

Geremy C. Kamens
Federal Public Defender

By:   _____/s/_____
Todd M. Richman
Va. Bar No. 41834
Cadence A. Mertz
Va. Bar No. 89750
Assistant Federal Public Defenders
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
703-600-0800
703-600-0880 (fax)
Cadence_Mertz@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2021, I will file the foregoing with the Clerk of Court and serve copies on counsel of record.

                                  ____/s/_____

                                  Cadence A. Mertz

                                  Va. Bar No. 89750

                                  Assistant Federal Public Defender

                                  Office of the Federal Public Defender

                                  1650 King Street, Suite 500

                                  Alexandria, Virginia 22314

                                  703-600-0840

                                  703-600-0880 (fax)

                                  Cadence_Mertz@fd.org