```
                UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA


  UNITED STATES OF AMERICA        :
                                  :
            Plaintiff,            :   Criminal Action
                                  :   No. 1:19-cr-59
  v.                              :
                                  :
  DANIEL EVERETTE HALE,           :   June 25, 2021
                                  :   10:00 a.m.
                                  :
                                  :
            Defendant.            :
                                  :
  ............................    :


            TRANSCRIPT OF MOTION HEARING PROCEEDINGS
              BEFORE THE HONORABLE LIAM O'GRADY,
               UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

  For the United States:       Gordon D. Kromberg, Assistant U.S.
                               Attorney
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                               (703)299-3700
                               Email: Gordon.kromberg@usdoj.gov

                               Alexander Patrick Berrang,
                               Assistant U.S. Attorney
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                               703-299-3700
                               Email:
                               Alexander.P.Berrang@usdoj.gov

  For the Defendant:           Todd M. Richman, Assistant Federal
                               Public Defender
                               Office of the Federal Public
                               Defender (Alexandria)
                               1650 King St, Suite 500
                               Alexandria, VA 22314
                               (703) 600-0800
                               Email: Todd_richman@fd.org
```

```
APPEARANCES:  Cont.

For the Defendant:          Cadence Mertz, Assistant Federal
                            Public Defender
                            Office of the Federal Public
                            Defender (Alexandria)
                            1650 King St
                            Suite 500
                            Alexandria, VA 22314
                            703-600-0800
                            Email: Cadence_mertz@fd.org

Court Reporter:             Scott L. Wallace, RDR, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA  2231-5798
                            Office: 703.549.4626
                            Cell: 202.277.3739
                            Email: Scottwallace.edva@gmail.com
```

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

**MORNING SESSION, JUNE 25, 2021**

(10:05 a.m.)

THE COURTROOM CLERK: The Court calls United States of America versus Danielle Everett Hale, case number 1:19-CR59. May I have appearances, please, first for the government.

MR. KROMBERG: Good morning, Your Honor, Gordon Kromberg for the United States. It's nice to be here on a Friday morning.

THE COURT: Right. Good morning to you.

MR. RICHMAN: Good morning, Your Honor, Todd Richman and Cadence Mertz for Mr. Hale who is present.

THE COURT: All right. Good morning to you both and good morning, Mr. Hale.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: All right. This comes on Mr. Hale's motion to compel production of evidence of actual harm and I read the pleadings, and tell me how this all fits into the sentencing regimes. I mean, it's obviously interesting.

MR. RICHMAN: I will, Your Honor. I think that's important. First let me -- well, I want to be clear about what we want. The government has said they searched for any formal damages has MENTS, none exist or  <*SP> at least they have NOTE TO CONFIRM/CHECK have been beenably to find any. We don't believe that there wasn't a damages assessment. There may not have been a formal one crackhead but in determining not to created a formal one, we believe that damage assessment occurred

1 in that process, based on the way the government works.  We know
2 that from the intelligence community directive, our own expert's
3 testimony, and Hess affidavit which is attached, that made clear
4 that these formal assessments occur unless a determination is
5 made that no damage occurred.
6 　　　　So, we believe that determination was made, even if it was
7 made in a meeting there,'s no formal written document that says
8 it, but we're entitled to that information, *Brady* and discovery
9 generally apply to information, no the to documents.  We often
10 get documents in -- we often get things in preparation for trial
11 where it's a letter from the U.S. Attorney's Office saying, look,
12 there's no 302, but this witness in the trial prep session
13 expressed some uncertainty about these facts and we need to tell
14 you that.  So it's very common that we FWET stuff just in the
15 letter acknowledging that certain facts occurred, whether there's
16 a formal document that shows et or not.  So we're entitled to
17 that, if there was any government assessment even informally in a
18 phone call that said there was no damage here.
19 　　　　The reason it's relevant, Your Honor, to sentencing, is
20 that sentencing, of course, the Court has to consider the nature
21 and circumstances of the offense.  One of the things the
22 government is going to point to and in fact he think one of the
23 things that they always point to heavily in these cases is that
24 the information's top secret and then they point to that
25 definition.  It's reasonably -- if disclosed, reasonably likely

```
 1   to cause exceptionally grave damage to national security.
 2          That -- those words, they not only relate to the
 3   government's argument about the circumstances of the offense,
 4   they add three years to the sentencing Guideline range, because
 5   the Guidelines go up if it's top secret versus some other
 6   information.
 7          The Court will have before it our acknowledgment that it
 8   was NDI which is not the same thing as top secret, it's actually
 9   much lower and I'll explain that in a second and the Court will
10   have the documents that were marked top secret.  We believe and
11   our expert said that there's actual tactical meaning.  They may
12   have had some top secret value for a very short period of time
13   when they were created but they weren't SCHOEFD until about two
14   years later when they had essentially to value to anybody.
15          So, we believe that the government pointing to that
16   definition to explain the seriousness of the offense and pointing
17   to the Guideline that's PREM MEFLS on the SFENSing commission
18   referring to the executive GRAFRJ's determination that these
19   documents are reasonably likely if disclosed to provide
20   SDAEPGSnally grave damage to national security like I said that
21   increases the sentencing guideline range.  We're en TEELT to look
22   HIEBD that in talking about the serious NEPTS on the event.  If
23   in rally all we're referring to also it's NDI NOTE TO
24   CONFIRM/CHECK which there is some theoretical possibility of harm
25   and that that harm -- maybe it's a theoretically possibly of a
```

```
 1   relatively low ARMENT of harm but there's a possibility of harm
 2   if that he wants disclosed that's what we pad toyed by admitting
 3   PIETS N DVP I we're entitled when discussing the seriousness of
 4   the offense to talk about whether -- what actual harm was risked
 5   or occurred.
 6           And the government, if the government made, even an en
 7   formal assessment that we don't need to go through this PROSZ of
 8   doing an process, because we didn't really COMBASHL the time it's
 9   disclosed we're entitled to know that information.
10           There are things we've seen in discovery in the SCIF that
11   I won't get in the detail that suggest that the female in the
12   government had those kind of views of the documents at some time.
13           So -- and, Your Honor, what I have trouble responding to,
14   because it seems so he will men THAER, the government's arguments
15   and their opposition, they're arguing that things aren't relative
16   to sentencing if they don't go to the elements of the offense or
17   if they don't go to the evidence they would have presented at
18   trial.
19           Now, I mean, everything we do at sentencing.  We talk
20   about the defendant's criminal record.  We talk about defendant's
21   acceptance of responsibility, we talk about how well they did on
22   supervision.  All of these things have nothing to do with the
23   elements of the offense they have nothing to do WL evidence that
24   would have been prevented R presented at trial.
25           THE COURT:  So you have an acknowledgment that the
```

1  government, that Mr. Kromberg and his team searched for any kind
2  of formal assessment.  It didn't exist, and knowledge that
3  there's no actual harm analysis that's been done, and therefore
4  isn't that -- doesn't that give you what you need to argue that
5  they can't come back and say there was this measure much actual
6  harm -- you know, the government, the United States intelligence
7  agency believes that this is the level of harm that occurred,
8  they can't come back and do that now.
9       MR. RICHMAN:  No, but they can say that the United States
10 intelligence community determined that there was reasonable
11 likelihood that exceptionally grave damage to national security
12 could come from releasing these documents SGLJ that's just based
13 on their classification.
14      MR. RICHMAN:  Right, and that would be in further RAVENTS
15 of saying how serious the offense is.  Our point is they're using
16 those words with no relation to their actual meaning.  None of us
17 would say it's reasonable likely that a first offense simple
18 possession of possession of marijuana could get a year in prison
19 it's theoretically possible it's not likely.  The government is
20 using that to increase the Guideline range and to increase this
21 discussion of the severity of the offense with no rational tether
22 to what the words actually mean, so we're entitled to go --
23      THE COURT:  It's not the government, it's the Sentencing
24 Commission, an independent group of -- so --
25      MR. RICHMAN:  But they're --

*1*   THE COURT: They're going --

*2*   MR. RICHMAN: They're deferring to the executive's

*3* judgments I'm sorry to cut you off.

*4*   THE COURT: They're going to get behind the Commission on

*5* this, right.

*6*   MR. RICHMAN: Get behind the executive's judgment that

*7* these documents are that type of document because that goes to

*8* the seriousness of the offense, and, Your Honor, I think that --

*9* so, an example that I would give is, you know, imagine we have a

*10* battery case where the degree of harm is not an element, it's

*11* simple battery, but the victim had a bruise on his face after the

*12* incident.  Imagine the victim had told police, by the way, that

*13* bruise was from yesterday from a, you know, an accident I had?

*14* He did touch me, the person did touch me without permission, and

*15* that's unlawful, and so it's still battery, but he didn't cause

*16* any of this harm.  It actually really didn't hurt.  Of course we

*17* would be entitled to that, and so what the  government says well

*18* we haven't satisfied the damage that's not the same,ing, because

*19* no real harm occurred NOTE TO CONFIRM/CHECK.  And that's what

*20* we're entitled to in discovery, so I mean I take Your Honor's

*21* point that they've admitted that and that we can still sort of

*22* infer that at sentencing, but it's different than being able to

*23* have their acknowledgment like we typically get in a *Brady*

*24* disclosure that says, by the way, the witnesses have said that

*25* they determined they didn't need to do one because they weren't

1  worried about these documents.  That's what we're entitled to.
2      THE COURT:  Okay.  Thank you.
3      MR. RICHMAN:  Thank you, Your Honor.
4      THE COURT:  Okay, Mr. Kromberg.
5      MR. KROMBERG:  Let me try starting with the easy stuff.
6  In a battery case, if somebody gets hurt, that in the Sentencing
7  Guidelines is an aggravating factor that the burden of proof is
8  on the government to prove.  If the government does not offer
9  proof that there's an aggravating factor, the Court -- the
10 aggregate does not assess additional points for an aggravating
11 factor.  In a heroin case, the reason heroin is punished so
12 severely is because of the risk that when you distribute heroin
13 people are going to get hurt.  If someone actually dies as a
14 result of a heroin distribution, there-it's an aggravating
15 factor, and you get punished more severely than if merely you
16 distribute heroin and there's no proof that someone gets killed.
17     793, the statute, goes on potential harm.  I was involved
18 in the prosecution of al dress aims almost 30 years ago, 25 years
19 ago and Robert Hanson B 20 years ago.  There were people killed
20 as a result, and the government proved that, or the government --
21 I think they were pleas and the defendants admitted that.  We are
22 not putting forth the aggravating factor of actual harm.  We are
23 not saying there was no actual harm, we're just not putting forth
24 proof that there was actual harm and as a result the Court should
25 not find actual harm, and if the Court is not going to find

*1* actual harm and just sentence on the basis of potential harm,
*2* there's no reason why the government should be providing in
*3* discovery information about the presence or absence of actual
*4* harm.
*5*     THE COURT: So what about Mr. Richman's argument that
*6* because the documents are top secret, that the Guidelines
*7* enhancement is the equivalent of proving actual harm.
*8*     MR. KROMBERG: So, Judge what the guidelines say is
*9* potential harm" which is pretty much tracks the definition of
*10* secret or top secret, likely to cause. I mean, it's no -- Mr.
*11* Richman knows that documents stolen by Mr. Hale ended up in a
*12* terrorists publication being distributed to other terrorists.
*13*     Now that's potential harm because we -we cannot prove that
*14* a terrorist used that information to conduct the particular
*15* terrorist act which killed a particular person, but it certainly
*16* is potential harm and that's what the statute applies to.
*17*     I would also note that one of -- there's an apples and
*18* oranges issue here. Mr. Richman suggests that there are
*19* some-that there were SACHLTS that some people the DOCHT <*SP>
*20* didn't think there was actual harm. Well there were hundreds of
*21* pages stolen by Mr. Hale, and the NDI that we designated was just
*22* a handful of pages, and there was nothing by anyone in the
*23* government that suggested that the NDI that was designated by the
*24* government was not -- there was no question about the potential
*25* harm from those particular items. What the defense is suggesting

```
 1   is that the precision with which the government chose the NDI
 2   should be thrown out the window at sentencing because now, if any
 3   of the hundreds of pages of secret and top secret and nonsecret
 4   information, such as document L, that Mr. Hale stole, if there
 5   was no -- if someone ever said that any of that stuff didn't
 6   create actual harm, therefore the government last to turn that
 7   information over, even though, for purposes of the trial we
 8   designated the NDI so narrowly so that it wouldn't be at issue
 9   whether any of that other stuff created potential harm.
10         It just doesn't make any sense that the precision with
11   which we chose the NDI for the trial gets thrown out the window,
12   and now we have to produce -- and the defense in the against's
13   theory we should have to produce assessments of the harm or not
14   harm created by the theft of the other hundreds of pages that we
15   didn't designate as NDI.  We're not saying -- I mean, in essence
16   judge we're not asking the Court to sentence Mr. Hale on actual
17   harm.  That would be our burden to show actual harm.  We're not
18   asking the Court to find actual harm.  We're asking the Court to
19   find, as defendant pled guilty, potential harm, and the potential
20   harm is obvious from the declarations that we will be -- well, we
21   will be filing declarations with our sentencing pleading that the
22   defense has essentially seen consistent with the expert witness
23   reports that were narrowly focused on the NDI.
24         So, that's what we're saying is potential harm.  We're not
25   asking for an enhancement on the basis of actual harm, and
```

*1* therefore we shouldn't have to go searching around to produce
*2* something about the presence or absence of something that is an
*3* aggravating factor that we're not asking the Court to find.
*4*     THE COURT: Well, in fact, you said in your pleadings,
*5* unless I got it wrong, that you had done a -- you had requested
*6* information on an assessment having been played by the agencies,
*7* and you didn't get a positive response.
*8*     MR. KROMBERG: That's correct, Judge. I did not make
*9* that. That was Ms. Submit I saw those e-mails I was come on UL
*10* of testnal I saw every one there were ten didn't agencies in a
*11* said we didn't find it before and we looked again and we don't
*12* have it now, so I don't think that there is -- I don't -- I'm not
*13* an expert in this to say whether what Mr. Richman says well that
*14* means there was an assessment of no harm. I don't think that's
*15* true. I think that's just pulled out of thin air, but we asked
*16* and there was nothing to produce, so we can't produce it. We
*17* shouldn't have to produce it if it exists but we don't have it
*18* anyway.
*19*     THE COURT: All right. Thank you, Mr. Kromberg. All
*20* right. Mr. Richman.
*21*     MR. RICHMAN: If I could just briefly say a couple of
*22* things in response to that.
*23*     The government says if they're not taking on the burden
*24* under the guidelines of trying to establish an ENS hadn't meant
*25* based on actual harm that it's not relevant. I mean, sentencing,

*1*   of course, the Guidelines are one factor.  The nature and
*2*   circumstances of the offense are always relevant and even when
*3*   it's not an element that the government is proving take like the
*4*   battery example of course weld be saying actually this was just a
*5*   JEP temperature or unwanted BAEK, it should be at the low end of
*6*   sentencing when you're looking at how to TENLS it of course we
*7*   should be staying, whether the government is presenting evidence
*8*   of harm.  It's something that's relevant to tensing, obviously,
*9*   and as far as the guidelines having-he says well the guidelines
*10*   potential harm NOTE TO CONFIRM/CHECK.  The guidelines just refer
*11*   to the executive branch's determination to label it top secret
*12*   which means that the executive branch halls made a determination
*13*   of reasonablenal likelihood of exceptionally grave damage.  So,
*14*   we are, of course, entitled to look behind that.  If you look at
*15*   for example the Kimbrough case in the Supreme Court about why
*16*   courts were allowed to ignore the crack cocaine Guideline it's
*17*   because both the Congress and the sentencing decision lad based
*18*   their determinations on?  Idea that crack was vastly more
*19*   dangerous than regular cocaine, and as science emerged that that
*20*   was not true, courts were allowed to follow that science and
*21*   disregard the Guideline.  Here the evidence that the reasonable
*22*   likelihood much actual harm is not true, that that determination
*23*   was over BLOEN or at least it was over blown at the time of the
*24*   disclosure of the documents, maybe it was true for five days when
*25*   the documents were made, but it was not true at the time of the

*1*  disclosure, evidence that would get behind that is within the
*2*  government.  They're the WUNDZ who, if they said, may by the time
*3*  he did this, we don't really care fluff to do a damages sexual
*4*  harassment.
*5*      THE COURT:  So, if we were in a NOTE TO CONFIRM/CHECK
*6*  heroin trial and you were looking for *Brady* material on a
*7*  co-conspirator and Mr. Kromberg was the prosecutor, he would
*8*  reach out to agencies that had dealt with this co-conspirator
*9*  before and DEA, and Fairfax County Police Department, and say
*10* give me all the information you have on bad acts by this person,
*11* and he would get the responses, and he would produce them to you,
*12* or at least, you know, how far out he went, but clearly here the
*13* message has been sent to the appropriate intelligence community,
*14* the government has gotten a response and provided it in their
*15* pleading, what other responsibility.
*16*     MR. RICHMAN:  .
*17*     MR. RICHMAN:  That's where I think the disconnect is.
*18* They've asked for any formal damages assessments.  They haven't
*19* asked for any information about why a determination was made to
*20* do a damage assessment or not, and about that -- about and about
*21* that decision, and if that information exists within the
*22* intelligence community and it exists and it's favorable to us, in
*23* other words we made the decision not to do one because these
*24* documents were not particularly valuable to us by the time they
*25* were disclosed, we're entitled to that, even if there no document

*1*   saying that.  We're entitled to it.  So the disconnect is he's
*2*   only asked as far as I can tell for formal damage assessments
*3*   that were made.  We're entitled to the evidence of the
*4*   government's assessments of whether to do damage assessments.
*5*         So, that's -- that's what I think is the disconnect.
*6*         THE COURT:  So the additional work that you want done by
*7*   the government is to send another e-mail that says was there a
*8*   formal or informal assessment done or was there a decision made
*9*   not to do an assessment at all?  Is that what you're --
*10*        MR. RICHMAN:  Correct, and-exactly, and we're -- and if
*11*  that exists and it's favorable to us, in other words, if it's
*12*  hey, we sat down and said this stuff's old, no need to do an
*13*  sexual harassment of it, didn't disclose any of our real sources
*14*  or methods or anything that we care about at this point, then,
*15*  you know, we're entitled to that even if it's just in a letter
*16*  even if there's no document saying it if the government just
*17*  writs us a letter and says this is what the CIA told us or this
*18*  is what this agency told us or whatever.
*19*        THE COURT:  Well, how does that differ from what you have
*20*  now, which is that you have a -- your expert who's -- I think
*21*  you're avert ran of the intelligence community, Mr. Cooper NOTE
*22*  TO CONFIRM/CHECK, says in fact that there is no damage assessment
*23*  that leads NOTE TO CONFIRM/CHECK leads tin tell JENLS community
*24*  believed that no damage occurred, and now you've got the
*25*  government saying we're not arguing for actual damage, that's an

1   enhancement and we haven't done it.

2   MR. RICHMAN: They're still going to argue potential
3   damage and they're going to argue potential damage based on the
4   assessments of the documents being top secret meeting that
5   definition, so if we have them saying later hey by the time they
6   were released they western were likely to cause exceptional
7   damage, then that's something that we're entitled to, and you're
8   right that we can say it inferentially based on our expert and
9   based our intelligence community directive that say that these
10  assessments have to be done but saying it inferentially is not
11  the saying after the fact the government sat down and said, hey,
12  what Mr. Hale disclosed wasn't really that sensitive by the time
13  he disclosed it.

14  So, that's what we think we're entitled to, and it's
15  stronger if we have the government actually saying it than if we
16  have an inference of it.

17  THE COURT: Okay. All right. Thank you. Mr. Kromberg,
18  why don't you give me your final thoughts on it.

19  MR. KROMBERG: What the high post offices that Mr. Rich
20  map ^ poses ^ possess is not what's going to happen. As I
21  mentioned before we're going to have declarations from the
22  subject matter experts talking about the potential harm that are
23  consistent with what we provided pretrial as -- regarding the
24  NDI. They're going to be talking about the NDI, and they're
25  going to be talking about the seriousness of what they saw as the

```
 1   potential harm.
 2          We, in our pleadings, in our sentencing, pleading, and at
 3   sentencing we're going to be arguing that the like -- like a
 4   heroin transaction, where we're not proving that someone actually
 5   died from it but there's inherent risk in these -- with respect
 6   to the NDI that was stolen.  Now, keep in mind there,'s also
 7   information that wasn't NDI, that wasn't even classified.
 8   Document L, for example.  We're going to be talking about the
 9   potential risk of harm from the disclosure of DOUMENT L and we're
10   going to have a declaration about that, but it just simply is not
11   going to be the case, we are simply not -- we are not simply
12   going to argue, oh, well it's top secret therefore there was
13   likelihood of severe harm.  Yes, it's true whether he stole them
14   he knew that when  his BOTSDZ had determined there was a
15   likelihood 267 severe harm when he told them NOTE TO
16   CONFIRM/CHECK but we're not going to be arguing harm #3W5I68D
17   solely on what he knew at the time we're going to be arguing on
18   the designation NAEFT of the SFERPT -- talking NOTE TO
19   CONFIRM/CHECK talking about the particular NDI, and the
20   declaration about document L which is not classified -- actually
21   it was FOU, I suppose, so we're not going to be -- our argument
22   is not going to be oh, well you should punish him because the
23   documents were MOOSHGD R marked top secret.  The documents were
24   marked top secret and he knew it when he stole them, and he knew
25   what top secret meant and he knew the determinations had been
```

1  made that disclosure of those documents were likely to -- were
2  likely to cause severe harm and he stole them anyway and he
3  leaked them anyway so that is a factor for sure, but as far as
4  the potential harm goes, we're going to be talking about the NDI
5  based on the subject matter experts.
6         THE COURT:  What was the language of the inquiry made to
7  the intelligence agency.  Did it say formal or informal.
8         MR. RICHMAN:  Information.  The e-mail was some -- the
9  most recent e-mails was something like "we previously asked you
10 for information relating to an assessment of harm for the
11 documents stolen in this case.  We are renewing that request.
12 Has anything -- has any information -- have you generated any
13 information since our last request regarding the existence of no
14 harm or minimal harm with respect to the information stolen in
15 this case."
16        THE COURT:  All right.
17        MR. KROMBERG:  Thank you.
18        THE COURT:  Well, that's a broad request, Mr. Richman, and
19 I think it satisfies the inquiry that you're asking the
20 government to make, and I guess the additional request might be
21 did you decide -- your point is, did you decide not to do an
22 assessment, but I think that broad inquiry provides you with the
23 confirmation that you need that there was no assessment made, and
24 that the additional leap that there was a decision not to do an
25 assessment is implicit in the fact that they didn't do an

1  assessment.  So, I think you've got what you need, so I'm not
2  going to order any further -- I'm not going to order the
3  government to make further inquiry.  I understand both of your
4  arguments a lot better than I did half an hour ago, so I see
5  where we're going, and as far as the declarations that are going
6  to come in, we can, you know, talk about those when the time
7  comes.  All right.  So, I'm going to deny the motion based on the
8  information provided this morning at the hearing.
9          All right.  Mr. Hale, are you getting any-are you able to
10 get in touch with your counselor from the jail?  Has that worked
11 out.
12         THE DEFENDANT:  Your Honor, I've spoken with Mr. Michael
13 KUNZ shortly after my bond was revoked, and he informed me that
14 Pretrial Services had terminated his contract, and that was the
15 last time we spoke.
16         THE COURT:  Do you know why that happened?
17         MR. RICHMAN:  That -- I mean that -- treatment is while he
18 was on pretrial supervision it's through the Probation Office.
19 He's no longer under their jurisdiction what have you.  He's in
20 the jail.  So he's entitled to whatever minimal services the jail
21 has.
22         THE COURT:  Okay.  If I could arrange for services with
23 Mr. KUNZ, would that be something you're still interested in.
24         THE DEFENDANT:  I would appreciate speaking to him, yes,
25 Your Honor.

1     THE COURT: Okay.
2     THE WITNESS: Let me see what I can do on that front.
3  I'll do what I can. I think that is important on the ongoing
4  basis. All right. Thank you, all. I appreciate you coming in
5  and explaining this to me, and I hope that we're farther down the
6  road in a meeting of the minds. So, thank you. We're in recess.
7     (Proceedings adjourned at 10:34 a.m.)