```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA


     UNITED STATES OF AMERICA      :
                                   :
                       Plaintiff,  :  Criminal Action
                                   :  No. 1:19-cr-59
              v.                   :
                                   :
     DANIEL EVERETTE HALE,         :  July 27, 2021
                                   :  9:55 a.m.
                                   :
                                   :
                       Defendant.  :  Washington, D.C.
                                   :
     ............................. :
```

**TRANSCRIPT OF SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE LIAM O'GRADY,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:      **Gordon D. Kromberg, Assistant U.S.**
                            **Attorney**
                            United States Attorney's Office
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            (703)299-3700
                            Email: Gordon.kromberg@usdoj.gov

                            **Alexander Patrick Berrang,**
                            **Assistant U.S. Attorney**
                            United States Attorney's Office
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            703-299-3700
                            Email:
                            Alexander.P.Berrang@usdoj.gov

                            **Heather Schmidt, Assistant U.S.**
                            **Attorney**
                            US Attorney's Office (Alexandria)
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            703-299-3700
                            Email: Heather.schmidt@usdoj.gov

APPEARANCES:   (Cont.)

For the Defendant:          **Todd M. Richman, Assistant Federal**
                            **Public Defender**
                            Office of the Federal Public
                            Defender (Alexandria)
                            1650 King St, Suite 500
                            Alexandria, VA 22314
                            (703) 600-0800
                            Email: Todd_richman@fd.org


For the Defendant:          **Cadence Mertz, Assistant Federal**
                            **Public Defender**
                            Office of the Federal Public
                            Defender (Alexandria)
                            1650 King St
                            Suite 500
                            Alexandria, VA 22314
                            703-600-0800
                            Email: Cadence_mertz@fd.org


Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA  2231-5798
                            Office: 703.549.4626
                            Cell: 202.277.3739
                            Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1      <u>**MORNING SESSION, JULY 27, 2021**</u>

2    (9:57 a.m.)

3        COURTROOM CLERK:  The Court calls *United States versus*

4    *Daniel Everett Hale*, Case Number 1:19-CR-59.

5        May I have appearances, please, first for the government.

6        MR. KROMBERG:  Good morning, Your Honor.  Gordon Kromberg,

7    Heather Schmidt and Alex Berrang for the United States.  With us

8    at counsel table is FBI Special Agent Pino.

9        THE COURT:  All right.

10        MR. RICHMAN:  And good morning, Your Honor.  Todd Richman

11    and Cadence Mertz for Mr. Hale.  Mr. Hale is not yet present.

12        THE COURT:  Yeah.  We're going to break before the

13    sentencing, but good morning, Mr. Hale.  Come in, please.

14        THE DEFENDANT:  Good morning, Your Honor.

15        THE COURT:  All right.  I've called the case preliminarily

16    because there was an issue as to whether or not counsel wanted

17    the opportunity to go into any of the classified information, and

18    if so, we would have to clear the courtroom and secure it.

19    Before that occurred, I'm happy to do it either way you want to

20    do it, but I wanted to know your position.

21        MR. RICHMAN:  Well, Your Honor, it was not our intention,

22    but following the government's filing yesterday, which we haven't

23    had any opportunity to respond to, we do think at least briefly

24    that we need an opportunity to respond.

25        THE COURT:  All right.  All right.  Then we'll -- that's

1   fine with me.  We'll certainly -- you should have that

2   opportunity, and we'll take a break.  We'll clear the courtroom

3   because we'll have to do some security measures inside the

4   courtroom before we hold that closed hearing, and then we'll open

5   up after that for the sentencing.  Mr. Kromberg.

6        MR. KROMBERG:  Your Honor, I was wondering whether it

7   might work to go into the -- some of the other parts of the

8   sentencing, and when we get to the dispute over facts, we could

9   break at that point, but essentially there's a dispute over the

10  facts, and that's what we would talk about in the closed session,

11  but there is -- there are many other things that are out there,

12  and it depends in what order the Court wants to do it.  For

13  example, say the -- typically, you say -- the Court asks, are the

14  Guideline factors accurately assessed?  And I -- my expectation

15  is that there would be -- there might be a disagreement on the

16  acceptance of responsibility, which goes into the facts.  So, I

17  don't know whether it's best to go first on the facts or get to

18  the facts later.

19       THE COURT:  Well, you know that the first question and

20  first issue I address in every sentencing is the Guideline

21  calculation, so I think we can deal with that then, and I

22  certainly don't want to break multiple times.  So let's do the

23  best we can to deal with the fact issue up front, and then we'll

24  open back up, all right.  Okay.  All right.  We're in recess.

25       (Thereupon, a recess in the proceedings began at 10:01

1    a.m.)

2         (Classified matter held.)

3

4              **MORNING SESSION, JULY 27, 2021**

5    (11:25 a.m.)

6         THE COURT:  All right.  We have established the Guideline

7    range, which is 87 to 108 months and one to three years of

8    supervised release.  I've indicated that Mr. Hale does not have

9    the ability to pay a fine.  He has received acceptance of

10   responsibility for having pled guilty and identified the

11   Statement of Facts information, and also that the Court will

12   amend condition number 13 to reflect that the Court will notify

13   third parties of risks occasioned by his employment.  All right.

14        Does either party intend to call any witnesses in the

15   case?  Mr. Kromberg?

16        MR. KROMBERG:  No, Your Honor.

17        THE COURT:  All right.  Mr. Richman?

18        MR. RICHMAN:  No, Your Honor.

19        THE COURT:  All right.  I've read the parties' submissions

20   and the supplemental that has been filed.  I have read many dozen

21   letters in support of Mr. Hale and their position from members of

22   the community, former military personnel, journalists, and I'll

23   hear anything that the government would like to say at this time.

24   Mr. Kromberg.

25        MR. KROMBERG:  Thank you, Your Honor.  The government said

1  most of what could be said in the pleadings, and I'm not going to

2  say it again, despite the temptation, but I'm going to not do it.

3  But, Judge, in this case what the defendant did was premeditated

4  in that he joined NGA for the purpose of obtaining information

5  for the purpose of leaking it.

6       He didn't just steal the information once, and it wasn't

7  just one document, but it was a number of different documents on

8  seven different dates over a four-month period.

9       So, in calculating an appropriate sentence for someone who

10 has done this, I think it's appropriate to say, well, what is the

11 appropriate sentence had the defendant stole merely one document,

12 one secret document and had he retained that one secret document?

13 Would that sentence then be enhanced by giving it to a reporter?

14 Would that sentence be enhanced if it was a top secret document?

15 And once we have that, what sentence would it be for doing six

16 documents on February 28th, including top secret, and then giving

17 it to the reporter, and how would that be enhanced for the

18 documents that were stolen in April and in May and that were

19 given to the reporter?

20      So I think the punishment that Mr. Hale should receive is

21 what's appropriate for stealing, for retaining, and for giving to

22 the reporter, the secret documents and the top secret documents,

23 and Document L, which was not a -- which was not a secret or top

24 secret document.

25      And in making the calculation, the Court should not allow

1    Hale's excuses to mask the significance of what he did.

2         The information he stole turned up in a publication put

3    out by ISIS to be used by terrorists all over the world.

4         That may not have been -- I mean, I'm sure -- I'm sure it

5    wasn't Mr. Hale's intention to support ISIS, but that's what he

6    did.  In his counsel's words, he used a bludgeon when he should

7    have used a scalpel.  Even using a scalpel would have been

8    illegal, but, in fact, he used a bludgeon.

9         A substantial sentence is needed here as Mr. Hale

10   repeatedly broke his repeated promises to protect classified

11   information.  Only a significant term of imprisonment can

12   adequately promote respect for the law, reflect the seriousness

13   of the offense, and, most importantly in this case, provide some

14   deterrence to other people who may be tempted to do the same

15   thing.  Thank you, Judge.

16        THE COURT:  All right.  Thank you, Mr. Kromberg.

17        Mr. Richman.

18        MR. RICHMAN:  Thank you, Your Honor.  We, as the Court is

19   aware, we're asking for a sentence of 12 to 18 months.  We think

20   that's supported by not only the other cases we've cited but all

21   the purposes of sentencing, and I know the Court has read a lot.

22   I am really going to try not to just cover all of that.  I know

23   the Court read everything and noted also the report from

24   Dr. Lynch, and I would -- but what I would like to do is merely

25   respond to a few arguments that the government has made, and then

1    I have a few other points I would like to make.

2         THE COURT:  Certainly.

3         MR. RICHMAN:  When I read the government's sentencing memo

4    and I listened to the government today, it strikes me that the

5    government feels this need to build up this strawman, this

6    caricature of Mr. Hale, and they won't -- they simply can't

7    believe that his reason for committing the offense is what he

8    said it was, following his conscience, that it was driven by a

9    deep need to sort of atone for and to make public things that he

10   thought were wrong.  But there's just nothing -- there is an

11   extraordinary amount of evidence showing that Mr. Hale is telling

12   the truth when he explains why he did what he did.  Perhaps what

13   he disclosed was not as finely calibrated as it could have been

14   to make the point he wanted to make.  That has nothing to do with

15   what his motivation was.  The fact is the Court has read the

16   lengthy report from Dr. Lynch.  The Court has read Mr. Hale's

17   letter.  The Court has read the many, many letters from those who

18   know him talking about what his motivation was, and it's that he

19   followed his conscience.

20        The government's alternative reality, they use words like

21   it was because of his vanity, it was because he was trying to

22   curry favor with a reporter.  We've got seven years of evidence

23   since this occurred, five years of which Mr. Hale was totally

24   anonymous.  He wasn't named until the government charged him.

25        What was he doing to curry favor with the reporter?  Did

1    he try to use it to try to get a job with the reporter in those

2    five years?  Did he become a big commentator on network TV about

3    national security issues or about the drone program?  He didn't

4    do any of that.  He didn't do this out of vanity.  He didn't do

5    it to curry favor with the reporter.  There's just absolutely

6    nothing to suggest that he did it for self-aggrandizement.  He

7    didn't seek money.  He didn't do any of those things.  He lived

8    anonymously.  And, as the Court can see, he's really deteriorated

9    under the weight of this case.  When he was arrested, he had

10   finally found some stability living as a dishwasher in Nashville

11   at a restaurant.  None of that is consistent with this whole

12   caricature that the government has portrayed, that somebody did

13   this out of vanity or to seek adulation from the public.  It's

14   just made up, Your Honor.

15       The government's only evidence that they used to support

16   that whole theory is these, you know, late night texts to a girl

17   he was seeing or he says "I would like to be a reporter" or

18   things like that.

19       It's just -- it's just made up to go from that to then

20   completely say that everything that Mr. Hale said about why he

21   committed this is false, and there was really just this self-

22   centered attempt to, I don't know, make himself something he

23   wasn't.  He just -- there's nothing in the record to support

24   that, and the fact that the government goes to such great lengths

25   seems to suggest that they agree, if his motivation was following

1   his conscience, that that is somewhat mitigating as compared to

2   other espionage act cases, and we submit it is.  It doesn't make

3   it not a crime, but it's mitigating, as compared to some other

4   cases, and we think it's something the Court should consider.

5       Now, the same goes for this claim that he premeditated

6   this and he sought the job at the NGA just so he could commit

7   this offense.  That could not be further from the truth.  There

8   are several things in the record that can show that to the Court.

9       First of all, if he premeditated this, when he was in the

10  Air Force, he had access then.  He was in intelligence.  He had

11  access.  He had no way of knowing if he would have access when he

12  left.  Even if he sought a job in the intelligence community, he

13  had no idea of knowing what type of access he had.

14      In fact, that job at Leidos he got because he had given

15  his résumé to his landlord at the time who was his former CO.  He

16  didn't even know the landlord had given it to someone at Leidos.

17  He got a call offering him this job.  When he took it, he knew it

18  was just doing maps, unclassified maps relating to China.  He had

19  no idea he would even have what's called a Hi-Fi computer,

20  meaning a computer that allows him access to high level

21  classified information.  He took that job having no idea he would

22  even have that access.

23      And the government makes much of his résumé, the goal

24  written in his résumé.  That's what he was counseled in his

25  pre-separation counseling before he left the Air Force.  You

1    know, you've been in intelligence, this is the kind of thing you

2    can pursue, and they gave him that exact language that the

3    government cites to put in his résumé.

4         So, if he had planned, before leaving the Air Force, to do

5    this, why would he have not used the access he had then, and why

6    would he have waited to a time when he didn't know if he would

7    have access again?

8         In addition to all of that, in addition to all those

9    logical reasons why the Court can see he didn't premeditate it,

10   Mr. Hale has told the Court exactly when he made the decision to

11   commit the offense.  It's in his letter.  He explains the moment

12   that he decided that just speaking generally about the drone

13   program, as he had already done, was not enough, and he felt this

14   deep seeded need to tell more and to explain to the public what

15   was happening in a way -- the only way he could come up with to

16   do so was to commit the offense.  He admits it was illegal.  He

17   knew it was when he did it, but that's when he made the decision,

18   and the Court should credit that, not only because it's

19   consistent with all the evidence, but Mr. Hale, unlike almost all

20   the defendants who are charged with these crimes and all the

21   comparison cases we've cited, he hasn't -- didn't have a separate

22   charge for lying to the government or for obstructing an

23   investigation.  He didn't get an enhancement for obstructing an

24   investigation.  Almost all these other cases did.  And so the

25   government just says he's lying about saying when he came up with

1    the idea to commit this, he actually premeditated that.  They

2    have no evidence that he's lying.  They don't have any history of

3    him lying about committing this offense, but they just want the

4    Court to just throw all that out and assume he's not telling the

5    truth about when he decided to commit the offense.  It wasn't

6    premeditated.  It had to do with what I call this perfect storm

7    that occurred with Mr. Hale shortly after he left the military,

8    in that time when he was processing what he had been through.

9         The fact is he -- Mr. Hale even came into the military

10   with -- unfortunately, with a very difficult background and

11   significant -- and a significant mental health history.  It

12   doesn't excuse the offense, but it explains how we got to this

13   perfect storm in 2014.  He had a very difficult upbringing.  He

14   was poor.  He was in an abusive household with a very strict

15   version of religion enforced in that household, sometimes in

16   violence.  In fact, apparently very often with violence.  That's

17   how he -- and he had been hospitalized.  There were mental health

18   diagnoses before he came to the military, and then he gets to the

19   military in 2009, essentially because he'd always been taught

20   that the military is a way to serve your country and a way to

21   better yourself and maybe open up opportunities that wouldn't

22   have been available, and Mr. Hale didn't have a lot of

23   opportunities and chose to enlist in the military at the height

24   of two wars.

25        Then, early on in his military career before he was put in

1   Afghanistan, the military diagnosed him with these very serious
2   mental health conditions.  They treated him for them, and for
3   some reason they sent him to work in the drone program two years
4   later.  That type of work, it's been known for a long time that
5   exposure to violence and to conduct that a person might think
6   conflicts with their own moral beliefs is something that causes
7   PTSD and causes mental health problems, sometimes that a person
8   deals with for the rest of their life.

9       In this case, Mr. Hale already had a lot of these mental
10  health problems.  They were exacerbated by working in the drone
11  program.  He probably never should have been sent there, but the
12  military knew of his diagnoses and sent him there.

13      Those things clearly exacerbated his underlying mental
14  health issues.  He -- in addition to the PTSD, he already had
15  Dr. Lynch in the VA who said that he has PTSD from his
16  experiences there.

17      After leaving the military, he did want to be a reporter.
18  He wanted to seek education to do that.  He took this job for a
19  short time at Leidos in-between while he was waiting to go to
20  school, but this experience continued to gnaw at him.  There is
21  no question that it was occurring.  Mr. Hale was dealing with
22  what -- it's not his words, it's the VA's terminology -- moral
23  injury from having engaged in conduct that he believes was
24  contrary to his very strict views of what's right and wrong.  He
25  believed he was participating in killings of civilians where the

1    government, A, had insufficient information about who they were

2    killing, and, B, was improperly classifying a lot of those killed

3    as not collateral damage but as combatants, and that ate at him,

4    and that's now, of course, well-established, not only that that

5    happens from those who participate in war, but particularly the

6    drone program.

7         As Dr. Lynch explains, the military wasn't doing a very

8    good job back in 2013 at recognizing that, particularly with

9    people involved in the drone program, but they've since improved

10   and they've begun to recognize it and treat it much more than

11   they were back then.  But Mr. Hale didn't get any of that.  He

12   was just released and told to write up a résumé to go work as a

13   government contractor.  And this, as I said, continued to gnaw at

14   him, and this is not an unusual thing.

15        Mr. Hale has received, as the Court alluded to, lots of

16   support from the veteran community because -- from veterans

17   themselves and from relatives of veterans because they've seen

18   their own family members or themselves go through this sort of

19   moral reckoning after returning from engaging in this sort of

20   conduct.

21        Now, not all of them do what Mr. Hale did.  Mr. Hale

22   accepts responsibility for having broken the law -- he pleaded

23   guilty -- but it's relevant to how he got there.  Not all of them

24   had the perfect storm of events leading up to what they did

25   either.  But that's how -- that's the sequence of events that led

 1   to the offense.

 2         And lastly, Your Honor, I would like to talk briefly about

 3   these comparison cases.  A couple things.  First, of course,

 4   particularly when you get outside of this district, the cases are

 5   all over the map, and it's hard to make any sense of them.

 6   General Petraeus, of course, that was some of the most sensitive

 7   information that could ever be disclosed.  He just carelessly

 8   left it in his house and gave it to his biographer, and he got a

 9   misdemeanor.

10         Others who simply retained information in their home that

11   were low-level employees have gotten, as the government points

12   out, as long as nine years just for keeping it in their basement.

13   Again, this is all outside of this district.

14         Now, those cases where people got those kinds of sentences

15   were either before *Booker* when the Guidelines were mandatory or

16   very shortly after *Booker*, and we don't know all the facts of the

17   cases, but the point is, when you look at the cases in this

18   district, there's a lot more consistency.

19         There's not only Mr. Sterling, a sentence that the

20   government criticizes, but Mr. Kiriakou, a sentence the

21   government agreed to, which is a lower sentence.  They criticized

22   the *Sterling* sentence.  They criticized Judge Brinkema for that

23   sentence not accomplishing deterrence.

24         Then they get another defendant committing a similar

25   offense with a higher Guideline range than Mr. Hale who

1    obstructed the investigation, and they agreed to a 30-month

2    sentence in that case.

3          Now they say that the sort of longer sentence imposed in

4    *Sterling* was too short to accomplish deterrence, so Your Honor

5    has to do that on Mr. Hale, even though they agreed to a lower

6    sentence in a case after Sterling for a person with a higher

7    Guideline range than Mr. Hale.  It doesn't make any sense.  The

8    Government points to what they say are the two most recent cases

9    involving disclosure.  They're not the two most recent.  The most

10   recent is more recent than either of those.  It's from this

11   district, the *Frese* case, which was more recent than either of

12   those, and received a 30-month sentence as well.

13         Now, there was a 5K in that case, but it started with a

14   Guideline range of 50 percent higher than Mr. Hale.  So, even

15   with a 5K, going all the way down to a 30-month sentence, is

16   dramatically below the Guidelines.

17         But the government's agreement to these lower sentences

18   isn't just from Kiriakou, it's happened repeatedly.  In the *Kim*

19   case in D.C. they agreed to 13 months, and that was a high-level

20   State Department employee disclosing top secret and SCI

21   information.

22         Of course, we already talked about Mr. Petraeus.  They

23   agreed to a misdemeanor.  General Cartwright, the executive

24   branch determined he shouldn't even be prosecuted.  Scooter

25   Libby, the executive branch determined no time in prison was

1   necessary.  Some of those weren't the DOJ, but they were all the

2   executive branch.

3          So, to do all of that and agree to 30 months and ask the

4   Court to impose 30 months in Kiriakou and ask this Court to

5   impose 48 months for Mr. Schriver, whose offense, even though it

6   wasn't completed, was a categorically worse offense.  He

7   conspired with an adversarial government for three years to try

8   to steal classified information, and they agreed to a four-year

9   sentence in that case before Your Honor.

10         So, for them to agree to all of those sentences and then

11  say, but, you know, the 42 months given to Sterling was way too

12  low to accomplish deterrence, you need to now accomplish

13  deterrence on Mr. Hale's crime, is just not fair.

14         The government has not been consistent in these cases, but

15  we submit that when you look at the cases in this court where

16  people who have leaked to the media have gotten between 30 and 42

17  months, all of which we believe include more aggravated conduct

18  than is present here and don't involve some of the mitigation

19  present here in terms of Mr. Hale's military service and the way

20  that military service exacerbated underlying mental health

21  conditions and contributed to the offense conduct.

22         So, all of those things put together, we would submit,

23  suggest a lower sentence on these facts, and we do think that 12

24  to 18 months is sufficient, and that giving a sentence longer

25  than imposed in those cases would create unwarranted disparities.

1    So I would ask the Court to impose a sentence no longer than 18

2    months.

3         THE COURT:  All right.  Thank you, Mr. Richman.  Do you

4    want to reply, at least to the disparate argument?

5         MR. KROMBERG:  Just for a minute, Judge.  Mr. Richman said

6    that Mr. Hale was living anonymously.  Well, that might have been

7    because his house was searched in August of 2014, his last day of

8    work at NGA, so he knew that we had some information about him at

9    that point.  And he didn't live that anonymously because he did

10   appear in a movie, the National Bird movie, where he appeared to

11   be proud of being a leaker.

12        As far as whether this case is how it stands on the

13   spectrum, I think Mr. Richman pointed out that we make an

14   individualized assessment.  I wasn't involved in the *Kiriakou*

15   case, but I'm confident that the reason that the government made

16   the recommendation it did in *Kiriakou* is because of the facts of

17   that case, and I think that Mr. Richman should accept that the

18   reason that the government is asking for a significant sentence

19   in this case is because of the facts of this case.

20        In this case, Hale did not in any way add to the public

21   debate about how we fight wars.  The only thing he accomplished

22   was to endanger those who were doing the fighting.  Thank you.

23        THE COURT:  All right.  Thank you.  Mr. Hale, please come

24   to the podium, sir.  I've read your letter, of course, and we

25   have spoken many times over the last year or more, and I'll hear

1    anything that you would like to say that you may have, with the

2    advice of counsel.

3         You pled guilty, but you may have certain rights to appeal

4    the sentence that I impose or other matters that were done

5    pretrial, so speak with your counsel about that.  And you must

6    file any appeal in a timely fashion, as Mr. Richman or Ms. Mertz

7    will indicate, but I'll hear anything that you would like to say

8    at this time, sir.

9         THE DEFENDANT:  Your Honor, I have written here

10   approximately six pages of -- I guess you would call it a speech

11   that I would like to give to the Court, if you will permit me to.

12        THE COURT:  Absolutely.  Go ahead.

13        THE DEFENDANT:  Well, first, if I may ask my counsel to

14   please take a seat so that they can -- if that's all right.

15        (Counsel continued to stand.)

16        THE DEFENDANT:  Okay.  I'm sorry.  I feel uncomfortable

17   with them standing behind me, if it's all right.  I just wanted

18   to open up with a thank you to the paralegals, social workers, in

19   terms of the Federal Public Defender's Office, for their tireless

20   work on my behalf; a special thanks to Todd Richman and

21   Ms. Cadence Mertz whose angelic patience and sage counsel has

22   shepherd me every step of the way through this process.  Yours is

23   a thankless job, and I seldom have been able to find the words to

24   express my gratitude.  But, from the bottom of my heart, thank

25   you.  It's been the honor of my life to have you represent me in

1    this case.

2          I would also like to address the Court to thank its many

3    clerks, officers, those of the pretrial and Probation Office, His

4    Honor for hearing this matter now going on 27 months since I

5    first appeared.

6          I would also like to thank the government, Mr. Kromberg

7    Ms. Smith, Mr. Berrang, and Special Agent Pino.  I owe you all a

8    sincere debt of gratitude.  Were it not for your steadfast

9    pursuit of justice in resolving this case, I might have given up

10   on the belief that brought me down this path to begin with.  A

11   better world is possible.

12         To my family, I love you.  To those members of the public

13   who are present today, do not look upon me with pity.  Do not

14   worry.  Have courage and take heart of hope.  Though it may be a

15   long day's journey into night, midnight is passing, and joy

16   cometh in the morning.

17         Your Honor, the rest of this is just my speech.  May I

18   proceed?

19         THE COURT:  Yes, sir.

20         THE DEFENDANT:  The following is read in remembrance of

21   those post-9/11 veterans who served honorably in the face of

22   impossible odds.  All gave some, some gave all.  And a special

23   dedication to my long lost friend, Jacob George, who, despite the

24   bigness of his heart, could not bear the burden, the weight of

25   having, you know, former -- I can't see -- sent to kill other

1    farmers in a foreign land.  Only the dead have seen the end of

2    war.  May they forever rest in peace.

3         Your Honor, Judge Liam O'Grady, my nickname is Daniel

4    Everett Hale.  It was passed down to me by my father, to him his

5    father's father, and so on, going back to the theologian writer

6    Edward Everett Hale.  Edward was a Massachusetts-born columnist

7    for the Atlantic Monthly Newspaper writing about issues of

8    abolition and slavery during the pre-Civil War era.  He was also

9    the grand nephew of revolutionary war hero Captain Nathan Hale.

10        Nathaniel, of course, is well-known for having been

11   executed in his efforts to spy on British troop movements in

12   support of General George Washington's rebel Army as they fought

13   to free the states of colonial rule.

14        Denied clergy, he was given only the chance to speak his

15   peace before left to hang three days in a public square as a

16   warning to other would be saboteurs.  It bears mentioning that

17   under certain circumstances an act of espionage is still

18   punishable by death in this country today.

19        The day after I pled guilty to a violation of the

20   Espionage Act, I took a lonely cycle ride towards the capitol to

21   clear my head in search of the statue honoring Captain Hale's

22   sacrifice.  I wish I could say that I wasn't surprised to find it

23   located next to the John F. Kennedy Department of Justice

24   building, but there it was, exactly where it belongs.

25        I asked a reluctant security guard to take my photo of the

1    statue of Nathan behind me, told him thank you, to which he

2    responded with a shrug and went about his day.  A short ways from

3    there, I came to be at the Lincoln War Memorial Park.  The park

4    was alive and bustling that day with people speaking different

5    languages coming to and fro from across the country and around

6    the world.

7         Of the many awe-inspiring commemorative monuments

8    surrounding the Reflecting Pool, I believe the Vietnam War

9    Memorial to be the most striking because of its straightforward

10   simplicity.  The more than 58,000 names of every American killed

11   in action etched into a 400-foot granite wall stands as a

12   testament to the completion of a war and our nation's commitment

13   to never forget the fallen.

14        By contrast, were it also to include the name of every

15   Viet person killed, would require it to be another four miles

16   long.

17        Curiously, there's still no monument to commemorate the

18   end of the Iraq war.  I often wonder how I will remember it, and

19   with the draw down of troops in Afghanistan looming, I wonder how

20   we'll remember it as well or if we intend to at all.  What I

21   remember best about Afghanistan is the endearing spirit of its

22   people.  I think of the farmers in their poppy fields whose daily

23   harvest will give them safe passage from the warlords who will in

24   turn trade it for weapons before it is synthesized, repackaged,

25   and resold dozens of times, until it finds its way into this

1    country and then into the broken veins of our nation's next

2    Opioid victim.

3         I think of the women who, despite living their entire

4    lives never once allowed to make so much as a choice for

5    themselves, are treated as pawns in a ruthless game politicians

6    play when they need justification to further the killing of their

7    sons and husbands.  And I think of the children whose bright-eyed

8    dirty faces look to the sky and hope to see clouds of gray,

9    afraid of the clear blue days that beckon drones to come carrying

10   eager death notes for their fathers.

11        Your Honor, Judge Liam O'Grady, I oppose drone warfare for

12   the same reason that I oppose the death penalty.  I believe

13   capital punishment to be an abomination and an all-out assault on

14   common decency.  I believe it's wrong to kill no matter the

15   circumstance.  Yet I believe that it is especially wrong to kill

16   the defenseless.

17        And in spite of what the Supreme Court has ruled, I

18   believe there is simply no way in which a person can be killed

19   that is not cruel and unusual.  If anyone here is still not

20   convinced of this, then they must ask themselves first if they

21   believe that the four percent of death row inmates exonerated

22   after the fact is an acceptable price to pay.  I don't.

23        No person should have to die for a crime that they did not

24   commit, just as no person should have to live with the burden of

25   having taken a poor, defenseless, innocent life; no soldier

1    carrying out his duties nor judge theirs.

2          When it comes to the drone program, the disparity between

3    the guilty and the innocent killed is incalculably higher.  In

4    some cases, as many as 9 out of 10 individuals killed are not

5    identifiable.

6          In one particular instance, the American born son of a

7    radical imam, an American imam, was assigned a Terrorist

8    Identities Datamart Environment or TIDE Personnel Number, tracked

9    and killed in a drone strike along with eight other members of

10   his family as they ate lunch together a full two weeks after his

11   father was killed.

12         Asked about why 16-year old Abdul-Rakhman, TIDE Personnel

13   Number 26350617, needed to die, one Whitehouse [sic] official

14   said he should have had a better father.

15         While deployed to Afghanistan, I was exposed to similar

16   ways of thinking to distract myself from the true nature of my

17   actions.  As one drone operator put it, do you ever -- excuse

18   me -- do you ever step on ants and never give it another thought?

19   That's what you're made to think of the targets.  They deserved

20   it.  They chose their side.  You had to kill a part of your

21   conscience to keep doing your job, ignoring the voice inside

22   telling you this wasn't right.

23         I, too, ignored the voice inside, as I continued walking

24   blindly towards the edge of an abyss.  And when I found myself at

25   the brink ready to give in, the voice said to me, You, who had

1   been a hunter of men are no longer.  By the grace of God you've

2   been saved.  Now go forth and be a fisher of men so that others

3   might know the truth.

4        So I ran to the press with documents in hand, not one more

5   nor one less than necessary to dispel the demonstrable lie that

6   said drone warfare keeps us safe, that our lives are worth more

7   than theirs, and that only more killing would bring about certain

8   victory.

9        Simply put, it is wrong to kill.  It is specially wrong to

10  kill the defenseless, and its an abdication of the Bill of Rights

11  to kill without due process of law.

12       Your Honor, much has been said about the potential,

13  serious, or exceptionally grave harm that was brought about due

14  to my actions.  But since no evidence of this fact has been

15  materialized in all the years since my criminal investigation

16  began, it might appear to an outsider looking in that such claims

17  are yet another example of a boy crying wolf.  But, in wishing to

18  settle the matter myself, I might have uncovered one instance

19  where my actions did contribute towards one of the most severely

20  grave attacks in our nation's history.

21       At 2 a.m., July 22nd, 2016, a lone gunman entered an

22  Orlando nightclub and proceeded to kill 49 people in what became

23  the most deadly mass shooting in American history up until that

24  time.

25       In a 9-1-1 call, the gunman stated, "They need to stop

U.S. Air strikes, okay.  This went down because a lot of innocent people, women and children, are getting killed in Syria, Iraq, and Afghanistan."  The gunman, Omar Mateen, was killed by police three hours after his bloody homicidal rampage began.

It goes without saying, Omar Mateen was a deranged homicidal lunatic who could in no way justify the killing of those 49 people that evening.  Tragically, this is a story all too common in American life today.  A maniac believes himself aggrieved and unheard with easy access to a gun.

What is unique to this case, however, is that the gunman's stated motives, though it is in no way an excuse for his heinous crimes, it is impossible to deny that air strikes in the Middle East have often dismissed innocent people as collateral damage for the safety and security of the United States.

When I consider my own participation in the drone program, I worry that my past actions will have given provocation to would be terrorists such as Omar Mateen to carry out their vengeful fantasies.  In that sense my actions have contributed greatly to the potential harm, or to use the CIA's term, blowback.

I'm left to wonder, if only I had had the courage to come forward sooner with my disclosures, could I have prevented such a tragic loss of life?  Of course, there's absolutely no way of absolutely knowing anything, but I wonder sometimes if Omar Mateen had seen someone accept responsibility and show remorse for their part in the war, would it have reached the part of his

1    heart that still held onto a shred of humanity.  Maybe he and his

2    49 other defenseless innocent victims would be alive today.

3         Nevertheless, I'm here to answer for my own crimes, not

4    that of another person.  It appears that I am here today to

5    answer for the crime of stealing papers, for which I expect to

6    spend some portion of my life in prison, but what I'm really here

7    for is having stolen something that was never mine to take,

8    precious human life, for which I was well-compensated and given a

9    medal.

10        My consequential decision to share classified information

11   about the drone program with the public was a gesture not taken

12   lightly, nor one I would have taken at all if I believed such a

13   decision had the possibility of harming anyone but myself.  But

14   it's because I could no longer live with myself in a world where

15   people pretended that what's happening isn't happening.  So I

16   acted not for the sake of self-aggrandizement, but that I might

17   some day stand before you and humbly ask for forgiveness.  So

18   please, I beg you, Your Honor, please forgive me.  The taking of

19   papers, as opposed to the lives of others, I could not, God so

20   help me, have done otherwise.

21        It may have been that my ancestor, Captain Nathan Hale,

22   was not a particularly good spy.  And, in fact, most historians

23   note that what he was able to provide was nothing of value in

24   winning the war, but it is said that his defiant and courageous

25   stance in the face of death was an example for British troops to

1    take heart and take heed of the seriousness with which Americans

2    take their liberty and demand it at all costs.

3         Your Honor, I do not know what a proper punishment is for

4    deterrence in this case, and in some ways I can't concede that

5    there simply is no punishment high enough to deter Americans from

6    doing what they feel is necessary because throughout history I've

7    been shown time and time again there is no shortage of persons

8    willing to sacrifice everything so others might live dignified

9    lives in a just peace under the law, but this has been going on

10   for seven years of my life, and it has torn me up inside.

11        I have nearly given in more times than I can count.  I

12   don't even know how I made it here.  I don't want to go to

13   prison, but I understand that crime deserves a punishment, and

14   I'm not above the law.  I only ask that you please consider that

15   I'd like to have my life back.  I would like to begin to heal

16   again.  I want to start a career.  I want to be able to own a

17   home.  I want to feel like I'm part of a community, and, if I'm

18   lucky, maybe a family.

19        Your Honor, no matter what happens today, my only regret

20   will be that I have but this one life to give in the service of

21   my country.  I can serve it here or within prison walls.  It

22   makes no difference.  Thank you, Your Honor.  I beg you, please

23   have mercy and leniency on me.

24        THE COURT:  All right.  Well, thank you for that.  And

25   I've read the many letters of persons who are certainly concerned

1    about your freedom, consider you to be a hero.  One, that you're

2    courageous and principled, and much of what you've done over the

3    last number of years is just that.  It is courageous and it is

4    principled, but you're not being prosecuted for speaking out

5    about the drone program injuring and killing innocent persons,

6    and you're not being prosecuted for your interviews with Code

7    Pink or the documentary or the other appearances that you've made

8    where you've disclosed the injustice of the drone program and how

9    morally unconscionable it is in hurting those people; you're

10   being prosecuted, as your counsel stated, because you took a

11   bludgeon and not a scalpel to documents that you accessed and

12   violated your position of trust in acquiring and then

13   disseminating to --

14          (Following discussion sealed by order of the Court.)

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████

19   ████████████████████████████████████████

20          (Previously sealed discussion concluded.)

21          MR. KROMBERG:  Your Honor, this would be

22   classified information that --

23          THE COURT:  I'm sorry.  Is that classified?

24          MR. KROMBERG:  May we approach?

25          THE COURT:  That general statement?  Yes, you can

1    approach.

2         (Following sidebar discussion had on the record but sealed

3    by order of the Court:)

4    ████████████████████

5    ██████████████████████████████████████

6    ███████████████████████████████████████

7    █████████████████████

8    ████████████████████████████████████████

9    ████████████████████████████████████████

10   ██████████████████

11        (Previously sealed discussion concluded.)

12        THE COURT:  All right.  Thank you.  The documents that we

13   discussed earlier this morning are all documents which are not

14   focussed on the drone program as it relates to injuring and

15   killing innocent persons; instead, was information that was

16   important to national security matters way beyond the drone

17   program, and at times completely unrelated to the drone program,

18   but instead really put the national interests of the government

19   in fighting terrorists organizations -- compromised it.

20        Now, we've talked about whether there was actual harm or

21   causation -- intentional harm.  Clearly the information that you

22   imparted was important information and included national security

23   information and would not in any way further your goal of

24   identifying the drone program, which everyone has admitted was

25   already known about, in a focused manner that you have discussed

1    previously and discussed today, and instead it was information

2    harmful generally to the military and to the government and

3    potentially could be used to defeat efforts in Afghanistan and

4    Iraq and other locations around the world.  So that is what

5    brought you here.

6        I am just like the majority of Americans who commend you

7    for coming forward and disclosing your personal experiences about

8    the breadth of the drone program and the persons who were injured

9    or killed who were innocent bystanders.

10       So that's what I consider that you have pled guilty to and

11   that brings you here, and that's why the Guidelines are 87 to 108

12   months, because of the seriousness of the offense.  You could

13   have been a whistleblower and garnered all this admiration

14   without taking any of these documents, frankly, but you carefully

15   selected these documents over a four-month period.  You may not

16   have known how important some of those documents were, but you

17   clearly understood the importance of many of the documents.  You

18   took them over a four- or five-month period.  I think you were

19   motivated because of your conscience, but I also think that you

20   were motivated by a desire to please the journalists who you had

21   been meeting with and communicating with.

22       Mr. Richman, of course, thinks there's no moment to the

23   communications that you made, but, you know, "I totally get off

24   on being a serious journalist who covers important issues in a

25   critical way," stating that "most journalists are super out of

1   shape and have no social life because they are so devoted, but I

2   look up to them like rock stars, I guess to be a journalist and

3   speak truth to power and have great sex all the time and make

4   enough to live, but not too much that I become part of the upper

5   crust" clearly was on your mind as you communicated with your

6   friends about life as a journalist.

7        And I think that -- your having spent time with those

8   journalists and their having made that impression on you, that

9   they inspired you to obtain these documents, and then, of course,

10  you did so, and then the journalists were presented with secret

11  and top secret documents, and they had to know that you were

12  facing almost certain prosecution.  But they went forward with

13  doing what they did, and this, of course, is where the

14  intersection of the First Amendment and our freedoms and advocacy

15  and responsible journalism cross, and it's a really difficult

16  area, but you are facing the consequences of that today, and

17  there were other alternatives for you.  You could have resigned

18  from the military.  You could have made your objections back when

19  you were in the Air Force and told your commanders that you

20  weren't going to do this anymore.  And I understand why you -- I

21  think I understand, given your mental health at the time, why you

22  did not do that, but you also could have -- as you've worked with

23  journalists -- without the national security documents to

24  identify the program and bring out public outrage to the

25  community and work that way, and you chose not to do that.

```
1          So the crime is a serious crime, and there's no way to
2    minimize it.  So you're 33 now.  You've lived a very difficult
3    life.  I was -- I don't know if you read the letter that your
4    father wrote to me, but it is so lacking in substance or any
5    admission of wrongdoing; some contrition, but not much more.  But
6    it didn't in any way represent the difficult upbringing that you
7    have had.  The psychological assessment clearly identifies the
8    history of your depression and your PTSD.
9          As Mr. Richman points out, the report identifies the
10   military's inexcusable decision to allow you to participate in a
11   drone program, as they knew of your psychological instability.
12   And even their tepid attempt to help you after your return to the
13   states was a horrible injustice to you.
14         And then, of course, you suffered great anxiety and
15   depression since you were arrested, and you've been waiting for
16   this day for a long time.  You should certainly be given credit
17   for the amount of work that you did to raise the public's
18   knowledge about the innocent persons being killed in this drone
19   program.  You also should be given credit in the sentence that I
20   impose for the multi-year odyssey where you waited for indictment
21   and then the pandemic delay as well.  I know it's taken a toll on
22   your mental health.
23         So, looking at the 3553 factors as I must, I don't think
24   there's -- we've discussed the seriousness of the offense.  I
25   don't think there's a need to deter you personally in the future
```

1    from committing an offense like this because you'll never be in a

2    position to do so, but there's a significant need to deter others

3    from disclosing national security information, and my sentence

4    must consider that.

5         The parties have identified past sentences and possible

6    disparities, and I've considered and looked at closely the cases

7    that concern the leaking of classified information versus the

8    true espionage activities of giving information to an enemy

9    state, and there's a lack of congruity there, but I've looked at

10   them and considered them carefully.

11        So I don't think a Guideline sentence is necessary under

12   the Guidelines, but I think a sentence, a substantial sentence is

13   necessary under the 3553 factors and for the reasons I've just

14   stated.

15        I'm going to sentence to you 45 months of incarceration,

16   three years of supervised release, a hundred dollar special

17   assessment.  I'll not impose a fine or costs, because I find

18   you're unable to afford them.  I'll give you credit for the time

19   you've been incarcerated awaiting sentencing.

20        As special conditions of supervised release, I'll require

21   you to participate in a program approved by the Probation Office

22   for substance abuse, as well as mental health treatment.  I'm

23   going to recommend that the Bureau of Prisons send you to Butner

24   for a medical evaluation before you're designated to any other

25   facility.

```
 1              Do you have a request for a designation, Mr. Richman?

 2              MR. RICHMAN:  Just the Mid-Atlantic region, Your Honor.

 3      Just this region, Your Honor.

 4              THE COURT:  Northern Virginia region?

 5              MR. RICHMAN:  Correct.

 6              THE COURT:  All right.  You're a young man who's got a

 7      great potential in the future.  You're bright.  You've told me

 8      today that you're interested in getting better and in living a

 9      life where you contribute to your community as a spokesperson,

10      perhaps.  I don't know whether you'll be involved in journalism

11      in the future, but I certainly think that you should follow your

12      passion and that good things will come of it.  I know this is in

13      your mind a long sentence, but I hope that it passes quickly.  I

14      hope that you make good use of the time you're at the Bureau of

15      Prisons, whether it's involved in working on a trade for

16      employment purposes or working on your mental health, but you

17      have -- I hope you'll have the opportunity to do that, and I hope

18      you'll take advantage of it, and I hope that you come out

19      determined to live a law-abiding and active life and follow your

20      passion, and I wish you the best, sir.

21              THE DEFENDANT:  Thank you, Your Honor.

22              THE COURT:  Anything else?

23              MR. RICHMAN:  (Shook head negatively.)

24              MR. KROMBERG:  No, thank you, Your Honor.

25              MR. RICHMAN:  Your Honor, the other counts are still
```

1    pending.  We, of course, think the Speedy Trial Act has passed.

2    We were ready to go to trial on them before and the government

3    didn't want to.  I would ask the Court to dismiss them with

4    prejudice.

5          THE COURT:  What's your position?

6          MR. KROMBERG:  We have no objection to the dismissal, Your

7    Honor.

8          THE COURT:  All right.  The other counts will be dismissed

9    with prejudice, then.

10          MR. RICHMAN:  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you all for the long and

12    hard work that you did on getting this case here to this point.

13    All right.  We're in recess.

14          (Proceedings adjourned at 12:27 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **C E R T I F I C A T E**

5

6              I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
7       proceedings in the above-entitled matter.

8        /s/ Scott L. Wallace                12/15/21
         ----------------------------    ----------------
9        **Scott L. Wallace, RDR, CRR**            **Date**
           **Official Court Reporter**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25